**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHERYL A. HARRIS, Co-Administratix | ) | |
| of the Estate of RYAN D. MASETH, | ) | |
| deceased, and DOUGLAS MASETH, | ) | |
| Co-Administrator of the Estate of RYAN | ) | |
| D. MASETH, deceased, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-563 |
| | ) | Judge Nora Barry Fischer |
| KELLOGG, BROWN & ROOT | ) | |
| SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

## I.  INTRODUCTION

In this action, the Court must determine whether wrongful death and survival claims by

Cheryl A. Harris and Douglas Maseth, executrix and executor of the Estate of Staff Sergeant Ryan

D. Maseth ("Plaintiffs") against Defendant Kellogg, Brown & Root Services, Inc.[1] ("Defendant" or

"KBR") present non-justiciable political questions or if such claims are preempted by the

"combatant activities" exception to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(j).

---

[1]

KBR is headquartered in Houston, Texas and "is a leading global engineering, construction and services company supporting the energy, hydrocarbon, government services and civil infrastructure sectors." http://www.kbr.com (last visited 3/30/009).  KBR's website also proclaims that it "has built a proud history and a leading market position in the government and infrastructure sectors by being a low-cost, high-efficiency and absolutely reliable service provider. Not only is KBR the largest contractor for the United States Army and a top-ten contractor for the U.S. Department of Defense, it is currently the world's largest defense services provider." http://www.kbr.com/corporate/index.aspx (last visited 3/30/09).

Staff Sergeant Maseth, an Army Ranger and Green Beret serving with the 5th Special Forces Group (Airborne) of the United States Army, tragically died on January 2, 2008 after a water pump short circuited, causing him to be electrocuted while showering at a military base in Baghdad, Iraq. KBR, a private military contractor, provided operations and maintenance services at that base pursuant to a contract with the Army. Plaintiffs' claims allege that KBR's negligence proximately caused Staff Sergeant Maseth's death.

Pending before the Court is a motion to dismiss pursuant to Rule 12 of the Federal Rules of Civil Procedure filed by KBR. (Docket No. 18). The Court has permitted the parties to conduct limited discovery related to the issues raised in KBR's motion to dismiss. Upon consideration of the present record and based on the following, the Court finds that Plaintiffs' claims neither raise non-justiciable political questions nor are they preempted by the combatant activities exception to the FTCA. Accordingly, KBR's Motion to Dismiss [18] is DENIED.

## II.  FACTUAL BACKGROUND

A.  *Factual Background Established During Limited Discovery*[2]

1.  United States Army LOGCAP Program

In 1985, the United States Army issued Army Regulation 700-137 and thereby instituted the Logistics Civil Augmentation Program ("LOGCAP"), authorizing the use of "civilian contractors to perform selected services in wartime to augment Army forces." U.S. Army Reg. 700-137, at 1-1 (Dec. 16, 1985). The Regulations establish the "policies, responsibilities, and procedures" related to the Army's authorized use of civilian contractors in peacetime and wartime support operations, both in the continental United States and overseas. *Id*. at 1-1; 2-1.

---

[2]

*See* § IV, Limited Discovery, *infra*.

The Regulations also recognize the importance of the use of civilian contractors in support of the Army's operations, explaining that the "[u]tilization of civilian contractors in a theater of operation will release military units for other missions or fill shortfalls." *Id.* However, the Army explicitly identifies in its Regulations that the "use of civilian contractors versus U.S. military personnel involves a higher degree of risk" because the performance of such contractors "cannot be accurately predicted." *Id.* at 2-4.

### 2.     Invasion of Afghanistan and Iraq

"Following the terrorist attacks of September 11, 2001, the United States led a military invasion of Afghanistan and, later, Iraq." *Lane v. Halliburton*, 529 F.3d 548, 554 (5th Cir. 2008). In support of these missions, the United States Army engaged certain civilian contractors to provide services in Afghanistan and Iraq under the LOGCAP program, including Brown & Root Services, Inc., now known as Kellogg, Brown & Root Services, Inc., which was awarded the LOGCAP III[3] contract with the United States Army on December 14, 2001.

At some point during the invasion of Iraq, a military base was established outside of Baghdad named the Victory Base Complex ("VBC"). (Docket No. 122-6 at ¶ 2; Docket No. 122-7 at ¶ 5). The VBC "includes fourteen distinct military base camps" as well as Baghdad International Airport. (Docket No. 122-7 at ¶ 5). Within the VBC, the military controlled all decisions with respect to "where to house soldiers, where to station headquarters and command centers, and which

---

[3]

KBR produced the LOGCAP III base contract as well as several versions of Task Order 139 issued thereunder to the Court under a letter dated September 23, 2008. The applicable provisions of both the contract and Task Order 139 are further detailed below as they are necessary to this Court's ruling.

existing hardstand[4] buildings to use as living quarters." (Docket No. 122-7 at ¶ 7). Many of the buildings in the VBC were pre-existing Iraqi structures with substandard electrical systems that needed to be upgraded by military personnel or government contractors. (Docket No. 122-7 at ¶¶ 6-8). These types of upgrades consisted of services that were outside of the scope of the LOGCAP III contract. (Docket No. 122-7 at ¶ 8). As the buildings were located in a war zone, they were also persistently under attack by mortar, missile and small arms fire. (Docket No. 122-7 at ¶ 3).

One of the base camps located within the VBC is the Radwaniyah Palace Complex ("RPC"). In its function as a military base, the RPC "serves as the headquarters for Combined Joint Special Operations Task Force personnel operating in Iraq." (Docket No. 122-6 at ¶ 7; Docket No. 20-2 at 5; Docket No. 23-2 at 2). The military "has overall responsibility for, and authority and control of, the activities and operations that take place at the RPC." (*Id*.). The RPC was built by the Iraqis during the regime of Saddam Hussein and consists of more than 100 separate buildings. (Docket No. 20-2 at 5; Docket No. 23-2 at 2; Docket No. 122-2 at 4, p. 98). Like the VBC generally, the military controlled and decided in which buildings soldiers were housed at the RPC. The military personnel that have presented the Court with sworn declarations or given deposition testimony in this matter have intimated that it was well known within the military that the buildings in the VBC and RPC did not meet Western construction standards and that there were deficiencies in the electrical systems, including a lack of proper grounding. (Docket No. 23-2 at 2; Docket No. 122-2 at 3, p. 62, 12, p. 206; Docket No. 122-6 at ¶ 4). Despite the presence of known substandard

---

[4] The term "hardstand buildings" as used herein describes the pre-existing structures that were present in Iraq prior to the invasion of that country by the United States. These buildings were not constructed by the United States military. This term is used to contrast those buildings from any prefabricated or other buildings that may have been erected by the United States after the occupation.

electrical systems, the military made a decision to house soldiers in these buildings as safer than manufactured housing, given the risk of mortar attacks and shelling.

Due to its size, the RPC was divided into compounds or areas. One such area was known as the Legion Security Forces Compound ("LSF").[5] (Docket No. 23-2 at 3; Docket No. 35-2 at 3). Staff Sergeant Maseth was housed in one of the buildings within the LSF, known as LSF-B1. (Docket No. 122-6 at ¶ 6).

### 3. LOGCAP III Contract[6]

The military also made a decision to engage KBR to provide maintenance services at the RPC pursuant to its LOGCAP III contract with the United States Army and Task Order 139 issued pursuant thereto. The LOGCAP III base contract, Contract No. DAAA09-02-D-007, references the applicable statutes and regulations or portions thereof including various Army Regulations, Federal Acquisition Regulations ("FAR") and Defense Federal Acquisition Regulations ("DFAR"). As this document is a general contract designed to govern a wide range of supplies to be provided and services to be rendered by KBR, no specific supplies or services are outlined therein. Section I-215

---

[5]

During oral argument, KBR presented the Court with several overhead photographs of the RPC to demonstrate its size. Due to the sensitive nature of these photographs, and per agreement of counsel for the parties, these photographs have been placed under seal. (Docket No. 58).

[6]

The Court notes that it has not been provided with information as to the circumstances regarding the negotiations and drafting of the contract and, therefore, cannot apply standard construction and interpretation doctrines to the contract and related documents at this time. However, the following provisions of the Code of Federal Regulations are referenced in the general contract: 48 C.F.R. 252.233-7001 Choice of law (overseas)("This contract shall be construed and interpreted in accordance with the substantive laws of the United States of America."); 48 C.F.R. 52.246-25 - Limitation of Liability - Services; 48 C.F.R. 52.247-21 Contractor Liability for Personal Injury and/or Property Damage; 48 C.F.R. 52.228-7 Insurance--Liability to Third Persons; 48 C.F.R. 52.228-5 Insurance--Work on a Government Installation.

of the base contract provides, in part, that "any ... services to be furnished under this contract shall be ordered by the issuance of ... task orders." (*LOGCAP III contract*, § I-215). In addition, the base contract specifies the applicable provisions of the Statement of Work ("SOW"), Attachment 001 to the base contract, that also govern the relationship.

4.    <u>LOGCAP III Contract - STATEMENT OF WORK</u>

The SOW attached to the base contract generally describes the LOGCAP program, the divisions of the United States Army that are responsible for oversight of the program, compliance and documentation requirements for the contractor as well as performance assessment standards. Like the base contract, the specific services to be performed by the contractor are not set forth in the SOW, which also provides that "[a]ll work to be performed shall be awarded by individual task orders." (*LOGCAP III contract, Statement of Work* at § 1.3). However, several provisions contained in the SOW are pertinent to the instant matter. Section 1.11 of the SOW clearly describes the relationship between the parties and establishes that the contractor maintains control over its employees, while the Army is responsible for managing and ensuring the contractor's compliance with the terms and conditions of the agreement. (*Id*. at 1.11). Specifically, section 1.11 provides that:

> **1.11 Contractor/Government Relationships.** The relationship of the Contractor and the U.S. Army shall at all times be that of independent Contractor. *The Contractor shall have exclusive supervisory authority and responsibility over employees. The government shall manage the contract but will not exert control or supervision over contractor employees.*

(*Id*. (emphasis added)). In addition, the base contract also delineates that the contractor is responsible for the quality of its services and has control of the coordination of all aspects of its performance, as agreed by the parties at paragraph 1.14:

6

> **1.14  Quality Control.**  *The Contractor will be responsible for* the *quality*, technical, logistical and financial accuracy, and *the coordination of all aspects of performance.*

(*Id*. at § 1.14 (emphasis added)).  The Army demands that the contractor strictly comply with the terms and conditions of the LOGCAP III contract. This is exemplified in section 7.0, which provides that:

> **7.0 Government Directives and Applicable Documents.**
>
> **7.1 General.**  The Contractor is obligated to follow and adhere to the Governing directives and applicable documents as listed in the contract and the SOW.  Supplements or amendments to those documents shall be considered to be in full force and effect upon receipt by the Contractor, except when such document is deemed to cause an increase or decrease in the cost of contract performance.  In such event, the Contractor shall inform the Contracting Officer in writing prior to implementation of such supplement or change.  If applicable, a negotiated change in contract price shall be made to the mutual satisfaction of both the Contractor and Government prior to the implementation of the change.

(*Id*. at § 7.1).

> 5.     <u>Task Order 139</u>

In December 2006, pursuant to the LOGCAP III contract, the United States Army issued Task Order 139.  Applicable to the instant matter, Task Order 139 "governs the base life support functions" to be performed by KBR at military bases in Iraq, and specifies the services to be provided thereto including Facilities and Operations & Maintenance Services.  (*Task Order 139*, version 16, § 1.0).  Task Order 139 also contains specific language which further describes the roles of both the contractor and the government.

Pursuant to Task Order 139, the contractor is responsible for the safety of employees and base camp residents during its operations, controlling all aspects of its performance and maintaining

supervision of its employees.  These duties are highlighted in the following provisions:

> 1.1.2 Worksite Safety.  The contractor shall be responsible for safety of employees and base camp residents during all contractor operations conducted in accordance with this Statement of Work and the Army and Occupational Safety and Health Administration (OSHA) safety regulations and guidance as it applies to the Iraq Theater of Operations.

(*Id*. at § 1.1.2).

> 1.10 OPERATIONAL CONTROL.  Operational Control (OPCON) in the context of this SOW is defined as the contractor being fully responsible for performing the function, service or capability specified by the government.    The contractor shall report performance outcomes to the responsible or accountable government official in charge.  *The contractor shall maintain supervisory control over all contractor employees.*

(Id. at § 1.10 (emphasis added)).

> 6.0 CONTRACTOR PERSONNEL REQUIREMENTS.  The contractor shall maximize opportunities to use host country national personnel, materials, products, and equipment.  The contractor shall, to the maximum extent practicable, hire host country national (HCN) personnel in cooperation with diplomatic agreements between the USG and the host nation.  *The contractor shall have exclusive supervisory authority and responsibility over employees.*

(*Id*. at § 6.0.  (emphasis added)).  Moreover, the parties agreed that "[n]otwithstanding any other provisions of this [Scope of Work] SOW, the contractor shall comply with all U.S. laws applicable to contractors supporting United States Government (USG) operations overseas."  (*Id*. at § 1.1.).

The Army's role under Task Order 139 remains to manage and ensure compliance with the contract.  In addition, the Army controlled any changes to the terms and conditions of the contract.  This is demonstrated in section 1.2, which provides that "[a]ll increases, decreases or modifications to requirements specified in this SOW are at the direction of the [Administrative Contracting Officer (ACO)] in coordination with the Procuring Contracting Officer (PCO)."  (*Id*. at § 1.2.).

Task Order 139 also specifies the services to be provided by KBR to the United States Army in Iraq. Applicable to the instant matter, section 8 of Task Order 139 details Operations and Maintenance Services. Those provisions state as follows:

> 8.1. FACILITIES MANAGEMENT AND OPERATIONS & MAINTENANCE (O&M) SERVICES. The contractor shall provide O&M Services and establish a preventative maintenance program to maximize life expectancy of base camp facilities at a reasonable cost to the Government. O&M consists of maintenance and repair of facilities listed in Appendix F (Facilities)...
>
> 8.1.1 Operations & Maintenance also includes the repair and/or replacement of equipment and major electrical appliances such as electrical heating, air-conditioning, refrigeration systems, freezer systems, and kitchen systems used to provide services to facilities listed in Appendix F.
>
> 8.1.2. Technical Inspection of all facilities not initially designated as "Level A" in Appendix F (Facilities) shall be completed before the contractor assumes O&M responsibilities. Upon conclusion of the technical inspection, if a facility requires substantial repairs, then those repairs will be completed in coordination with the LSO and the base camp mayor and at the direction of the ACO, prior to assuming O&M. Upon completion of Technical Inspection and correction of any deficiencies, the ACO will direct the contractor to assume O&M and amend Appendix F (Facilities).
>
> ...
>
> 8.1.4. O&M maintenance, repairs or replacement will be initiated by a customer service request. The contractor shall establish a database to manage service requests and response times.
>
> 8.1.4.1. Emergency[7] services requests shall be responded to within

---

[7]

The Court notes that the term emergency repairs is further defined in Appendix C - Definitions to Task Order 139. (*Task Order 139, Appendix C*, version 14.2). "Facilities Maintenance repair priorities" provides:

> Level P1, emergency repairs. The contractor shall respond within two (2) hours of the request. Emergency repairs are situations that

2 hours. At a minimum, emergency repairs consist of failure in water, sewage, *electric*, general utility networks and those functions pertaining to force protection and operational considerations. The contractor shall notify the ACO and the Base Camp Mayor if repairs cannot be affected within the 2 hour time period. The initial response from the contractor back to the mayor's cell shall be made via telephone, followed up in writing, and will provide a mitigation plan.

...

8.4. ELECTRICAL DISTRIBUTION. The contractor shall replace, maintain, and repair electrical distribution systems and equipment to include, but not limited to, switchgear, distribution panels, lighting, and electrical outlets. Appendix F (Facilities) identifies those facilities that will receive full service.

(*Id*. at § 8 (emphases added)). As recognized in many of the provisions above, Appendix F details

the levels of O&M services that can be ordered by the military and provided by KBR under the

contract. Appendix F states that:

APPENDIX F – FACILITIES O&M
F.1. Appendix F applies to all facilities (such as hard structure buildings, guard towers, etc.) located on military base camps. The appendix is subdivided into three Levels: A, B and C. Appendix F will be included in the consolidated MSOW as tab[s] "Facilities".

F.1.1. Determination for the total number of buildings located on a

affect life, *safety* and force protection.

Level P2, urgent repairs less than 24 hours. The contractor shall respond within 24 hours of the request. Urgent repairs are non-life threatening situations such as water leak vs. water break, generator running out of fuel (except for critical facilities as identified by Base Camp Mayor), etc.

Level P3, routine repairs between 24 hours through 14 days. The contractor shall respond within 24 hours. Routine repairs include replacing light bulbs, repairing door hinges, door repair, etc.

(*Id*. (emphasis added)).

particular facility is a joint effort between the Mayoral Cell[8] and the contractor.

F.1.2. Prioritization of facility levels (A, B and C) is the responsibility of the Mayoral Cell.

F.2. There are two levels of maintenance that the contractor shall provide: Level A, Full Maintenance and Level B, Limited Maintenance. Facilities prioritized into Level C receive no contractor maintenance.

F.2.1. Level A, Full Maintenance.

F.2.1.1. The contractor shall provide maintenance on any items pertaining to these facilities that can be repaired (such as plumbing, electrical, HVAC, roofs, floors, windows, doors, walls and grounds around the facilities) and provide preventative maintenance (such as change out of filters, HVAC cleaning, etc).

F.2.1.2. The Government will initiate a service request for all maintenance repairs pertaining to Level A.

F.2.2. Level B: Limited Maintenance.

F.2.2.1. Limited Maintenance does not include inspections, preventative maintenance and upgrades.

F.2.2.2. Upon receipt of service request, the contractor shall conduct an assessment to determine feasibility of repair or replacement of existing items. The assessment shall be provided to the Mayoral Cell.

F.2.2.2.1. If the assessment determines repair or replacement is warranted, the contractor shall repair or replace existing items only.

F.2.2.2.2. Repair or replacement of existing items is defined as items, which currently exist in the facility, and are within current funding streams.

F.2.2.2.3. If the assessment exceeds the scope of repair or replacement; the contractor shall return the service request to the Mayoral Cell for disposition.

---

8

*See* § II.A.(8) *infra* for a discussion of the function of the Mayoral or Mayor's Cell.

F.2.2.3. Any repairs or replacement that need to be done on the facility will be initiated with a service request by the customer.

F.3. Facility determination and prioritization should be reviewed jointly between the Mayoral Cell and the contractor

F.4. Preventive Maintenance:

F.4.1. A Category. Inspection should be conducted every 60 days, but can be modified by the base camp mayor for more or less frequent inspections on an individual basis. The purpose of these inspections is for safety and to save the government money by identifying deficiencies while they are still small and easy to fix. Inspection should include but is not limited to the following:

F.4.1.1. Electrical. Check for damage or tampering with switches, outlets, junction boxes, control panels, circuit breakers, fuses, grounding rods, and overloading.

F.4.1.2. Plumbing. Check for leaks, drips, corrosion in showerheads, shower curtains, water pressure, hot water temperature, and evidence of water damage to floors and walls.

F.4.2. B Category. Contractor shall provide service support either by service order or ACL. Upkeep and inspection not part of services. Power generation: check based on Power Generation tab contained in the Consolidated MSOW and MSOW.

(*Id*. at Appendix F).

6. Project Planning Estimate

On February 8, 2007, the United States Army, through the LOGCAP program, requested KBR "to provide a project planning estimate to perform maintenance services on 126 ... buildings, as well as other facilities and functions at RPC." (Docket No. 20-2 at 14, 36). KBR "requested several weeks to conduct technical inspections for the 126 buildings to evaluate their maintenance needs and current state of repair." (Docket No. 20-2 at 15). However, the Army granted KBR less than two weeks to complete the technical inspection process. (*Id*.). In addition, KBR and the Army

discussed the level of maintenance service to be provided in the project planning estimate, i.e., whether KBR would provide Level A or Level B maintenance services as set forth in Appendix F to Task Order 139. (*Id.*). The Army determined that the cost associated with Level A maintenance was prohibitive and requested an estimate as to Level B maintenance, only. (*Id.* at 16).

Prior to the completion of the project planning estimate, KBR conducted a technical inspection[9] of the RPC on February 10, 2007 pursuant to Task Order 139.[10] Task Order 139 provides the following regarding a project planning estimate:

> 8.25. PROJECT PLANNING. The contractor shall provide assistance to the supported unit for project and facility planning and scheduling as requested by the LOGCAP Support Unit. Planning shall consist of site assessments, technical risk assessments, alternative analyses, environmental impact assessments, project schedules and project planning estimates for labor, equipment, materials and subcontract requirements.

(*Task Order 139*, version 16, at § 8.25, version 14.2 at § 8.24). The February 10, 2007 technical inspection report prepared by KBR identified several electrical deficiencies at "Radwaniyah Palace D9" and "LSF Office."[11] (Docket No. 121-3). The problems identified in the report included, *inter*

---

[9]

"Technical inspections" are defined as "[a]ssements conducted on facilities and/or equipment prior to the contractor assuming maintenance responsibility. A written or verbal assessment shall be provided to the Base Camp Mayor upon conclusion of the technical inspection. Upon completion of a technical inspection and correction of any deficiency, the ACO will direct the contractor to assume maintenance responsibility and coordinate with the LSO to amend appropriate index." (*Task Order 139, Appendix C*, version 14.2).

[10]

As described in the May 23, 2008 declaration of Bruce Chirinko, a KBR employee whose title is Program Manager in Iraq under the LOGCAP Contract DAAA09-02-0007, the technical inspection report filed of record is incorrectly dated as February 10, 2006, but the actual inpsection occurred on February 10, 2007. (Docket No. 20-2 at 22).

[11]

The Court notes that "LSF Office" as used in the technical inspection report refers to LSF-B1, the building in which Staff Sergeant Maseth was housed.

*alia*: a lack of grounding of a main distribution panel; incorrectly sized and not properly grounded wires on secondary feeder wire circuits; and, an improperly grounded water heater tank. (*Id.*). As set forth on the report, despite the noted deficiencies, the main distribution panel for the "Radwaniyah Palace D9" was identified by KBR with an equipment condition code ("CC") of "B5 Serviceable - used, fair (w/ qualifications)." (*Id.*).

In response to the Army's request and after completing the technical inspection, KBR submitted a Project Planning Estimate ("PPE") to the Army dated February 19, 2007 with revisions completed on February 20 and 23, 2007. (Docket No. 121-2). The PPE is essentially a quoted estimate for the cost of services to be performed by KBR under the contract. The period of performance for the PPE was identified as February 24, 2007 through August 31, 2007. (*Id.*). The PPE also contains several "Estimate Assumptions," many of which are applicable here. They are as follows:

> 8.    KBR may, at its option, use any equipment, material, article or process that in the judgment of KBR will provide the performance requirements of the product and be consistent with good business practic[e].
>
> ...
>
> 14.    The short suspense for the PPE does not allow for a complete TI of each building. KBR assumes the buildings are up to the quality standards of LOGCAP and has based the estimate on assuming O&M on buildings and peripheral equipment that are in acceptable condition.
>
> ...
>
> 16.    KBR assumes the building systems to be in good condition and upon discovery of defective systems (Electrical, Mechanical, or Structural) repairs will be made only at the direction of an ACL. *KBR has included the cost of known repairs required at the time of the estimate.*

17.   Roads and grounds will consist of O&M under Level B services limited to common areas, high occupied facilities and common roadways.

...

19.   Maintenance will be performed at IAW TO139.

20.   11KV electrical maintenance is included including the poles, substations, switch gear, and terminals under Level B services.

21.   Irrigation systems maintenance will consist of maintaining approximately (30) pumps under Level B services.

...

27.   KBR assumes FACILITY MAINTENANCE will be level B. Limited maintenance does not include inspections, preventative maintenance and upgrades. Any repairs that need to be done on the facility will be initiated with a service request by the customer. Upon receipt of service request, the contractor shall conduct an assessment to determine feasibility of repair or replacement of existing items. The assessment shall be provided by the Mayoral Cell. If the assessment determines repair or replacement is warranted, the contractor shall repair or replace. However, if the assessment exceeds the scope of repair or replacement; the contractor shall return the service request to the Mayoral Cell for disposition. *Repairs on emergency items* (i.e. No power or no AC in the summer) will be initiated within two hours of the request. Normal repairs initiated within 24 hours of the request.

(*Id*. at 6-7 (emphases added)). Attached to the PPE is an itemized cost analysis which describes the estimated costs of labor and non-labor services provided by KBR at the RPC. The total estimated cost for the services to be provided under the PPE was $3,239,194.26. (*Id*. at 8). The estimated costs of the quoted Operations and Management services included estimates of $2,213,245.08 for "non labor" services and $349,420.26 for "labor" services. (*Id*.). Also attached is an itemized

estimate that consists of material and equipment costs including costs for various electrical materials and equipment. (*Id*. at 14-20).

7. The Army's Acceptance of Defendant's PPE

On February 23, 2007, Captain Greg Becht, SC, USN, MNC-I[12] CJ8 LOGCAP Budget Officer sent an email to Patricia Tillman, GS-12, MNF-I Slayer, and copied it to various other individuals including Jana Weston, Procuring Contracting Officer, Deputy Program Director - Iraq, LOGCAP-Iraq, certifying that the funds requested in KBR's PPE were available. (*Id*. at 23). Specifically, the email stated the following:

> This email certifies that funds for a grand total of $3,239,194.26 are available for LOGCAP project JARB CJ 072346 (PPE 07-139-D9-005) for FOB Radwaniyah.
>
> See attached documents.
>
> Please issue NTP to KBR.
>
> "The government realizes the potential cost impact to this Task Order and any increases thereto."
>
> After [ACO Change Letter] is issued, please forward a copy to me.

(*Id*.). The ACO Change Letter was then issued on February 23, 2007 by memorandum from Jana Weston to Mr. Charles Wilson, KBR Contract Administrator, Task Order 139. (*Id*. at 2). The Memorandum stated, in pertinent part, that:

> SUBJECT: ACO Change Letter (ACL) 07-139-D9-005; Operation and Maintenance for Radwaniyah Palace
>
> 1. References:

---

[12]

"MNC-I" as used herein refers to the Multi-National-Corps--Iraq. (Docket No. 122 at 2). "MNC-I is the tactical unit responsible for command and control for all military operations throughout Iraq. MNC-I is headquartered at the Victory Base military complex near Baghdad." (*Id*.).

       a.      LOGCAP III Contract DAAA09-02-D-0007, Task Order 139

       b.      KBR Project Planning Estimate 07-139-D9-005l dated 18 February 2007

       c.      Funding Email from CAPT Becht, LOGCAP Budget Officer; dated 23 February 2007

       d.      KBR Certificate of Current Cost or Pricing Data; Dated 23 February 2007

2.     General:

KBR is hereby directed to perform Operation & Maintenance for the Radwaniyah Palace to include 126 buildings, roads, grounds and city services as detailed in the project planning estimate referenced in paragraph 1.

3.     Period of Performance:

The work described above is considered to be in scope of the LOGCAP III Basic Contract, but is considered new work under Task Order 0139.

4.     Definitized Amount:

This definitized ACL is issued for the estimated cost of $3,239,294.26.

...

Signed Jana L. Weston, Procuring Contracting Officer, Deputy Program Director - Iraq, LOGCAP-Iraq.

(*Id*. at 2-3).   Accordingly, this memorandum directed KBR to begin performing Operations and Maintenance work on 126 buildings at the RPC pursuant to the LOGCAP III contract, Task Order 139 and the PPE.[13]   Under this agreement, KBR was to provide Level B maintenance services at

---

[13]

KBR has also indicated in its briefs that it "had a previous contract for O&M at the RPC in 2006. This contract similarly authorized only on-call maintenance where a work order was required to initiate all repairs, and it did not authorize on-going inspections or upgrades." (Docket No. 122 at 4 n.2).

126 buildings in the RPC, including LSF-B1, the building wherein Staff Sergeant Maseth was

stationed.         8.    Processing of Service Order Requests

The Mayor's Cell, a division or section of the RPC made up of military personnel, was

responsible for base infrastructure and logistics at the RPC. Chief Warrant Officer David Carrier

was the "Mayor" at the Mayor's Cell from March 2007 to October 2007. (Docket No. 76-2 at 3).

Sergeant First Class Michael Skaggs also served as the Mayor from late 2007 through 2008.

(Docket No. 122-2). The Mayor's role was to serve as the liaison between the military and

representatives of KBR at the RPC and to coordinate the operations and maintenance services to be

performed by KBR under its contract with the Army. (Docket No. 76-2 at 5).

All work performed by KBR at the RPC under Level B maintenance was initiated by service

order requests from the military. The typical procedure for the processing of such requests involved

the following. If military personnel identified a maintenance issue or deficiency at one of the

buildings in the RPC, they would fill out a service order request. (Docket No. 76-2 at 5). The

individual service order requests were submitted to either battalion headquarters or the Mayor's Cell.

(*Id*.). The Mayor would pick up the service order requests two or three times per day from both of

these locations, review and, if appropriate, forward them to KBR for service. (*Id*.). Sergeant Skaggs

estimated that approximately fifteen service order requests came through the Mayor's office on a

daily basis. (Docket No. 122-2 at 6, p. 138).

After a service order request was forwarded to KBR, KBR sent its workers to the site of the

identified deficiency. (Docket No. 121-11 at 4). KBR's workers would diagnose and fix any

problems within the scope of its contract with the Army. (*Id*.). Army personnel did not accompany

the KBR workers to the site and the Mayor did not assign anyone to oversee the completion of the

work.  (*Id*.).  However, after the work was completed, KBR would have the soldier who submitted the service order request sign off on a form verifying that the requested work was finished.  (*Id*.). In this regard, the soldier was not responsible for inspecting KBR's work but merely identified that KBR had appeared and completed the requested work.  (*Id*.).

If KBR representatives believed that the content of a service order request was outside the scope of KBR's contract, i.e., that it involved some new construction work and not repair or maintenance of existing facilities, they would return the service order request to the Mayor's Cell for additional direction.  (Docket No. 76-2 at 6).  The Mayor's Cell would then evaluate the request and, if necessary, seek additional approval and funding from the Army.  (Docket No. 122-6 at ¶ 14). There was also an understanding between the Army and KBR that there was a $2,500 limit per service order request and that any maintenance or repairs requested that would cost an amount in excess of $2,500 required further approval.  (Docket No. 121-11 at 10).  Chief Carrier testified that, during his tenure as Mayor, there was only one instance that he did not authorize work outside the scope of KBR's contract. (Docket No. 77-2 at 13 p. 21).  He further testified that he would authorize work outside the scope of the contract if it was safety related.  (*Id*.).

9.     <u>Actual Service Order Requests</u>

With respect to any actual service order requests that were issued, there is no evidence presently of record which demonstrates that the Army made any service order requests or specifically directed KBR to perform maintenance services regarding any of the deficiencies identified in the February 10, 2007 technical inspection report ("TI"), described above.[14]  Indeed,

---

[14]

It is noted that the February 10, 2007 TI was produced to the Army on two occasions.  It was submitted first, shortly after the completion of the inspection and second, on November 5, 2007, in response to a request to KBR that all TIs and building surveys be provided to the Army by Staff

KBR has supplied the Court with declarations of military officials as well as declarations and testimony of its own representatives in support of the same. (Docket No. 20-2 at 10-11; Docket No. 23-2 at 5-6; Docket No. 122-4 at 3).

After the February 10, 2007 TI was completed, several service order requests were made to KBR regarding maintenance issues at the LSF-B1 building. Some of these are relevant to the instant case. Specifically, Sergeant First Class Justin Hummer was housed in the same living quarters as Staff Sergeant Maseth at the RPC immediately prior to Staff Sergeant Maseth. (Docket No. 28-2 at 8). He lived at LSF-B1 from June 2007 to October 2007. (*Id.*). SFC Hummer was shocked four to five times while using the shower in the same restroom in which the electrocution of Staff Sergeant Maseth occurred. (*Id.*). SFC Hummer testified that each time he was shocked, a service order request was filled out and presented to the Mayor's Cell. (*Hummer Deposition 8/21/08*, Defendant's Exhibit 3 to 8/27/08 Motion Hearing ("*Hummer Deposition*") at 67). KBR representatives responded to each of these requests and completed the maintenance services. (*Id.* at 67-68). During these maintenance calls, KBR inspected the water pump on the roof of LSF-B1, replaced a pressure switch on the water pump and replaced a heating coil on the water tank. (Docket No. 28-2 at 9).[15] SFC Hummer also testified that after the work was completed, the shocking events subsided for some time. (*Id.* at 68).

In addition to reporting the electric shocks by way of service order requests, SFC Hummer

Sergeant Daniel Wilson, Deputy Mayor of the RPC in 2007. (Docket No. 23-2 at 5).

[15]

Plaintiffs also maintain that KBR installed the water pump in question, relying on an email communication from Amber Wojnar, A SAC, MNF-1 Slayer to Plaintiffs. (Docket No. 121-8). That email states that "[a] Filipino plumber admitted to installing the pump on the roof during the previous KBR project in 2006. So, it was in fact conducted during KBR's time at RPC, and was not a bi-product of Iraqi engineering as previously alleged." (*Id.*).

spoke directly to Chief Warrant Officer Carrier regarding the same on multiple occasions. (*Hummer Deposition* at 68). SFC Hummer testified that he told Chief Warrant Officer Carrier the entire building needed rewired due to the electrical problems he encountered. (*Id*.). According to SFC Hummer, Carrier responded by telling him that rewiring the building was outside the scope of KBR's contract and that a new contract would need to be issued before that type of work could be completed. (*Id*. at 68-69). However, Chief Warrant Officer Carrier testified that he did not recall having any of these conversations with SFC Hummer. (Docket No. 76-2 at 25-26). SFC Hummer also testified that when he moved out of LSF-B1, he conveyed this information to Staff Sergeant Maseth. (*Hummer Deposition* at 69).

### 10. November 19, 2007 Fire Inspection

A fire inspection of LSF-B1, the building where Staff Sergeant Maseth lived, was conducted on November 19, 2007. (Docket No. 20-2 at ¶ 4). A report of that inspection has been filed of record and consists of several pages of documents that were prepared by the Inspector, Captain James Cook. (Docket No. 20-2 at 25-29). The report identifies certain electrical deficiencies at LSF-B1. A chart titled "BUILDING - FIRE RISK MANAGEMENT SURVEY" identifies electrical deficiencies including frayed and improper wiring. (*Id*. at 25). A report titled "HAZARD/DEFICIENCY INSPECTION RECORD" states that Kitchen Room B has "spliced wires near stove/ oven" and that Room H had a "Hot Water Heater hard wired into outlet" and "Dryer unit hard wired into outlet." (*Id*. at 27). Both of these documents were signed by Staff Sergeant Maseth as Fire Marshall. (*Id*. at 25, 27).

### 11. January 2, 2008 Incident

The parties do not dispute that, on January 2, 2008, Staff Sergeant Maseth was electrocuted

while showering in his living quarters in building LSF-B1 at the RPC. Staff Sergeant Maseth's exposure to electric current caused him to suffer cardiac arrest, which resulted in his death. The source of the electric current was determined to be a water pump located on the roof of LSF-B1.

The United States Army Criminal Investigation Laboratories engaged Kevin Kennedy & Associates to analyze the water pump in question and identify the problems that led to its malfunction. (Docket No. 137-2 at 1). That firm prepared a report dated May 7, 2008. (*Id*.). The findings in the report generally indicate that the water pump overheated and failed and that this was likely caused by long term overload of the motor. (*Id*. at 10). In addition, problems were identified with the grounding of the water pump including that it was not properly grounded upon installation and did not have a safety ground. (*Id*.).

B.      *Plaintiffs' Allegations*

At the time of his death, Staff Sergeant Ryan D. Maseth was serving his second tour in Iraq as an "active duty Army Ranger and Green Beret, serving in the 5th Special Forces Group (Airborne) of the United States Army." (Docket No. 1-3 at 6, 7). Staff Sergeant Maseth was stationed in Baghdad, Iraq, at the RPC. (*Id*. at 8).

Plaintiffs allege that the RPC was one of the facilities for which KBR was responsible, and that KBR "undertook an inspection and survey of the facilities at the RPC and, specifically, Staff Sergeant Maseth's building known as LSFB1." (*Id*. at 10-11). During said inspection, it is alleged that KBR "discovered hazardous conditions stemming from the improper grounding of electrical infrastructure at LSFB1" and that KBR was aware of similar hazards at several other facilities including buildings LSFB5 and LSFB6 at the RPC. (*Id*. at 12-13). It is further alleged that KBR's "inspection revealed specific hazards relating to the water storage, pumping, heating and delivery

systems at [the RPC]" (*Id*. at 14) including:

> that the water pump servicing the facility failed to meet applicable United States safety standards (*Id*. at 15);
>
> "that the electric supply to the water pump at LSFB1 had bypassed the main electrical disconnect by means of connecting all of the wires to the top of the breaker" (*Id*. at 16);
>
> "that there were two unprotected splices in the incoming electrical supply line at ground level at LSFB1" (*Id*. at 17); and,
>
> "That the water tanks serviced by the pump in LSFB1, LSFB5 and LSFB6 were not grounded." (*Id*. at 18).

In addition, Plaintiffs allege that KBR "was aware or should have been aware of as many as 11 other instances of United States military personnel being electrocuted at military bases in Iraq due to faulty wiring, grounding, and/or other aspects of the electrical systems." (*Id*. at 19).

It is also alleged that KBR was contractually obligated to fix the electrical problems at LSFB1 under the LOGCAP III contract and the Task Orders issued thereunder, that the Defense Contract Management Agency instructed and authorized KBR to repair the electrical problems, but that despite this obligation, KBR did not fix, otherwise make safe or warn U.S. troops of the hazardous condition at LSFB1. (*Id*. at 20-22). Further, KBR continued to permit U.S. troops, including Staff Sergeant Maseth, to utilize the faulty electrical, shower and water systems without warnings or safe alternatives, despite its knowledge of the problems and prior instances of electrocution. (*Id*. at 23-24).

## III.    PROCEDURAL HISTORY

On March 24, 2008, Plaintiffs filed their initial complaint against KBR in the Court of Common Pleas of Allegheny County, Pennsylvania. (Docket No. 1-3). The Complaint was then removed to this Court by KBR on April 22, 2008. (Docket No. 1).

Thereafter, KBR filed a Motion to Seal its brief in support of a motion to dismiss (Docket No. 16), which was granted by the Court (Docket No. 17).[16]  On May 23, 2008, KBR filed the pending Motion to Dismiss (Docket No. 18) and its Memorandum in Support of its Motion to Dismiss under seal (Docket No. 20).  Attached to KBR's motion were several sealed exhibits including declarations provided by government and KBR employees as well as pertinent Army Regulations and facilities standards. (*Id.*).  After receiving leave of Court, on June 2, 2008, KBR filed a sealed supplemental brief entitled Corrected Exhibit 2 and Subsequent History of Cited Case.[17] (Docket No. 23).  On June 26, 2008, Plaintiffs responded by filing their Brief in Opposition to KBR's Motion to Dismiss and appendix.  (Docket No. 28).  After receiving an extension of time from the Court and permission to file its brief under seal, KBR filed its sealed Reply brief on July 18, 2008.  (Docket No. 35).  Plaintiffs then filed their Sur-Reply Brief in Opposition to KBR's motion to dismiss on August 12, 2008.  (Docket No. 45).

On August 27, 2008, the Court heard oral argument as to the pending motion. (Docket No. 58).  At oral argument, both parties submitted additional exhibits in support of their respective positions.  (Docket No. 58-2).  The Court ordered KBR to produce the LOGCAP III contract and Task Order 139 as neither were of record.  *Mot. Hr'g Trans. 8/27/08* at 24-5.  These documents were

---

[16]

KBR's motion to seal stated that the information to be contained in its exhibits contained, among other things, United States Army documents marked as "For Official Use Only," as well as information about United States Army "housing and base locations in Iraq," and the "identity and location of [KBR] and military personnel stationed in Iraq."  (Docket No. 16).  Given the safety issues involved, the Court granted KBR's motion.  (Docket No. 17).

[17]

KBR's brief recognized that several of the district court decisions relied upon in its initial brief were reversed by the United States Court of Appeals for the Fifth Circuit in *Lane v. Haliburton*, 529 F.3d 548 (5th Cir. 2008).

later provided to the Court by defense counsel under a letter dated September 23, 2008. The parties

each filed a Supplemental Brief and additional exhibits in support of their respective positions on

October 10, 2008. (Docket Nos. 76, 77).[18]

In an Order of Court issued on November 14, 2008, the Court permitted the parties to

conduct additional limited discovery related to KBR's motion to dismiss. Said discovery was to be

completed by December 31, 2008 and any supplemental briefs related to the same were to be filed

by January 16, 2009. (Docket No. 81).

Following enlargements of time,[19] the parties filed their respective supplements and

corresponding exhibits on March 13, 2009. (Docket Nos. 121, 122). KBR then sought leave to file

a reply brief to Plaintiffs' supplemental brief, which was granted by the Court. (Docket Nos. 126,

127). KBR filed its reply on March 18, 2009. (Docket No. 128). Likewise, Plaintiffs filed a motion

for leave to file a sur-reply on March 19, 2009. (Docket No. 133). The Court granted Plaintiffs'

motion and they filed their sur-reply on March 23, 2009. (Docket Nos. 136, 137). This matter is

---

[18]

The Court notes that the parties also participated in an Early Neutral Evaluation before Judge
Donald E. Zeigler on October 21, 2008 pursuant to this Court's Alternative Dispute Resolution
program. (Docket No. 66).

[19]

Plaintiffs filed an unopposed motion for an extension of time to complete discovery on
January 12, 2009, which was granted by the Court, extending the period for discovery and the filing
of supplements to February 13, 2009. (Docket Nos. 92, 93). Then, during a telephone status
conference conducted on February 2, 2009, KBR made an oral motion to extend the period of time
for discovery, which was granted by the Court. (Docket No. 94). The parties were ordered to file
any additional supplemental briefs by March 13, 2009. (*Id.*).

In the interim, Plaintiffs sought sanctions against KBR and its counsel as a result of KBR's
dissemination of two press releases to local media outlets. The Court denied Plaintiffs' motion in
a Memorandum Opinion issued on March 11, 2009. (Docket No. 117); *Harris v. Kellogg, Brown
& Root Services, Inc.*, Civ. A. No. 08-563, 2009 WL 700162 (W.D.Pa. March 11, 2009).

now fully briefed and ripe for disposition.

## IV.    LIMITED DISCOVERY[20]

As noted, the parties have engaged in limited discovery related to KBR's defenses as permitted by a series of orders.  (Docket Nos. 51, 61, 62, and 81).  KBR essentially initiated discovery by attaching declarations and other documentary evidence to its brief in support of its Motion to Dismiss.  (Docket No. 20).  Plaintiffs initially objected to KBR's submissions, but simultaneously argued for discovery and attached their own evidence in support of their responses. (Docket Nos. 28, 45).  After a series of motions were filed by Plaintiffs seeking discovery and by virtue of an agreement between counsel, (*See* Docket No. 56 at 8; *Mot. Hr'g Trans. 8/27/08* at 76-77), the Court ordered that the parties conduct limited discovery on the issues raised by KBR's motion to dismiss, but held ruling on KBR's motion in abeyance pending the close of said discovery and further submissions.  *See United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 514 (3d Cir.2007).

Finally, although counsel for both parties have generally argued that the evidence submitted to the Court is either inapplicable or not necessary in support of or in opposition to the legal arguments they have advanced, there have been no formal objections to the Court's consideration

---

[20]

Related to the limited discovery permitted in this matter, the Court has been required to author two decisions regarding the terms of the Confidentiality and Protective Order (Docket No. 91) governing this case. (*See* Docket Nos. 79, 90); *see also Harris v. Kellogg, Brown & Root Services, Inc.*, Civ. A. No. 08-563, 2008 WL 5246017 (W.D.Pa. Dec. 15, 2008).  The Confidentiality and Protective Order was entered in accordance with the standing Order regarding Confidentiality and Protective Orders in Civil Matters issued by Chief Judge Donnetta W. Ambrose on January 27, 2005.  *See* http://www.pawd.uscourts.gov/Documents/Forms/confident_protective_order.pdf (last visited 3/30/09).  As the Court has noted previously, the protection of confidential information related to the on-going military operations in Iraq is necessary for the safety of the men and women in the military as well as those employed by military contractors.  (*See* Docket No. 90 at 13).

of any and all of the submissions for the purposes of resolving the pending motion.

## V.   LEGAL STANDARD

KBR argues that its Motion to Dismiss under Rule 12 of the Federal Rules of Civil Procedure is "jurisdictional" in nature and that the Court may consider matters outside the pleadings in resolving the motion. (Docket No. 20).  KBR's motion is premised, in part, on the political question doctrine.[21]   (*Id*.).  The United States Court of Appeals for the Third Circuit has recognized that "a court with jurisdiction over a claim should nonetheless decline to adjudicate it if it is not justiciable." *Gross v. German Foundation Indus. Initiative*, 456 F.3d 363, 378 (3d Cir. 2006).  In *Baker v. Carr*, the Supreme Court held that:

> [i]n the instance of nonjusticiability, consideration of the cause is not wholly and immediately foreclosed; rather, the Court's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded.

*Baker v. Carr*, 369 U.S. 186, 198, 82 S.Ct. 691 (1962).  In conducting this evaluation, this Court must "undertake a 'discriminating inquiry into the precise facts and posture of the particular case.'" *Gross*, 456 F.3d at 377-78 (quoting *Baker*, 369 U.S. at 217).

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the lack of subject matter jurisdiction over a plaintiff's claims. *See* Fed.R.Civ.P. 12(b)(1). "At issue in a Rule 12(b)(1) motion is the court's 'very power to hear the case.'" *Petruska v. Gannon University*, 462

---

[21] Plaintiffs initially argued that KBR's Motion should be evaluated under Rule 12(b)(6) and that the Court should not consider matters outside the pleadings. (Docket No. 28 at 5).  After limited discovery was permitted, Plaintiffs have not renewed this objection nor suggested that KBR's motion should be converted to a motion for summary judgment under Rule 12(c).  Given the present record, this Court would deny KBR's motion under either standard.

F.3d 294, 302 (quoting *Mortenson v. First Federal Savings and Loan Association*, 549 F.2d 884, 891 (3d Cir.1977)). As it is the party asserting jurisdiction, a plaintiff "bears the burden of showing that its claims are properly before the district court." *Development Fin. Corp. v. Alpha Housing & Health Care*, 54 F.3d 156, 158 (3d Cir.1995); *see also Kehr Packages, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)("[w]hen subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff must bear the burden of persuasion"). In reviewing a motion to dismiss pursuant to Rule 12(b)(1), the court must distinguish between facial attacks and factual attacks. *Petruska*, 462 F.3d at 302.

KBR has asserted a factual attack on the pleadings in this instance. When a defendant launches a factual attack on subject matter jurisdiction, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Petruska*, 462 F.3d at 302 (quoting *Mortenson*, 549 F.2d at 891). In a factual attack, the court must weigh the evidence relating to jurisdiction, with discretion to allow affidavits, documents, and even limited evidentiary hearings. *Atkinson*, 473 F.3d at 514. Here the Court has chosen to exercise its discretion.

## V.    DISCUSSION

KBR argues that Plaintiffs' Complaint should be dismissed as the claims alleged are non-justiciable under the political question doctrine and preempted by the "combatant activities" exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(j). (Docket No. 18 at 1). Plaintiffs maintain that their claims of Wrongful Death and Survival under 42 Pa.C.S. §§ 8301[22] and 8302,[23]

---

[22]

42 Pa.C.S. § 8301, titled Death Action, provides, in relevant part, that:

> (a) General rule.--An action may be brought, under procedures prescribed by general rules, to recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence

respectively, do not constitute non-justiciable political questions and that the combatant activities exception is inapplicable to the facts of this case. (Docket No. 28). The Court will discuss each of KBR's arguments, in turn.

A.      *Political Question Doctrine*

In *Marbury v. Madison*, the United States Supreme Court held that "[q]uestions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court." *Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 170, 2 L.Ed. 60 (1803). "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). To determine if a case or controversy constitutes a non-justiciable political question, the Court must ascertain "whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." *Baker*, 369 U.S. at 198. In *Baker*, the Supreme Court set forth the following factors to

---

> or negligence of another if no recovery for the same damages claimed in the wrongful death action was obtained by the injured individual during his lifetime and any prior actions for the same injuries are consolidated with the wrongful death claim so as to avoid a duplicate recovery.

42 Pa.C.S. § 8301.

[23] 42 Pa.C.S. § 8302, titled Survival Action, provides that:

> All causes of action or proceedings, real or personal, shall survive the death of the plaintiff or of the defendant, or the death of one or more joint plaintiffs or defendants.

42 Pa.C.S. § 8302.

be analyzed in this determination:

> Prominent on the surface of any case held to involve a political question is found
>
> (1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department;"
>
> (2) "a lack of judicially discoverable and manageable standards for resolving it;"
>
> (3) "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;"
>
> (4) "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;"
>
> (5) "an unusual need for unquestioning adherence to a political decision already made;"
>
> (6) "or the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

369 U.S. at 217. "A finding of any one of the six factors indicates the presence of a political question." *Gross*, 456 F.3d at 377 (citing *INS v. Chadha*, 462 U.S. 919, 941, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983)). However, "[u]nless one of these formulations is *inextricable* from the case at bar, there should be no non-justiciability on the ground that a political question is present." *Baker*, 369 U.S. at 217 (emphasis added). In evaluating whether a case presents a political question, a court must "undertake a 'discriminating inquiry into the precise facts and posture of the particular case.'" *Gross*, 456 F.3d at 378 (quoting *Baker*, 369 U.S. at 217); *see also Lane,* 529 F.3d at 568 ("different cases involving different claims require their own discriminating inquiry under *Baker*"). Further, "[t]he Constitution's allocation of war powers to the President and Congress does not exclude the courts from every dispute that can arguably be connected to 'combat.'" *Ibrahim v. Titan Corp.*, 391

F.Supp.2d 10, 15 (D.D.C. 2005)(citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 124 S.Ct. 2633, 2645-51, 159 L.Ed.2d 578 (2004)).

The United States Court of Appeals for the Third Circuit has not addressed the application of the political question doctrine to claims against a private military contractor providing services to the military during wartime. The Courts of Appeals that have analyzed the political question doctrine in this context have rejected the theory, at least at the motion to dismiss stage.

In *Koohi v. United States*, heirs of deceased passengers and crew of a civilian aircraft, which was inadvertently shot down by a United States Navy warship over the Persian Gulf, brought design defect claims against the military contractor that manufactured the ship's missile defense system as well as negligence claims against the United States. *Koohi v. United States*, 976 F.2d 1328, 1330-31 (9th Cir. 1992). The United States Court of Appeals for the Ninth Circuit analyzed several of the *Baker* factors and held that the claims were justiciable, focusing on the fact that the claims were tort suits seeking money damages as opposed to injunctive relief. *Id*. at 1331-32.

The United States Court of Appeals for the Eleventh Circuit also addressed the issue in *McMahon v. Presidential Airways*, 502 F.3d 1331 (11th Cir. 2007). The plaintiffs in *McMahon* were the survivors of three soldiers who were killed in 2004 when an aircraft that was owned and operated by a private military contractor crashed into the side of a mountain in Afghanistan. *Id*. at 1336. The soldiers were being transported by the contractor between two different locations in Afghanistan pursuant to a contract with the Department of Defense. *Id*. The plaintiffs brought wrongful death claims against the contractor for negligent operation of the flight. *Id*. at 1337. The Court of Appeals analyzed the *Baker* factors as well as the terms and conditions of the contract between the government and the contractor and determined that the political question doctrine was

not implicated. *Id*. at 1357-65. The Court of Appeals reasoned that the contractor, and not the military, maintained control of the flight itself and could potentially be liable for the alleged pilot error.

*Lane v. Haliburton*, a decision of the United States Court of Appeals for the Fifth Circuit, also held that the political question doctrine was not applicable to bar plaintiffs' fraudulent misrepresentation and negligence claims against private military contractors, including KBR. *Lane*, 529 F.3d at 554. *Lane* addressed three consolidated cases. *Id*. (citing *Fisher v. Halliburton*, 454 F.Supp.2d 637, 639-45 (S.D.Tex.2006); *Smith-Idol v. Halliburton*, No. 4:06-cv-01168, 2006 WL 2927685 (S.D.Tex. Oct.11, 2006); *Lane v. Halliburton*, No. 4:06-cv-01971, 2006 WL 2796249, (S.D.Tex. Sept.26, 2006)). The plaintiffs in those cases, the estates of contractor employees who were killed when a convoy operated by contractors in Iraq was attacked by Iraqi insurgents, alleged that the employees were told by KBR that they received assurances from KBR that they would not be sent to war zones when they were recruited and that their safety was guaranteed. *Id*. at 554-55. The three cases were all dismissed by the district court on political question grounds at the motion to dismiss stage before any discovery was conducted. *Id*. at 556. On review, the Court of Appeals reversed, finding that the "fraud-based" and negligence claims could potentially be maintained without implicating military judgments. *Id*. at 564, 568. The contractors argued that, as the Army was responsible for protection of the convoy, causation could not be established. The Court of Appeals disagreed, closely examining the *Baker* factors and the precise causes of action, holding that the plaintiffs may be able to demonstrate that the contractors' conduct was the legal cause of the deaths, although recognizing that further discovery may result in a finding that political questions were implicated. *Id*. at 559-68.

Several district courts have dismissed lawsuits against private military contractors on political question grounds. *See e.g., Smith v. Halliburton Co.*, 2006 WL 2521326 (S.D.Tex. Aug. 30, 2006)(political question doctrine barred negligence claims against defense contractor arising from a suicide bombing at a dining hall as the military and not the contractor, controlled security of the base); *Carmichael v. Kellogg, Brown & Root Services, Inc. ("Carmichael II")*, 564 F.Supp.2d 1363 (N.D.Ga. 2008)(on a renewed motion to dismiss after discovery was conducted, court found that the political question doctrine barred claims of a soldier's estate against private military contractor for negligent operation of a convoy vehicle as the military controlled all aspects of the convoy operation); *Whitaker v. Kellogg, Brown & Root, Inc.*, 444 F.Supp.2d 1277 (M.D.Ga. 2006)(political question doctrine barred claims of a soldier's estate alleging that the soldier's death was caused by negligent operation of convoy vehicle by KBR because the Army controlled all aspects of the convoy operation); *Bentzlin v. Hughes Aircraft Co.*, 833 F.Supp. 1486 (C.D. Cal. 1993)(political question doctrine barred claims of a soldier's estate against contractor alleging design defects in missile system after soldiers were killed in battle by friendly fire).[24]

However, many district courts have declined to apply the political question doctrine and bar claims against private miliary contractors, finding it inapplicable to the precise facts of the case and the claims raised by the parties. *See e.g.*, *Norwood v. Raytheon Co.*, 455 F.Supp.2d 597 (W.D.Tex. 2006)(political question doctrine did not bar claims of American and German servicemen against government contractors that manufactured radar detectors for physical injuries resulting from exposure to x-rays during their military service); *Lessin v. Kellogg Brown & Root*, No. CIVA

---

[24] The decisions in *Smith* and *Whitaker* were not appealed. *See Lane*, 529 F.3d at 548 n.9. However, a notice of appeal was filed by the plaintiffs in *Carmichael* on August 7, 2008. *See Carmichael*, Civ. A. No. 1:06-cv-00507-TCB, Docket No. 125. That appeal remains pending.

H-05-01853, 2006 WL 3940556, at *1-3 (S.D.Tex. June 12, 2006)(soldier was injured while attempting to repair a vehicle owned and operated by KBR and the district court found that the political question doctrine did not bar negligence claims against KBR for failure to maintain and warn of dangers to the vehicle, despite the fact that the injuries occurred on the side of the road in a combat zone during a convoy operation in Iraq); *Getz v. Boeing Co.*, No. CV 07-6396 CW, 2008 WL 2705099 (N.D. Cal July 8, 2008)(soldiers' estates design and manufacturing defect claims against contractor arising from helicopter crash in Afghanistan were not barred by political question doctrine); *Flanigan v. Westwind Technologies*, Civ. A. No. 07-1124, 2008 U.S.Dist.LEXIS 82203 (W.D.Tenn. Sept. 15, 2008)(political question doctrine did not bar civilian helicopter pilot's design defect suit against contractors that manufactured the helicopter flown by and the helmet worn by the pilot); *Al Shimari v. CACI Premier Technology, Inc.*, Case No. 1:08cv827-GBL (E.D.Va. Mar. 18, 2009)(unpublished)(political question doctrine did not bar Iraqi citizens' claims that they were allegedly tortured at Abu Ghraib prison in Iraq by government contractors).

KBR invokes several of the *Baker* factors quoted above, and sets forth the following arguments in support of its contention that this case involves a non-justiciable political question: (1) Plaintiffs' Complaint raises issues regarding military decisions that are constitutionally committed to the political branches; (2) Plaintiffs' Complaint raises issues that are not susceptible of resolution by judicially discoverable standards; (3) that the issues to be resolved by this case are impossible for the Court to decide without an initial policy determination of a kind clearly for nonjudicial discretion; and (4) that the issues cannot be determined without embarrassing or expressing a lack of respect due to the coordinate branches of government. (Docket No. 20). Plaintiffs contend that the factors cited by KBR do not preclude this Court from resolving the instant matter. (Docket No.

28). The Court now turns to each of KBR's arguments.

1. Textually Demonstrable Commitment to Coordinate Political Branches

KBR first argues that the dismissal of Plaintiffs' claims under the textual commitment factor is compelling in this case because the "military's establishment, operation, and maintenance of bases located in hostile foreign countries are inherently non-justiciable political issues constitutionally committed to the political branches." (Docket No. 20 at 14). KBR maintains that Article II, § 2[25] and Article I, § 8[26] of the United States Constitution sufficiently demonstrate a textual commitment

[25] Article II, section 2 of the United States Constitution provides, in relevant part, that:

> The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States; he may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices, and he shall have Power to grant Reprieves and Pardons for Offenses against the United States, except in Cases of Impeachment.

U.S. Const. art. II, 2.

[26] Article I, section 8 of the United States Constitution provides, in relevant part, that:

> The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States
> ...
> To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water To raise and support Armies, but no Appropriation of Money to that Use shall be for a longer Term than two Years;
> ...
> To provide and maintain a Navy;
> ...
> To make Rules for the Government and Regulation of the land and

to the President and executive branch of the decisions as to foreign affairs and military operations

and to Congress as to the funding of the military.  (Docket No. 20 at 14).  In *Lane,* the United States

Court of Appeals for the Fifth Circuit discussed the textual commitment factor and held that:

> Examples of cases that implicate a textual commitment of constitutional authority to the Executive Branch include a challenge to the President's decision to deploy troops in a foreign land, *Eisentrager*, 339 U.S. at 789, 70 S.Ct. 936, or mine the harbors of another country in the course of a war against that country, *DaCosta v. Laird*, 471 F.2d 1146, 1153-57 (2d Cir.1973); so too has such a textual commitment been involved when a suit seeks judicial oversight of training procedures employed by the National Guard, *Gilligan*, 413 U.S. at 5-10, 93 S.Ct. 2440, requests an injunction of all nuclear testing, *Pauling v. McNamara*, 331 F.2d 796 (D.C.Cir.1963), or requires the resolution of a territorial dispute between foreign sovereigns, *Occidental*, 577 F.2d at 1202-03. These are matters that the President is constitutionally privileged to address.

*Lane,* 529 F.3d at 560.

"[T]he first *Baker* formulation is primarily concerned with direct challenges to actions taken

by a coordinate branch of the federal government."  *Lane*, 529 F.3d at 560 (citing *McMahon*, 502

F.3d at 1359).  KBR, a private corporation, is not a coordinate branch of the federal government.

Therefore, in order for KBR to invoke the "textual commitment" factor, it faces a "double burden."

*Id*.  KBR must first "demonstrate that the claims against it will require reexamination of a decision

*by the military*.  Then, it must demonstrate that the military decision at issue is ... insulated from

judicial review." *Id*. (quoting *McMahon* 502 F.3d at 1359-60 (emphasis in original; citation

omitted)).  With respect to the types of military decisions that are insulated from judicial review, the

Supreme Court has recognized that:

---

naval Forces;

U.S. CONST. art. I § 8.

> [t]he complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches. The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability. It is this power of oversight and control of military force by elected representatives and officials which underlies our entire constitutional system.

*Gilligan v. Morgan*, 413 U.S. 1, 10, 93 S.Ct. 2440, 2446 (1973).

In its Motion to Dismiss, KBR cites three specific United States military decisions that it claims are non-justiciable under the first *Baker* factor: (1) the policy decision to use the RPC as a base for special forces; (2) the policy decision to house military personnel in existing structures at the RPC rather than constructing prefabricated structures with knowledge that the buildings did not meet United States construction standards; and (3) the policy determination by the military to "***not*** expend its financial resources for the performance of preventative maintenance on most of the structures at the RPC, including LSFB1." (Docket No. 20 at 19 (emphasis in original)). KBR also contends that the first *Baker* factor is implicated in the following: (1) that the Court will have to define the legal duty owed by KBR to Staff Sergeant Maseth; (2) that Plaintiffs will have to establish whether KBR breached its contractual duties; and (3) that KBR will be "forced" to argue in its defense that the military's own "faulty" decisions to house soldiers in the RPC, by assigning most buildings to receive only Level B maintenance, and to ignore the hazardous conditions which contributed to Staff Sergeant Maseth's death. (Docket No. 35 at 10).

Through subsequent briefing, KBR's arguments as to the first *Baker* factor have shifted, focusing more on its contention that it was not authorized under its contract with the Army to provide preventative maintenance or conduct periodic inspections of LSF-B1. KBR contends that

the Army exercised an "envelope of control" over their contractual relationship such that KBR was only authorized to provide work as specifically directed by the Army and that it was never directed to repair the electrical deficiencies at LSF-B1. (Docket No. 76 at 7). KBR maintains that these decisions made by the Army are insulated from judicial review.

Plaintiffs counter that their claims do not directly implicate any decisions of the military. They do not dispute that the Army made a decision to house soldiers in hard-stand buildings at the RPC or to ascribe that the buildings in the RPC received only Level B maintenance. Instead, Plaintiffs argue that "this lawsuit asks this Court and a jury to determine whether the ***work that KBR actually performed*** at the RPC was substandard, negligent work that resulted in Ryan Maseth's death." (Docket No. 137 at 2 (emphasis in original)).

In this Court's estimation, Plaintiffs' claims do not question any decision by the military. Rather, they focus on KBR's conduct in performance of its contractual agreements with the Army once it undertook certain tasks at the LSF-B1 and how that conduct may have led to Staff Sergeant Maseth's death. Specifically, they point to the technical inspection, the electrical equipment that was purchased pursuant to Task Order 139 and the service calls on the building where SFC Hummer and then Staff Sergeant Maseth were housed.

In this regard, this Court finds particularly persuasive the decisions in *McMahon* and *Lessin*, both of which found that the political question doctrine was not implicated despite some military presence and decision-making. As discussed above, *McMahon* involved a plane crash in Afghanistan, and the United States Court of Appeals for the Eleventh Circuit found that the plaintiffs' claims alleging pilot error against the government contractor which controlled the operation of the flight were justiciable, even though the accident occurred in a war zone and the

military controlled the timing of the flight as well as other aspects of the flight plan. *McMahon*, 502 F.3d 1357-65. The Court of Appeals looked primarily to the terms and conditions of the contract between the military and the contractor in reaching its decision. *Id.* Likewise, in *Lessin*, the District Court for the Southern District of Texas rejected KBR's assertion of the political question doctrine as a defense to a soldier's claims arising from injuries sustained while attempting to repair a vehicle maintained by KBR on the side of the road in Iraq during a military controlled convoy operation. *Lessin*, 2006 WL 3940556, at *1-3. The soldier had alleged that KBR failed to properly maintain the vehicle or warn him of certain hazards to the vehicle. *Id.* at *1. The district court found that these claims did not implicate any policies or decisions of the military and, hence, did not present non-justiciable political questions. *Id.* at *3.

The general proposition that derives from these decisions is that when evaluating claims against a private military contractor in a war zone, "the key inquiry is whether a court will have to consider the wisdom of military operations and decision-making, or whether it need only consider the private contractor's performance." *Getz v. Boeing*, 2008 WL 2705099, at *6.

Further, as discussed below, the decisions which have dismissed actions against private military contractors on political question grounds are distinguishable, as each involved some form of active combat operations. *See e.g., Smith*, 2006 WL 2521326; *Carmichael II*, 564 F.Supp.2d 1363; *Whitaker*, 444 F.Supp.2d 1277; *Bentzlin*, 833 F.Supp. 1486. The district courts found that the performance of the private military contractor in those cases could not be divorced from the military's decisions which were made while it was engaged in active military operations.

Turning to the facts of the instant matter, pursuant to their contractual agreement the Army delegated certain of its maintenance responsibilities at the RPC to KBR, a private military contractor

specializing in providing such services.  It is undisputed that KBR performed maintenance services at LSF-B1 prior to Staff Sergeant Maseth's death.  KBR conducted a technical inspection of the building on February 10, 2007 and responded to several service order requests submitted by Sergeant First Class Justin Hummer.  The applicable provisions of the contractual agreement demonstrate that KBR had discretion not only in identifying but also in responding to maintenance problems at the RPC as well as control over the performance of its employees who conducted the technical inspection and provided maintenance repairs.

With respect to the technical inspection, Task Order 139 sets forth the general requirements in section 8.1.2, providing that:

> 8.1.2.  Technical Inspection of all facilities not initially designated as "Level A" in Appendix F (Facilities) shall be completed before the contractor assumes O&M responsibilities.  *Upon conclusion of the technical inspection, if a facility requires substantial repairs, then those repairs will be completed in coordination with the LSO and the base camp mayor and at the direction of the ACO, prior to assuming O&M*.  Upon completion of Technical Inspection and correction of any deficiencies, the ACO will direct the contractor to assume O&M and amend Appendix F (Facilities).

(*Task Order 139* at § 8.1.2 (emphasis added)).  This provision may have been partially qualified by certain "assumptions" made by KBR in the PPE which was accepted by the Army and incorporated into the contract.  (Docket No. 121-2 at 6-7).  Those assumptions provided the following:

> 14.  *The short suspense for the PPE does not allow for a complete TI of each building.*  KBR assumes the buildings are up to the quality standards of LOGCAP and has based the estimate on assuming O&M on buildings and peripheral equipment that are in acceptable condition.
>
> ...
>
> 16.  *KBR assumes the building systems to be in good condition* and upon discovery of defective systems (Electrical,

Mechanical, or Structural) repairs will be made only at the direction of an ACL. *KBR has included the cost of known repairs required at the time of the estimate.*

(*Id.* (emphasis added)). KBR completed a technical inspection of LSF-B1 on February 10, 2007 but the PPE was not submitted to the Army until February 19, 2007 (and was later revised on February 20 and 23, 2007). Therefore, it is not clear whether the terms in the "assumptions" should apply or if the terms of Task Order 139 should govern. In any event, KBR conducted the technical inspection and exercised discretion by identifying several electrical hazards at LSF-B1 on the technical inspection report. (Docket No. 121-3). KBR also determined that the building was "serviceable" as opposed to "unserviceable," terms which are undefined in the report, although a classification as "unserviceable" may have resulted in the building being condemned. (*Id.*). In light of the parameters of Task Order 139 and the technical inspection, it appears that any decisions made by the Army as to repairs of the building were likely made in reliance on KBR's identification of hazards.

The contract language also demonstrates that KBR possessed discretion when performing services pursuant to Level B maintenance. Appendix F to Task Order 139 provides the following:

F.2.2. Level B: Limited Maintenance.

F.2.2.1. Limited Maintenance does not include inspections, preventative maintenance and upgrades.

F.2.2.2. *Upon receipt of service request, the contractor shall conduct an assessment to determine feasibility of repair or replacement of existing items.* The assessment shall be provided to the Mayoral Cell.

F.2.2.2.1. *If the assessment determines repair or replacement is warranted, the contractor shall repair or replace existing items only.*

F.2.2.2.2. *Repair or replacement of existing items is defined as items, which currently exist in the facility, and are within current funding streams.*

F.2.2.2.3. If the assessment exceeds the scope of repair or replacement; the contractor shall return the service request to the Mayoral Cell for disposition.

F.2.2.3. *Any repairs or replacement that need to be done on the facility will be initiated with a service request by the customer.*

F.3. Facility determination and prioritization should be reviewed jointly between the Mayoral Cell and the contractor.

(*Task Order 139, Appendix F*, § F.2.2-F.3 (emphases added)).  While the customer (Army personnel) initially identified deficiencies in the building and requested services, KBR was required to conduct an "assessment" of the reported deficiencies.  (*Id*.).  In its discretion, KBR then either repaired or replaced the equipment, or returned to the Mayor's Cell for additional funding, if necessary.  (*Id*.).  Therefore, KBR, given its expertise exercised discretion by assessing the problems identified by the Army and determining whether repair or replacement was warranted.

Several provisions of the LOGCAP III contract and Task Order 139 demonstrate that KBR maintained exclusive control over its employees when performing these discretionary functions and conducting the requested repairs.  Sections 1.11 and 1.14 of the SOW provide the following:

**1.11 Contractor/Government Relationships.**  The relationship of the Contractor and the U.S. Army shall at all times be that of independent Contractor.  *The Contractor shall have exclusive supervisory authority and responsibility over employees.  The government shall manage the contract but will not exert control or supervision over contractor employees.*

(*LOGCAP III contract, Statement of Work* § 1.11 (emphasis added)).

**1.14  Quality Control.**  *The Contractor will be responsible for* the quality, technical, logistical and financial accuracy, and *the coordination of all aspects of performance.*

(*Id*. at § 1.14 (emphases added)).  In addition, sections 1.10 and 6.0 of Task Order 139 provide that:

1.10 OPERATIONAL CONTROL.  Operational Control (OPCON)

42

> in the context of this SOW is defined as the contractor being fully responsible for performing the function, service or capability specified by the government. The contractor shall report performance outcomes to the responsible or accountable government official in charge. *The contractor shall maintain supervisory control over all contractor employees.*

(*Task Order 139* at § 1.10 (emphasis added)).

> 6.0 CONTRACTOR PERSONNEL REQUIREMENTS. The contractor shall maximize opportunities to use host country national personnel, materials, products, and equipment. The contractor shall, to the maximum extent practicable, hire host country national (HCN) personnel in cooperation with diplomatic agreements between the USG and the host nation. *The contractor shall have exclusive supervisory authority and responsibility over employees.*

(*Id.* at § 6.0 (emphasis added)). The highlighted portions of these provisions establish that KBR supervised and controlled the performance of its employees under the contract, including the completion of the technical inspection and any repairs or replacements as directed by the Army. In addition, the evidence submitted to this point demonstrates that the Army neither supervised nor inspected any of the repairs that KBR actually performed on LSF-B1.

Upon consideration of the pertinent contractual provisions and the evidence of record, the Court finds that Plaintiffs' claims do not directly implicate professional military judgments the consideration of which by this Court would violate the principles of separation of powers. Instead, they call into question KBR's performance once it undertook certain work and under its contract with the Army. Accordingly, KBR's motion to dismiss Plaintiffs' claims under the first *Baker* factor is denied.

## 2.   Judicially Discoverable and Manageable Standards

KBR also argues that Plaintiffs' claims should be dismissed under the second *Baker* factor, because this case presents issues that are not susceptible to resolution by judicially discoverable and

manageable standards. (Docket No. 20). KBR maintains that Plaintiffs' wrongful death and survival claims implicate the reasonableness of the military's decisions which are inextricably intertwined with Plaintiffs' claims and KBR's defenses. (Docket No. 20). In opposition, Plaintiffs argue that this Court will need to apply only traditional tort principles in its resolution of the instant matter, applying United States and British standards for electrical maintenance and KBR's "own LOGCAP III Standard Operating Procedures for electrical maintenance" to determine the duty owed. (Docket No. 28 at 10-11). Plaintiffs further maintain that this case implicates only the performance of KBR under the LOGCAP III contract and does not challenge any of the terms or conditions contained therein.

"A political question looms menacingly when a claim suffers from 'a lack of judicially discoverable and manageable standards for resolving it.'" *Lane*, 529 F.3d at 560 (quoting *Baker*, 369 U.S. at 217). "One of the most obvious limitations imposed by [Article III, § 1, of the Constitution] is that judicial action must be governed by *standard*, by *rule*." *Id*. (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 278 (plurality opinion))(emphases in original). "Courts have frequently held that certain military judgments are outside the competence of courts" as courts are not equipped with appropriate standards to resolve the questioning of these judgments. *McMahon*, 502 F.3d at 1363 (discussing *Gilligan*, 413 U.S. 1; *Boyle v. United Technologies Corp*., 487 U.S. 500, 511 (1988)). The type of judgments that are insulated from judicial review involve inherently military activities including combat operations and training exercises. *Id*.

Plaintiffs' wrongful death and survival claims under Pennsylvania law allege that KBR's negligence in failing to adequately inspect facilities, and failing to warn of or remedy known electrical hazards were the proximate cause of Staff Sergeant Maseth's death. (Docket No. 1-3).

As pled, this is an ordinary tort suit seeking money damages against a private corporation. (*Id.*). Accordingly, this Court can apply traditional negligence principles to determine the parties' respective rights and liabilities. Under Pennsylvania law, "[i]n any case sounding in negligence, a plaintiff must demonstrate: (1) a duty of care; (2) the breach of the duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting to the plaintiff." *Farabaugh v. Pennsylvania Turnpike Com'n*, 590 Pa. 46, 60-61, 911 A.2d 1264, 1272-73 (Pa. 2006)(citing *R.W. v. Manzek*, 585 Pa. 335, 888 A.2d 740, 746 (Pa. 2005)).

In *McMahon*, the Court of Appeals for the Eleventh Circuit held that "[t]he flexible standards of negligence law are well-equipped to handle varying fact situations." *McMahon*, 502 F.3d at 1364 (footnote omitted). Pennsylvania law recognizes the same. *See Campo v. St. Luke's Hosp.*, 755 A.2d 20, 24 (Pa.Super.Ct. 2000)("Duty, as a concept, is a flexible notion."); *Shamnoski v. PG Energy, Div. of Southern Union Co.*, 579 Pa. 652, 674, 858 A.2d 589, 602 (Pa. 2004)(noting that the reasonable man standard is "familiar and flexible"); *Sinn v. Burd*, 486 Pa. 146, 165-66, 404 A.2d 672, 682 (Pa. 1979)(noting that the concepts of duty and proximate cause are "elastic notions"). Like the factual scenario in *McMahon*, this "case does not involve a sui generis situation such as military combat or training, where courts are incapable of developing judicially manageable standards." *McMahon*, 502 F.3d at 1364 (footnote omitted). Instead, this case involves a determination of whether a building's electrical system and a water pump were properly maintained, and if KBR was either responsible for such maintenance by virtue of its contract with the Army or had knowledge of the electrical hazards and failed to warn the Army or Staff Sergeant Maseth. "It is well within the competence of a federal court to apply negligence standards" to this factual situation. *McMahon*, 502 F.3d at 1364. As the Supreme Court has recently noted, while this Court

may be required to make "refined and exacting factual inquiries," it is not "inherently ill-equipped" to resolve the issues presented, which do not involve highly political judgments by the military. *Bartlett v. Strickland*, --- U.S. ---, 2009 WL 578634, at *11 (March 9, 2009)(citing *Holder v. Hall*, 512 U.S. 874, 894 (1994)) (Kennedy, Roberts, Alito).

The Court recognizes that the standard of care to be applied in this matter raises unique issues and that providing maintenance services at a military base in Iraq is certainly different than providing the same at a civilian facility in Pennsylvania. However, these differences do not make this case non-justiciable. *See McMahon,* 502 F.3d at 1363 ("We readily acknowledge that flying over Afghanistan during wartime is different from flying over Kansas on a sunny day. But this does not render the suit inherently non-justiciable. While the court may have to apply a standard of care to a flight conducted in a less than hospitable environment, that standard is not inherently unmanageable."). As the Supreme Court of Pennsylvania has recognized:

> The concept of duty is rooted in public policy, and the determination of whether a duty should be imposed upon an alleged tortfeasor involves a balancing of the following factors:
>
> "(1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution."

*Sharpe v. St. Luke's Hosp.*, 573 Pa. 90, 96, 821 A.2d 1215, 1219 (Pa. 2003)(quoting *Althaus v. Cohen*, 562 Pa. 547, 553, 756 A.2d 1166, 1169 (2000)). The applicable duty owed by KBR to Staff Sergeant Maseth, if any, can be defined with reference to common law negligence principles as well as the LOGCAP III Contract, Task Order 139, service order requests at LSF-B1, and KBR's internal

operating procedures.[27]   While the Court cannot ignore the context in which the contract was

performed, i.e., at a military base in Iraq, the reasonableness of KBR's conduct can be evaluated in

relation to any duty owed.   Moreover, the decisions that have dismissed cases against private

military contractors on political question grounds under the second *Baker* factor are distinguishable

as each involved some form of actual combat operations which necessitated dismissal.   These cases

---

[27]

The Court notes that under Pennsylvania law a person need not be classified as a third-party beneficiary or be in privity of contract with one of the parties to a contract for a duty to be created by a contract between third parties.  In this regard, the Supreme Court of Pennsylvania has noted that "[p]rivity of contract ... is not an essential prerequisite to the existence of a duty, as the law may operate under certain circumstances to impose a duty in favor of a third party against one operating under a contract, without reference to the terms of that contract."  *Sharpe*, 573 Pa. at 98 n.3. Moreover, despite KBR's reliance on the terms and conditions of its contract with the Army in an attempt to limit any potential duty owed, KBR may have a legal duty outside of the contract, such as a duty to warn of known dangerous conditions including electrical hazards.

The Court further notes that Pennsylvania law also recognizes that a supplier of electricity may owe a heightened duty of care to certain persons.  *See Estate of Zimmerman v. Southeastern Pennsylvania Transp. Authority*, 168 F.3d 680, 685 (3d Cir. 1999)(citing *Heller v. Consolidated Rail Corp.*, 576 F.Supp. 6, 12 n. 7 (E.D.Pa.1982), *aff'd*, 720 F.2d 662 (3d Cir.1983)). Given that the maintenance services provided by KBR included servicing the electrical systems at the RPC, this principle may be applicable to the instant matter.

In addition, "irrespective of the presence or absence of a contractual duty, a defendant may assume a duty by a course of conduct."  *Boyanoski ex rel. Estate of Kane v. Gould, Inc.*, 46 Pa. D. & C.4th 164, 171 -172 (Pa.Com.Pl. 1999)(citing RESTATEMENT (SECOND) OF TORTS § 323).  *See also* RESTATEMENT (SECOND) OF TORTS 324A (recognizing that one may assume a duty to third parties through a course of conduct directed to others).  Accordingly, to the extent that KBR performed maintenance services at LFF-B1, it may have assumed a duty of reasonable care by virtue of its conduct.  Moreover, to the extent that KBR held itself out as a specialist in providing maintenance services to the Army as a private military contractor, the standard of care governing professional liability cases may be applicable.  *See Merlini ex rel. Merlini v. Gallitzin Water Authority*, 934 A.2d 100, 105 (Pa.Super.Ct. 2007)("there are two questions involved in determining whether a claim alleges ordinary as opposed to professional negligence: (1) whether the claim pertains to an action that occurred within the course of a professional relationship; and (2) whether the claim raises questions of professional judgment beyond the realm of common knowledge and experience.").

were dismissed because a judicial determination of the standard of care to be afforded to the plaintiffs was unmanageable given the military judgments presented. The facts presented in those decisions were the following: the operation of a military convoy through a war zone, *see Carmichael*, 564 F.Supp.2d 1363, *Whitaker*, 444 F.Supp.2d 1277; the amount of security protection to afford a military base to ward off potential attacks, *Smith*, 2006 WL 2521326; and, whether to launch a missile at foreign targets, *Bentzlin*, 833 F.Supp. at 1497-98. The district courts could not delineate between the conduct of the contractor and the military judgment and, therefore, the facts of those cases presented non-justiciable political questions, violating the principles of separation of powers.

The issues presented in the instant matter do not involve actual combat operations and are more analogous to *McMahon*. In *McMahon*, the government contractor retained discretion and control over its performance under the terms of its contract with the military. *McMahon*, 502 F.3d at 1364-65. The Court of Appeals for the Eleventh Circuit found that the plaintiffs could maintain an action against the contractor for negligence caused by the government contractor's performance. *Id*. at 1365. *See also Getz v. Boeing*, 2008 WL 2705099, *6 (when considering the political question doctrine as applied to a private military contractor, "the key inquiry is whether a court will have to consider the wisdom of military operations and decision-making, or whether it need only consider the private contractor's performance."). As discussed above, KBR retained discretion and control over the maintenance services that it provided to the Army at the RPC under the LOGCAP III contract and Task Order 139. The initial military determinations of where to house soldiers and to assign those buildings Level B instead of Level A maintenance are not directly implicated by Plaintiffs' claims, which challenge only KBR's performance under its contract with the Army.

Plaintiffs further maintain that their claims are justiciable because they seek money damages from a private entity, rather than injunctive relief which would tend to have a greater impact on the military. In *Koohi v. United States*, the United States Court of Appeals for the Ninth Circuit held that:

> Damage actions are particularly judicially manageable. By contrast, because the framing of injunctive relief may require the courts to engage in the type of operational decision-making beyond their competence and constitutionally committed to other branches, such suits are far more likely to implicate political questions.

*Koohi*, 976 F.2d at 1332. Plaintiffs seek compensation for Staff Sergeant Maseth's injuries and death allegedly caused by KBR's negligence. They do not seek to enjoin KBR's conduct. This finding weighs in favor of judicial resolution.

Based on the foregoing, this Court finds that Plaintiffs' allegations do not implicate political questions and can be reviewed under judicially discoverable and manageable standards. Accordingly, KBR's motion to dismiss Plaintiffs' claims under the second *Baker* factor is denied.

### 3. Policy Determination of a Kind Clearly for Nonjudicial Discretion

KBR also maintains that political questions are present because initial policy determinations of a kind clearly for nonjudicial discretion are implicated by this case which require the Court to "examine the policies of the Executive branch during wartime." (Docket No. 20 at 20 (quoting *Fisher*, 454 F.Supp.2d at 644)). Specifically, KBR maintains that "the needs of the military, its decision to contract for and fund only limited maintenance for the buildings to which it assigned combat personnel, and the requirements it placed on a civilian contractor to provide those maintenance services" are at issue. (Docket No. 20 at 21). Plaintiffs counter that this case does not require the Court to make any determinations outside the scope of its discretion. (Docket No. 28

at 12).

As discussed with respect to the first and second *Baker* factors, the issues presented in this case can be resolved without implicating military judgments or policy determinations. This same analysis is applicable to the third factor. Accordingly, KBR's motion to dismiss Plaintiffs' claims under the third *Baker* factor is also denied.

4.    Embarrassment or a Lack of Respect to a Coordinate Branch of Government

Finally, KBR claims that a judicial determination which questioned the "military's policies regarding the operation and maintenance of military bases would express a lack of respect due to the coordinate branches of government that oversee war efforts" and that there is "potential of embarrassment" because the Executive and Legislative branches are currently investigating the death of Staff Sergeant Maseth which risks "embarrassment from multifarious pronouncements." (Docket No. 20 at 21-22; Docket No. 122 at 16). This argument invokes both the fourth and sixth *Baker* factors.

The Court is aware of several investigations related to this matter that are currently being conducted in both the executive and legislative branches of the federal government. This includes investigations by the Department of Defense Inspector General, Army Criminal Investigation Division, House Oversight Committee and the Defense Contract Management Agency. (Docket No. 122 at 16 n.11). Several reports that have been produced by these coordinate branches have been filed of record in this matter.[28]

---

[28]

*See* Docket No. 45-2, United States House of Representatives Committee on Oversight and Government Reform Majority Staff Analysis, New Information About the Electricution of Staff Sergeant Ryan Maseth dated July 30, 2008; Docket No. 121-5, Defense Contract Management Agency, CAR # HQ-08-LOGCAP-001 LIII, Deficient Quality System - Level III Corrective Action Request; Docket No. 121-6, KBR Response to CAR #HQ-08-LOGCAP-QA-001-LIII Level III

The Court understands that those investigations, which are ongoing, relate to either an assessment of whether KBR or its representatives should be prosecuted criminally for the circumstances that led to the death of Staff Sergeant Maseth or to evaluate the performance of KBR under the LOGCAP III contract. While these investigations are being conducted by a parallel branch of the federal government, none will address the claims for monetary damages brought by the Estate of Staff Sergeant Maseth and each involve different policy determinations or legal standards than the negligence principles at issue in this case. Further, despite KBR's concerns as to potential embarrassment to the Army if this case were permitted to proceed to the merits, the Army has not sought to intervene in this action nor expressed any concerns to this Court. *See McMahon*, 502 F.3d at 1365 (citation omitted)(noting that the United States had not intervened in that action, despite an invitation from the court to do so and stating that "the opinion of the United States is significant in deciding whether a political question exists.").

In this Court's estimation, adjudicating Plaintiffs' claims will not cause embarrassment nor show a lack of respect to the coordinate branches. Moreover, as this Court has jurisdiction over this matter, absent a finding that Plaintiffs' claims are non-justiciable, it is required to hear Plaintiffs' claims. *See Gross*, 456 F.3d at 376 (citing *Baker*, 369 U.S. at 198)("[q]uestions of justiciability are distinct from questions of jurisdiction, and a court with jurisdiction over a claim should nonetheless decline to adjudicate it if it is not justiciable."). Accordingly, KBR's motion to dismiss is also denied to the extent that it relies on the fourth and/or sixth *Baker* factors.

### 5. Conclusion as to the Political Question Doctrine

Upon consideration of the present record and after conducting a "discriminating inquiry into

Corrective Action Request (CAR) dated October 10, 2008.

the precise facts and posture" of this case, the Court finds that Plaintiffs' claims do not present non-justiciable political questions. *Baker*, 369 U.S. at 217. The principles of separation of powers will not be violated by the Court resolving the merits of Plaintiffs' claims. Accordingly, KBR's motion to dismiss Plaintiffs' claims based on the political question doctrine is denied, without prejudice. If further factual development illuminates the presence of political questions in this action, KBR may renew its motion at that time.

B.      *"Combatant Activities" Exception to the Federal Tort Claims Act*

KBR also argues that Plaintiffs' state law claims should be dismissed as the claims are preempted by federal law. (Docket No. 20 at 22). Specifically, KBR maintains that the "combatant activities" exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(j) has been extended by several federal courts to apply to defense contractors and preempt state law claims. (Docket No. 20 at 22 (citing *Koohi*, 976 F.2d 1328; *Bentzlin,* 833 F.Supp. 1486; *Ibrahim*, 2007 WL 3274784)). Plaintiffs argue that the combatant activities exception is not applicable and that the cases cited by KBR do not support the application as each decision involved actual combat operations. (Docket No. 28 at 14).

The Federal Tort Claims Act authorizes "damages to be recovered against the United States for harm caused by the negligent or wrongful conduct of Government employees, to the extent that a private person would be liable under the law of the place where the conduct occurred." *Boyle v. United Technologies Corp*., 487 U.S. 500, 511 (1988)(citing 28 U.S.C. §1346(b)). KBR has asserted that the "combatant activities" exception to the Federal Tort Claims Act applies here to bar Plaintiffs' claims. Section 2680(j) of the Federal Tort Claims Act provides an exception which precludes tort liability for "[a]ny claim arising out of the combatant activities of the military or naval

52

forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j). Regarding section 2680(j), KBR admits that "[t]his exception to the FTCA's waiver of sovereign immunity does not apply directly to government contractors" but maintains that "the principles underlying the exception have been extended to defense contractors." (Docket No. 20 at 22 (citing *Koohi*, 976 F.2d 1328; *Bentzlin,* 833 F.Supp. 1486; *Ibrahim v. Titan Corp*., 556 F.Supp.2d 1 (D.D.C. 2007))); *see also Flanigan*, 2008 U.S.Dist.LEXIS 82203.

At the outset, it is important to note that the "combatant activities" exception argued here by KBR is distinguishable from the "government contractor" defense established by *Boyle*. The cases cited by KBR have applied the reasoning behind the Supreme Court's decision in *Boyle*, which shields government contractors from design defect suits, to the "combatant activities" exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(j).

In *Koohi*, the United States Court of Appeals for the Ninth Circuit found that one of the purposes of the exception set forth in section 2680(j) "is to recognize that during wartime encounters no duty of reasonable care is owed to those against whom force is directed as a result of authorized military action." *Koohi*, 976 F.2d at 1337. The Court of Appeals in *Koohi* found that section 2680(j) preempted state law claims brought against a weapons manufacturer for injuries sustained by passengers on an Iranian civilian aircraft which was mistakenly shot down by the Navy. *Id*. at 1330.

The District Court for the Central District of California in *Bentzlin*, applied section 2680(j) to bar the families of soldiers who were killed when a missile struck the vehicle in which the soldiers were traveling from bringing suit against weapons manufacturers for allegedly defective products. *Bentzlin*, 833 F.Supp. at 1492. The district court found the decision in *Koohi* to be "wholly persuasive" and explained that "[t]he combatant activities exception manifests the federal interest

in determining the duty of care in combat." *Id.*  The district court further held that the "federal interests that exist in wartime would be frustrated by allowing state tort suits against government contractors that arise from wartime deaths, even when plead as manufacturing defect claims." *Id.*

In *Ibrahim*, the district court granted summary judgment in favor of defense contractors based on the "combatant activities" exception to the FTCA against state law tort claims brought by "Iraqi nationals who allege[d] that they or their late husbands were tortured or otherwise mistreated while detained by the U.S. military at Abu Ghraib and other prisons in Iraq." *Ibrahim*, 556 F.Supp.2d at 2.  The employees of the defense contractor in *Ibrahim* were interpreters.  The district court found that the interpreters acted effectively as soldiers, specifically holding that:

> Where contract employees are under the direct command and exclusive operational control of the military chain of command such that they are functionally serving as soldiers, preemption ensures that they need not weigh the consequences of obeying military orders against the possibility of exposure to state law liability. It is the military chain of command that the FTCA's combatant activities exception serves to safeguard, however, and common law claims against private contractors will be preempted only to the extent necessary to insulate military decisions from state law regulation. This is why the degree of operational control exercised by the military over contract employees is dispositive. When the military allows private contractors to retain authority to oversee and manage their employees' job performance on the battlefield, no federal interest supports relieving those contractors of their state law obligations to select, train, and supervise their employees properly.

*Id.* at 5.  As the district court found that "control" by the government was dispositive, it granted summary judgment in favor of defendant Titan which supplied interpreters, but denied summary judgment as to defendant CACI which had supplied interrogators as it found that disputed facts existed as to whether sufficient "control" was present.  *Id.*

Plaintiffs distinguish the above cited decisions and rely on *Lessin v. Kellogg, Brown & Root*

*Services, Inc.*, 2006 WL 3940556 (S.D.Tex. 2006) and *Carmichael v. Kellogg, Brown & Root Services, Inc., et. al ("Carmichael I")*, 450 F.Supp.2d 1373 (N.D.Ga. 2006) to support their contention that section 2680(j) is inapplicable to the instant matter.

In *Lessin*, the district court for the Southern District of Texas found that the combatant activities exception did not prevent a United States soldier from maintaining an action against KBR for negligence in inspecting, maintaining and repairing a vehicle which had injured the soldier. *Lessin*, 2006 WL 3940556 at *4. The district court distinguished *Koohi* and *Bentzlin* as the injuries in those decisions "arose from the United States' use of weapons during combat," in finding that section 2680(j) was inapplicable to bar the plaintiff's claims. *Id*. at *4.

Likewise, in *Carmichael I*, the district court for the Northern District of Georgia denied KBR's motion to dismiss the negligence claims of a U.S. soldier against KBR under the "combatant activities" exception to the FTCA. *Carmichael I*, 450 F.Supp.2d at 1380-81 (plaintiffs claims were later dismissed by the district court after discovery when it determined that the case presented a non-justiciable political question). The soldier was a passenger in a tractor trailer driven by one of KBR's contractors and was injured when the truck was in an accident allegedly caused by negligent driving of the contractor. *Id*. at 1374. The district court found the decision in *Lessin* persuasive and likewise distinguished *Koohi* and *Bentzlin*, denying KBR's motion to dismiss. *Id*.

The decisions of *Koohi* and *Bentzlin* are distinguishable from the instant matter as both involved products liability claims against manufacturers resulting from actual combat operations. *Ibrahim* is also distinguishable as the interpreters were found to be acting as soldiers under direct control of the military during actual combat operations.[29]

---

[29]

The Court notes that the decisions in *Koohi*, *Bentzlin* and *Ibrahim* are also distinguishable

This case does not involve claims arising from active military combat operations. The issues presented by Plaintiffs' claims involve the alleged negligent performance or non-performance of KBR in providing maintenance services to the United States Army. In addition, KBR has not presented the Court with any evidence or allegations that Staff Sergeant Maseth's death was caused by active military operations. Therefore, Plaintiffs' claims do not arise out of "the combatant activities of the military" under 28 U.S.C. § 2680(j). Accordingly, KBR's motion to dismiss under the "combatant activities" exception to the FTCA is denied.

## VI. CONCLUSION

Based on the foregoing, KBR's Motion to Dismiss [18] is denied, without prejudice. Plaintiffs' claims, as framed and supported, do not raise non-justiciable political questions nor are they preempted by the combatant activities exception to the FTCA at this time. An appropriate order follows.

_s/ Nora Barry Fischer_
Nora Barry Fischer
United States District Judge

Dated: March 31, 2009

cc/ecf: All counsel of record.

---

as each were issued after discovery on motions for summary judgment, while only limited discovery has been ordered in this matter which is before the Court on KBR's motion to dismiss.