**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHERYL A. HARRIS, Co-Administratrix of the Estate of RYAN D. MASETH, deceased, and DOUGLAS MASETH, Co-Administrator of the Estate of RYAN D. MASETH, deceased, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 08-563 Judge Nora Barry Fischer |
| KELLOGG, BROWN & ROOT SERVICES, INC., | ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

I.      INTRODUCTION

Plaintiffs, the parents and administrators of the Estate of Staff Sergeant Ryan Maseth, seek damages against government contractor Kellogg, Brown and Root Services, Inc. ("KBR"), claiming that KBR's alleged negligence in the performance or non-performance of electrical services at a military base during the Iraq War was the proximate cause of his electrocution and death while showering at the Radwaniyah Palace Complex ("RPC"). (Docket No. 209).  The crux of Plaintiffs' case is that KBR failed to employ certain safety procedures in conjunction with electrical maintenance services it provided at the RPC.  (*Id.*).  The use of grounding and bonding techniques as suggested by Plaintiffs is standard practice by electricians in the United States and other Western countries.  (*Id.*).  According to Plaintiffs, the use of these safety precautions may have prevented their son's death, which they maintain resulted from the failure of a water pump installed without it being grounded or bonded.  (*Id.*).  KBR does not challenge the merits of Plaintiffs' claims at this time.  Instead, KBR has filed a renewed motion to dismiss, arguing that

this case is barred by the political question doctrine under *Baker v. Carr*, 369 U.S. 186, 82 S. Ct. 691 (1962), and, alternatively, that Plaintiffs' claims are preempted by the combatant activities exception to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(j). (Docket No. 260).

This Court previously denied a motion to dismiss brought by KBR raising these same defenses, holding that, as pled, Plaintiffs' claims did not raise non-justiciable political questions and were not preempted by the combatant activities exception. *See Harris v. Kellogg, Brown & Root Services, Inc.*, 618 F. Supp. 2d 400 (W.D. Pa. 2009). The United States Court of Appeals for the Third Circuit dismissed KBR's appeal of this decision without addressing the merits and the case was remanded to this Court. *Harris v. Kellogg, Brown & Root Services, Inc.*, 618 F.3d 398 (3d Cir. 2010). Upon remand, the parties were ordered to conduct discovery regarding Plaintiffs' claims and KBR's defenses, which they did. Extensive discovery has been undertaken by the parties. KBR's renewed motion to dismiss has been fully briefed and argued by the parties. (*See* Docket Nos. 260-279, 282-285, 294).

The Court has carefully considered all of the parties' arguments and the detailed factual record in this case. (*See id.*). After conducting a "discriminating inquiry into the precise facts" of this case as established through a lengthy period of discovery and having heard the parties' arguments outlining the claims and defenses that they intend to present at trial, the Court finds that further adjudication of this dispute will inextricably lead to consideration of sensitive military judgments for which no judicially manageable standards exist. *Baker*, 369 U.S. at 217. Specifically, further adjudication of this case will require evaluation of the military's decision to continue to house soldiers in hardstand buildings with hazardous electrical systems even though the military was aware that the buildings lacked grounding and bonding and the military

possessed specific knowledge that such electrical deficiencies had resulted in electrocutions to military personnel, causing injuries and even deaths, prior to the events of this case.

The Court finds that the issues which Plaintiffs seek to try – whether KBR was negligent in failing to install grounding and bonding features on the malfunctioning water pump, failing to install grounding and bonding features on the electrical system, or failing to properly bond the pipes at Legion Security Forces Building 1 ("LSFB1") – cannot be answered without first considering the wisdom of military judgments, thus taking this case beyond judicial review.   In this Court's view, KBR has also presented sufficient evidence from which it may legitimately argue that the military exposed soldiers to what its commanders determined to be an acceptable level of risk after considering all of the other hazards of war which were faced by soldiers in the Iraq war theatre and its ability to fund the electrical upgrades and safety features which are admittedly standard here in the United States.  (*See* Def Ex. 2, Docket No. 263-2:11; Def Ex. 6, Docket No. 263-15; Def Ex. 7, Docket No. 263-16; Def Ex. 22, Docket No. 263-33; Def Ex. 24, Docket No. 263-35).  This evidence supports its position that despite the known risk presented by electrical deficiencies at the RPC, the military did not contractually require KBR or prior contractors to complete upgrades to the electrical facilities there.  (Def Ex. 26, Docket No. 263-37:48; Def Ex. 43, Docket No. 263-69; Pl Ex. A, Docket No. 266). The military also declined KBR's offer to upgrade the electrical facilities for cost reasons.  (Docket Nos. 262 at ¶ 135; 265 at § I, ¶ 135).

The level of safety provided to soldiers at a military base is a decision which is constitutionally committed to members of the Executive Branch while the funding of the military is constitutionally committed to the Legislative Branch.  *See Lane v. Halliburton*, 529 F.3d 563, 559 (5th Cir. 2008) ("[T]he Constitution commits to Congress the power to raise and support an

army and navy, and to the Executive the responsibilities of commanding those armed forces."). In this Court's estimation, following the Supreme Court's dictates in *Baker*, the judgments of these officials on such sensitive military and legislative policy issues cannot be evaluated in a court of law without violating the doctrine of separation of powers.

For these reasons, and as is further detailed below, the Court now concludes that this case is barred by the political question doctrine and preempted by the combatant activities exception to the FTCA and must be dismissed.

## II.   FACTUAL BACKGROUND

The factual record in this case is extensive.   As much of the evidence was previously considered by the Court in the decision denying KBR's initial motion to dismiss, *see Harris*, 618 F. Supp. 2d at 403-15, the Court recounts here only those facts necessary to resolve the pending motion.

### A.   The RPC and LSFB1

KBR's provision of operations and maintenance services to the United States Army during the Iraq War pursuant to the Logistics Civil Augmentation Program ("LOGCAP") is central to this case.  (Docket Nos. 262 at ¶¶ 1-10; 265 at § I, ¶¶ 1-10).   As noted, the relevant events occurred at the RPC.  (Docket Nos. 262 at ¶¶ 28-30; 265 at § I, ¶¶ 28-30).   The RPC was the headquarters for Special Operations Forces operating in Iraq.   (Docket Nos. 262 at ¶ 29; 265 at § I, ¶ 29). The military had overall responsibility for, and authority and control of, the activities and operations that took place at the RPC, including the decisions as to which buildings were used as housing.  (Def. Ex. 7, Docket No. 263-16, *Satterfield Depo* at 102 ("Commanders authorize soldiers, and when I say commanders I'm talking now all services, told the troops where they were allowed to live or not live."); Docket Nos. 262 at ¶¶ 51-52; 265 at § I, ¶¶ 51-52).

The RPC consists of approximately 144 separate buildings.  (Docket Nos. 262 at ¶ 125; 265 at § I, ¶ 125).  Due to its size, the RPC was divided into compounds or areas.  (Docket Nos. 262 at ¶ 46; 265 at § I, ¶ 46).  One such area was known as the Legion Security Forces Compound ("LSF").  *Id.*  Staff Sergeant Maseth was housed in one of the buildings within the LSF, known as LSFB1.  *Id.*  Other inhabitants of the LSF buildings were Special Forces troops who conducted midnight raids on enemy forces or provided security at the heavily-guarded entry control point which was located near LSFB1.  (Docket Nos. 262 at ¶¶ 35-39, 47; 265 at § I, ¶¶ 35-39, 47).  The soldiers housed in the LSF buildings also provided intelligence for the war effort in Iraq. (Docket Nos. 262 at ¶ 38; 265 at § I, ¶ 38).

The RPC buildings were initially constructed by Iraqis prior to the U.S. led invasion of Iraq.  (Docket Nos. 262 at ¶ 45; 265 at § I, ¶ 45).  The military referred to these buildings as "hardstands."  (*Id.*).  Some of the buildings had internal restroom and shower facilities which were likewise constructed by Iraqis.  (*See* Docket Nos. 262 at ¶¶ 70, 172, 178, 187; 265 at § I, ¶¶ 70, 172, 178, 187).  Soldiers living in these buildings often showered in these facilities.  (*Id.*). LSFB1 had two such internal restroom facilities which were used by the inhabitants.  (*See* Def Ex. 31, Docket No. 263-54 at 14, Figure 2, Floor Plan of LSFB1).  However, there were containerized showering facilities known as ablution units, which were made available to soldiers at the RPC.  (Docket Nos. 262 at ¶ 49; 265 at ¶ 49).  Military commanders were responsible for directing soldiers to use ablution units, if they deemed it appropriate.  (Def. Ex. 7, Docket No. 263-16, *Satterfield Depo* at 102-104).  As a contractor, KBR had no authority to order military personnel to do anything, including to direct soldiers where to live or shower.  (Docket Nos. 262 at ¶¶ 54-55; 265 at § I, ¶¶ 54-55).

5

B.  *Renovations to LSF Buildings by Iraqi Subcontractor*

Shortly after the occupation, in 2003, the Army made a decision to renovate and refurbish the hardstand LSF buildings, including LSFB1.  (Docket Nos. 262 at ¶ 99; 265 at § I, ¶ 99).  Prior to the renovations, LSFB1 was completely looted and it had no electrical power, electrical components, internal plumbing, doors or windows.  (Docket Nos. 262 at ¶ 100; 265 at § I, ¶ 100).  Lieutenant Colonel Richard Cote was the project manager for the renovation project and he was directed to engage a local Iraqi contractor, rather than an American contractor, to perform the renovations.  (Docket Nos. 262 at ¶ 101; 265 at § I, ¶ 101).  Local contractors were used in order to improve U.S. – Iraqi relations and to support the local economy which had been devastated by the war.  (Docket Nos. 262 at ¶¶ 103-04; 265 at § I, ¶¶ 103-04).  The original intent of the project was for LSFB1 to be used as office space and a command post rather than living quarters.  (Docket Nos. 262 at ¶¶ 105-06; 265 at § I, ¶¶ 105-06).  Hence, making the building safe for living quarters was not considered a priority during the renovations.  (*Id.*).

The contractual agreement with the Iraqi contractor provided that it was to rewire the building using supplies and materials from the local economy and to include grounding and bonding for all electrical work.  (Docket Nos. 262 at ¶¶ 107-09; 265 at § I, ¶¶ 107-09).  The contract further directed that acceptance of the contractor's work would be conditioned on a successfully completed test of the grounding system.  (Docket Nos. 262 at ¶ 110; 265 at § I, ¶ 110).  However, no such test was ever completed, (*id.*), even though it was well known within the military chain of command that Iraqi contractors did not ground and bond their electrical work.  (Docket Nos. 262 at ¶¶ 102, 113; 265 at § I, ¶¶ 102, 113).  In fact, military personnel testified that the work was "bad news" and "jerry-rigged."  (Docket Nos. 262 at ¶ 113; 265 at § I, ¶ 113).  Thus, the work performed at LSFB1 was no exception.

Subsequent to the renovations, it was generally accepted that the buildings in the RPC did not meet Western construction standards and that there were deficiencies in the electrical systems, including a lack of proper grounding and bonding. *See Harris*, 618 F.Supp.2d at 405. Despite the known presence of deficient electrical systems, the military made a decision to house soldiers in these buildings as they were considered safer than manufactured housing, given the risk of mortar attacks and shelling. *Id.*; (*see also* Docket Nos. 262 at ¶ 91; 265 at § I, ¶ 91 ("As General Vines acknowledged: 'We chose to assign personnel to live in these pre-existing structures, notwithstanding their electrical deficiencies. All of us, including myself, lived in buildings with similar deficiencies.'")). Indeed, despite the initial mandate that LSFB1 would not be used to house soldiers, the building was continuously occupied by soldiers from its acceptance by the military in May of 2004 through 2008. (Docket Nos. 262 at ¶¶ 112, 114; 265 at § I, ¶¶ 112, 114). The evidence also shows that the military never remedied the faulty electrical work in LSFB1 completed by the Iraqi subcontractor nor did it engage another contractor to fix the problems. (Docket Nos. 262 at ¶¶ 117, 188, 190; 265 at § I, ¶¶ 117, 188, 190).

### C. CENTCOM Contracts with Washington Group and KBR

The United States Army Corps of Engineers ("USACE") engaged Washington Group International[1] ("WGI") to provide operations and maintenance services at the RPC from April 2003 through April 2006 under a series of contractual agreements. (Docket Nos. 262 at ¶ 117; 265 at ¶ 117). These contracts provided that the buildings be maintained "as is" and noted that "[e]xisting interior and exterior electrical systems are in poor condition. The Contractor shall support **existing** electrical systems." (*Id.* (emphasis added)). During its term as service provider

---

[1]   The Court notes that Plaintiffs also brought suit against URS Corporation, the successor to WGI in this District. *See Harris v. URS, Civ. A. No. 09-1673.* That matter was amicably resolved by the parties.

at the base, WGI never upgraded the deficient electrical work which was completed by the Iraqi subcontractor.  (Docket Nos. 262 at ¶¶ 188, 190; 265 at § I, ¶¶ 188, 190).

The USACE next contracted with KBR to provide operations and maintenance services at the RPC under the CENTCOM contract for the period of April 2006 through February 2007.  (Docket Nos. 265 at § II, ¶ 1; 283 at ¶ 1).  Like the contracts with WGI, this agreement with KBR also provides that "[e]xisting interior and exterior electrical systems are in poor condition.  The Contractor shall support **__existing__** electrical systems."  (Docket Nos. 262 at ¶ 118; 265 at § I, ¶ 118 (emphasis added)).  Services were provided under the USACE contract as directed by the military in order to "restore a facility or component thereof, to a condition substantially equivalent to its original intended and designed capacity … or is restored to its 'as built' condition."  (Docket Nos. 262 at ¶ 119; 265 at § I, ¶ 119).

The parties dispute which provisions of the CENTCOM contract were applicable to the present circumstances.  KBR contends that § 34, Requirements for Electrical, which contained no explicit standard for electrical work, applied while Plaintiffs take the position that § 44, Requirements for Low Voltage Electric System Maintenance and Repair, which specified that the National Electrical Code ("NEC") standards govern KBR's work, applied.  (Docket No. 262 at ¶¶ 118, 119; 265 at § I, ¶¶ 118, 119).  The parties have not presented any evidence outside of this contract to support their positions with respect to which provision of the CENTCOM contract controlled KBR's relationship with the Army Corps of Engineers, i.e., if § 34 rather than § 44 applied.[2]  (*See* Docket No. 294 at 94, 106).

---

[2]    The Court questioned counsel regarding the CENTCOM contract at the motion hearing.  (*See* Docket No. 294 at 94).  Plaintiffs' counsel admitted that he had no such evidence, while KBR's counsel stated that the dispute was not relevant to the Court's analysis of the pending motion.  (*Id.* at 94, 104).  As is discussed below, the Court agrees that the dispute is immaterial to the disposition of the pending motion because Plaintiffs have been unable to present any direct evidence that KBR installed the water pump during the prior contract.  *See* § V.A.1, *infra*.  Therefore, KBR may legitimately argue that the CENTCOM contract has no bearing on this case.  *Id.*

### D.  Warnings Concerning the Risks to Soldiers of Potential Electrical Hazards at Military Bases in Iraq

During the period of 2004-2006, there were several reports of injuries and deaths of United States soldiers after sustaining electrical shocks in the Iraq war theatre.  (*See* Def. Exs. 2, pts 2-10, 22, 24, Docket Nos. 262-2:262-11, 262-33, 262-35).   Many of these shocks were attributed to improper grounding of electrical systems.   (*Id.*).   As is detailed below, this information pertaining to the specific risk of electrical shocks to soldiers was then publicized within the military, including distribution to many high-ranking officials in the chain of command.   These warnings emanated from the Army Safety Center, the Defense Contract Management Agency ("DCMA") and other military personnel.

To this end, the United States Army Safety Center publishes a monthly magazine, "Countermeasures," which focuses on Army ground risk-management advice.[3]  (Def. Ex. 22, Docket No. 263-33 at 2).   An article titled *"Electrocution: The Unexpected Killer"* appeared in the October 2004 issue of this publication.  (*Id.* at 20).   This article states that five soldiers had died in Iraq in fiscal year 2004 from electrocutions, including one soldier who was killed while showering in May or June of 2004.  (*Id.*). The author cited "improper grounding of electrical systems" as the cause of that electrocution, and a senior military engineer confirmed that the military had seen "several shocks in showers and near misses here in Baghdad, as well as in other parts of the country."  (Docket Nos. 262 at ¶ 64; 265 at § I, ¶ 64).   Although this is an Army publication and is directed to troop safety, it is unclear from the record how widespread was this publication's reach.

---

[3]     The Court notes that the publication contains a disclaimer which provides that "[i]nformation is for accident prevention purposes only and is specifically prohibited for use for punitive purposes or matters of liability, litigation, or competition."  (Def. Ex. 22, Docket No. 263-33 at 2).  Despite same, Plaintiffs have not asserted any objections to the Court's consideration of this publication.

Later, in 2006, Lieutenant Colonel Brent Carey, a LOGCAP support officer who reported directly to Jana Weston within the DCMA, observed electrical hazards at hardstand buildings on the bases within Iraq where soldiers were housed and prepared a presentation describing same. (Def Ex. 2, pts 2-10, Docket No. 263).   The purpose of LTC Carey's presentation titled "Sub-Standard Electric Wiring Conditions" was to bring attention to a "serious threat to the life, health and safety of our soldiers."  (Docket Nos. 262 at ¶ 69; 265 at § I, ¶ 69).   His briefing provided a warning that soldiers could be electrocuted in the shower and pointed out that a soldier had died in a shower in a hardstand building in the summer of 2005.  (Docket Nos. 262 at ¶ 70; 265 at § I, ¶ 70).   LTC Carey intended his presentation "to make a case for having soldiers leave the hardstand buildings or releasing the funding so that KBR or another contractor could fix the wiring."  (Docket Nos. 262 at ¶ 71; 265 at § I, ¶ 71).   LTC Carey testified that he discussed his concerns with various individuals throughout the military chain of command.  (Docket Nos. 262 at ¶ 72; 265 at § I, ¶ 72).

Major James Harvey also served in the LOGCAP support unit and received LTC Carey's presentation.  (Docket Nos. 262 at ¶ 73).   In 2006, Major Harvey forwarded the briefing up the chain of command to a number of other high-ranking individuals, including "Brigadier General Satterfield, Colonel Jack O'Connor, General Kathleen Gainey, General Joseph Anderson, Major John Stewart, Colonel Jacque Azmar, possibly Colonel Jake Hanson, Colonel Thad Hartman, Jana Weston, Headquarters of Army Sustainment Command in Rock Island, someone within Fort Belvoir, Don Anderson, the LOGCAP office, Colonel Christianson, Colonel Smith, and Congressman Wayne Gilchrest."[4]   (Docket Nos. 262 at ¶ 74; 265 at § I, ¶ 74).   Major Harvey testified that he submitted this information to these individuals (and possibly others) because they

---

[4]       Congressman Wayne Thomas Gilchrest is a Republican who formerly represented the 1st District of Maryland in the U.S. House of Representatives.

had the authority and ability to take action and make changes regarding the electrical deficiencies. (Docket Nos. 262 at ¶¶ 73-76; 265 at § I, ¶¶ 73-76).

Subsequently, Major Harvey identified the electrical hazards as critical issues in situational weekly reports that he prepared for an additional four to six weeks. (Docket Nos. 262 at ¶ 78; 265 at § I, ¶ 78). These reports were also provided to military commanders. (*Id.*). In addition to the briefings, LTC Carey gave photographs of widespread electrical hazards to base camp Mayors at meetings which were held for the purpose of identifying additional services needed at the base camps. Neither Harvey nor Carey received any significant response to their concerns. (Docket Nos. 262 at ¶¶ 82-83; 265 at § I, ¶¶ 82-83). Indeed, LTC Carey testified that the base camp Mayors who received his report seemed "annoyed" by it. (Docket Nos. 262 at ¶ 84; 265 at § I, ¶ 84).

Brigadier General Douglas Satterfield was one of the senior commanding officers who received LTC Carey's briefing on potential electrical hazards at the bases. (Docket Nos. 262 at ¶ 85; 265 at § I, ¶ 85). General Satterfield testified that it was well known throughout the military that the electrical systems presented hazards. (Docket Nos. 262 at ¶¶ 86-87; 265 at § I, ¶¶ 86-87). He also explained that he was likewise housed in one of the hardstand buildings and was exposed to these risks. (Docket Nos. 262 at ¶¶ 88-89; 265 at § I, ¶¶ 88-89). He further confirmed that shocking incidents of soldiers occurred regularly and admitted that he was shocked "many times." (Docket Nos. 262 at ¶ 89; 265 at § I, ¶ 89). However, General Satterfield considered the shocking incidents to be "minor" as compared to other more pressing military issues such as power generation and the protection of base residents from indirect enemy fire. (Docket Nos. 262 at ¶ 90; 265 at § I, ¶ 90). Lieutenant General John Vines, former Commander of the Multi-National Force – Iraq, declared that the military chose to house soldiers in the hardstand buildings despite

the known electrical risks and that all of the soldiers who were housed there – including him – were exposed to such risks.  (Def Ex. 6, Docket No. 263-15, Docket Nos. 262 at ¶ 91; 265 at § I, ¶ 91).  General Vines further opined that the tragic incident involving Staff Sergeant Maseth could have occurred at any of the bases in Iraq where existing hardstand structures were used to house soldiers, because they all suffered from the same electrical deficiencies and subjected soldiers to similar risks.  (*Id.*).

Additional internal military documents demonstrate further awareness of the electrical problems at U.S. bases in Iraq.  For example, on February 1, 2007, Paul W. Dickinson of the DCMA issued a Memorandum for the Commander of DCMA Iraq, in conjunction with an audit he was conducting for the purpose of establishing contractual standards for a future contract with KBR under LOGCAP IV.[5] (Def Ex. 24, Docket No. 263-35; Docket Nos. 262 at ¶ 92; 265 at § I, ¶ 92).  The purpose of the Memorandum was "[t]o set a baseline on the safety status and culture, state the way forward to improve status, and develop the measures and timeline to ensure the process is properly aligned to achieve the mission goals." (Def Ex. 24, Docket No. 263-35; Docket Nos. 262 at ¶ 93; 265 at § I, ¶ 93).  Dickinson wrote that:

> KBR has a large professional safety staff and institutionalized safety program.  However, the program is based upon US OSHA Safety Standards as required by contract, and is substantially non-achievable due to the war environment. Many products and facilities available in Iraq do not meet basic US standards nor a military risk analysis based on a generally acceptable "good enough" standard.  The LOGCAP contract process influences KBR to inherit many facilities which are not intended for long term usage.

(Def Ex. 24, Docket No. 263-35; Docket Nos. 262 at ¶ 94; 265 at § I, ¶ 94).  Dickinson also noted that the "[p]rimary safety threat, theater wide, is fire due to the inferior 220 electrical fixtures

---

[5]     The Court notes that the LOGCAP IV program was instituted after the events of this case and is otherwise not pertinent here.

found throughout Iraq. Improper installation, substandard equipment purchases (such as light fixtures), and heavy usage appear to be the three primary causes of these fires."  (Def Ex. 24, Docket No. 263-35; Docket Nos. 262 at ¶ 95; 265 at § I, ¶ 95).

E.    Transition from CENTCOM Contract to LOGCAP – Technical Inspections

In February of 2007, the military desired to shift KBR's limited maintenance responsibilities under the CENTCOM contract to the LOGCAP program.  (Docket Nos. 262 at ¶¶ 127, 128; 265 at § I, ¶¶ 127, 128).   There were several reasons identified for the transition, including an effort to reduce the overall cost of maintaining the RPC and the fact that the CENTCOM contract was near expiration.   (Docket Nos. 262 at ¶ 227; 265 at § I, ¶ 227). Negotiations ensued between the parties regarding the details of the transition, including the timing of same and the scope of the services KBR was to provide under the LOGCAP program.

The transition from CENTCOM to LOGCAP was accomplished in a few short weeks as documents provided to the Court show that the formal request for a project planning estimate was made by the military on February 8, 2007 and KBR responded to same on February 19, 2007, with subsequent revisions submitted on February 20 and 23, 2007.  (Def. Ex. 3, Docket No. 263-12 at 26-48).   One of the initial requirements that the military imposed on KBR prior to the transition was the completion of technical inspections of the RPC buildings.  (Docket Nos. 262 at ¶ 129; 265 at § I, ¶ 129).   The documents suggest that KBR was expected to accomplish the inspections within the short time frame allotted by the military.  (Docket Nos. 262 at ¶ 130; 265 at § I, ¶ 130).   For practical purposes, the completion of full technical inspections of all of the 126 buildings was not possible during the two-week time frame.   In this regard, the military officer in charge of the transition, LTC Donna Williams, testified that the time frame permitted to complete the technical inspections was "unrealistic" given the number of buildings at the RPC.  (Id.).  KBR

made a request for additional time to complete the inspections but military commanders rebuffed this request, and LTC Williams testified that she believed that the transition was "rushed." (Docket Nos. 262 at ¶¶ 130, 132; 265 at § I, ¶¶ 130, 132).  She also felt that the transition was expedited because of exigent battlefield needs of the military and in order to avoid a break in KBR's services.  (Docket Nos. 262 at ¶¶ 129, 131; 265 at § I, ¶¶ 129).

The hurried nature of the transition is also demonstrated by KBR's project planning estimate, wherein KBR states that:

> 14.     *The short suspense for the PPE does not allow for a complete TI [technical inspection] of each building.*  KBR assumes the buildings are up to the quality standards of LOGCAP and has based the estimate on assuming O&M [operations and maintenance services] on buildings and peripheral equipment that are in acceptable condition.
>
> …
>
> 16.     *KBR assumes the building systems to be in good condition and upon discovery of defective systems (Electrical, Mechanical, or Structural) repairs will be made only at the direction of an ACL [administrative change letter].*  KBR has included the cost of known repairs required at the time of the estimate.

(*Project Planning Estimate "PPE"*, attached to Def Ex. 3, *Weston Depo*, Docket No. 263-12 at 30-31 (emphasis added)).   Despite this language, KBR did complete a "limited" technical inspection of some of the RPC buildings and prepared a February 10, 2007 technical inspection report which identified several electrical deficiencies at "Radwaniyah Palace D9" and "LSF Office."  (Pl. Ex. W, Docket No. 277 at 2-3).  The problems identified in the report included, *inter alia*: a lack of grounding of a main distribution panel; incorrectly sized and not properly grounded wires on secondary feeder wire circuits; and, an improperly grounded water heater tank.  *Id*. at 2. As set forth on the report, despite the noted deficiencies, the main distribution panel for the

"Radwaniyah Palace D9" was identified by KBR with an equipment condition code ("CC") of "B5 Serviceable - used, fair (w/ qualifications)." *Id*. Other options on the form included "Unserviceable" - a code which testimony demonstrates if selected may have resulted in condemnation of a building. *Id.* at 3. This technical inspection was provided to the military a second time in November of 2007, after military personnel requested KBR to provide it with another copy of the report. (Docket Nos. 262 at ¶¶ 169-170; 265 at § I, ¶¶ 169-170).

During the initial negotiations, KBR proposed that it be engaged to provide Level A maintenance at the RPC under Task Order 139.[6] (Docket Nos. 262 at ¶ 134; 265 at § I, ¶ 134). Level A maintenance included upgrades to existing facilities and the establishment of a preventative maintenance program, including checks for grounding of electrical systems. (Docket Nos. 262 at ¶¶ 136, 137; 265 at § I, ¶¶ 136, 137). Level B constituted a lower level of maintenance services and expressly excluded upgrades to existing systems and preventative maintenance. (Docket Nos. 262 at ¶¶ 138-139; 265 at § I, ¶¶ 138-139). After some discussions, the Army determined that the cost associated with Level A maintenance was prohibitive and requested an estimate as to Level B maintenance, only. (Docket Nos. 262 at ¶ 135; 265 at § I, ¶ 135). In its project planning estimate, KBR relied on a series of assumptions which are consistent with the Level of maintenance to be provided, including that:

> 27.    KBR assumes FACILITY MAINTENANCE will be level B. Limited maintenance does not include inspections, preventative maintenance and upgrades. Any repairs that need to be done on the facility will be initiated with a service request by the customer. Upon receipt of service request, the contractor shall conduct an assessment to determine feasibility of repair or replacement of existing items. The assessment shall be provided by the Mayoral

---

[6]    The parties have not pointed the Court to a specific value of this proposed contract, but there are suggestions in the record that the value was $10 million or $20 million dollars. (*See* Def Ex. 3, Docket No. 263-12 at 8; *see also* Def Ex. 29, Docket No. 263-52 at 60).

> Cell.  If the assessment determines repair or replacement is warranted, the contractor shall repair or replace.  However, if the assessment exceeds the scope of repair or replacement; the contractor shall return the service request to the Mayoral Cell for disposition.  *Repairs on emergency items* (i.e. No power or no AC in the summer) will be initiated within two hours of the request.  Normal repairs initiated within 24 hours of the request.

(*PPE*, Def Ex. 3, Docket No. 263-12 at 31).  On February 23, 2007, the military approved funding for KBR's project planning estimate and issued an administrative change letter authorizing KBR to commence work under the LOGCAP III program in exchange for compensation in excess of three million dollars.  (*2/23/07 ACO Change Letter*, attached to Def Ex. 3, Docket No. 263-12 at 26-27).

Prior to January 2, 2008, the military never directed KBR to repair the electrical deficiencies identified in the technical inspection for LSFB1 or to issue an administrative change letter authorizing KBR to upgrade or rewire LSFB1.  (Docket No. 262 at ¶ 166).  In addition, after its initial offer to complete Level A maintenance was rejected by the military, KBR never requested that it be permitted to upgrade the electrical facilities of LSFB1 and never explicitly sought the military's approval to upgrade or rewire the buildings.  (Docket No. 265 at § I, ¶ 161).  Nor did the military ask KBR to do so.

### F.  LOGCAP Contract/Statement of Work/Task Order 139

The Court previously detailed the relevant terms and conditions of the LOGCAP III Contract between KBR and the military, which consists of the LOGCAP base contract, Statement of Work and Task Order 139. [7]  (*See Task Order 139*, Def. Ex. 43, Docket No. 263-69; Pl. Ex. B, Docket No. 266-1).  Thus, the Court focuses its analysis on the provisions which are necessary to

---

[7]    *See Harris*, 618 F. Supp. 2d at 405-412.  The contract is filed in multiple locations on the Court's docket. For convenience, the Court will cite to same as "*Task Order 139*."

the disposition of the present motion, rather than recounting the terms and conditions of the agreement in explicit detail a second time.

The relationship between the military and KBR is established in the contract.  To this end, the military controlled the terms and conditions of the contract and mandated strict compliance. *See Task Order 139* at §§ 1.1, 7.1.  As such, KBR was obligated to perform in line with the terms of the Statement of Work and Task Order 139.  *Id.* at § 7.1.  KBR was not permitted to engage in any work which was outside the scope of the contract without prior approval from the military contracting authorities.  *Id.* at § 7.1.  However, KBR was responsible for the quality of its work and the coordination of all aspects of its performance, including supervision of its employees.  *Id.* at §§ 1.11, 1.14, 7.1.   The agreement makes clear that the military was not required to supervise KBR's work, other than to monitor performance under the contract to ensure that KBR did not submit any false claims for compensation to the government.

Task Order 139 "governs the base life support functions" to be performed by KBR at military bases in Iraq and specifies the services to be provided thereto including Facilities and Operations & Maintenance Services.  *Task Order 139* at § 1.0.  Applicable to the instant matter, section 8 of Task Order 139 details Operations and Maintenance Services, which consists of maintenance and repair of facilities and repair or replacement of equipment and major electrical appliances in the RPC.  *Id.* at § 8.  The Task Order sets forth three separate levels of maintenance services: Level A – Full Service; Level B – Limited Maintenance; and Level C – No Maintenance.  *Id.* at § F.2.  According to the contract, it was the responsibility of the Mayor's Cell to prioritize the level of maintenance for each facility.  *Id.* at § F.1.2.  However, the evidence presented by the parties shows that the decision to engage KBR to provide only Level B maintenance was made by higher commanders within the military and the contracting authorities

17

at the DCMA and may have been made without consulting the base mayors.  In any event, the operative portions of Task Order 139 which applied to Level B maintenance did not explicitly set forth any electrical standards governing KBR's performance.  *See Id.* at §§ F.2.2, F.4.2.  In addition, the contract did not include any specific standards for the completion of technical inspections of the facilities.  *See Id.* at § 8.1.2.  Instead, the terms and conditions of the contract are silent regarding the standard of KBR's electrical performance under Level B maintenance.  *See Task Order 139* at § F.2.2.

While Level A maintenance was not selected, it is important to note that this level of maintenance would have required the contractor to provide preventative maintenance services at the base every 60 days, including a requirement to conduct grounding checks on equipment and major electrical appliances.  *See Id.* at § F.4.1.1  Indeed, the provision governing preventative electrical maintenance required the contractor to "[c]heck for damage or tampering with switches, outlets, junction boxes, control panels, circuit breakers, fuses, grounding rods, and overloading."  *Id.*  Another option which was not selected, "Refurbishment," would have required that upgrades to the facilities be performed to Western construction standards.  *See id.* at § 8.2.1.[8]  However, no refurbishment of the RPC or LSFB1 was ever ordered by the military.

### G.  Processing Service Order Requests

The Court detailed the procedures for the processing of service order requests at the RPC in its prior decision.  *Harris*, 618 F. Supp. 2d at 412.  Relevant here, all service order requests were initiated by soldiers on the ground, funneled through the Mayor's Cell[9], where the requests were prioritized and then forwarded to KBR for completion. *Task Order 139* at § F.2.2.3; (Docket

---

[8]        Section 8.2.1. "Refurbishment" states that "[t]he contractor … shall evaluate, upgrade or refurbish hardstand buildings to a safe and livable condition.  This new work may include refurbishment, construction, alternations and upgrades.  All new work shall be in accordance with International Building Code and British Standard 7671." *Task Order 139* at § 8.2.1.

[9]        The Mayor's Cell was responsible for base infrastructure, logistics and base life services.

Nos. 265 at § II, ¶¶ 64-65; 283 at ¶¶ 64-65). Although a working relationship existed between the base camp Mayors and KBR personnel, KBR staff responded to work orders without oversight or inspection by the military.   (Docket Nos. 265 at § II, ¶¶ 64, 68; 283 at ¶¶ 64, 68).   If KBR believed that the scope of the work order was outside the parameters of its contract for Level B maintenance, its representatives were not permitted to complete the work but would return the work order to the Mayor's Cell for further direction and approval.  *See Task Order 139* at § F.2.2.2.3; (Docket Nos. 265 at § II, ¶¶ 64-65, 69; 283 at ¶¶ 64-65, 69).

### H.  Evidence of Interpretation of LOGCAP Contract

Colonel Kirk Vollmecke provided a sworn statement to the Department of Defense Inspector General ("DODIG") in conjunction with its investigation of the circumstances of this case.  (Def. Ex. 29, Docket No. 263-52 at 12-85).[10]  Colonel Vollmecke testified that in his position as Commander of the DCMA, he reviewed all of the relevant contractual provisions. (*Id.*).  His interpretation of the contract was that it contained no explicit standards for KBR's performance, including no requirements that electrical work be completed in accordance with NEC or British standards.  (*Id.* at 52).  Colonel Vollmecke further explained that by signing the administrative change letter authorizing KBR to commence Level B maintenance at the RPC, the military accepted KBR's assumptions and thereby waived the requirement that KBR complete full technical inspections of all of the buildings prior to assuming responsibility for same. (Docket No. 263-52 at 32, 36).  From his perspective, DCMA personnel should not have waived the requirement that KBR complete full technical inspections of the facilities prior to initiating Level B maintenance services.  (*Id.*).

---

[10]     The Court notes that the interview of Colonel Vollmecke is attached to the deposition of Plaintiffs' expert Jim Childs.  (Def Ex. 29, Docket No. 263-52 at 12-85).

Colonel Vollmecke also stated that the contracts did not include any provisions specifying that KBR only hire employees who were certified to perform electrical work.  (*Id.* at 41-42).  He said that the lack of such requirements was possibly the result of an assumption that the individuals KBR hired would be qualified to perform electrical work.  (*Id.*).  But, he did not believe that such an assumption was realistic because the contractor staff of approximately 68,000 individuals was over 60 percent foreign national-based and generally unfamiliar with Western electrical standards.  (*Id.* at 41).  He faulted several individuals within DCMA for failing to include explicit electrical performance standards and requirements for certifications in the contract.  (*Id.*).  But, he explained that the DCMA was under tremendous pressure during the events in question which coincided with the "Surge",[11] a military maneuver wherein 5 brigades of troops (approximately 20,000 soldiers) were added to complete the military's mission in Iraq, resulting in a corresponding increase in the number of hardstand buildings being occupied by soldiers, the number of contractors engaged in the war theatre and, likewise, the number of contractual changes required of the DCMA in its oversight of the military contractors.  (*Id.* at 42).

_____

[11]     The Court notes that President George W. Bush addressed the increase in troops which became commonly known as the "Surge" during his 2007 State of the Union Address.   During his speech, President Bush declared that:

> We're carrying out a new strategy in Iraq -- a plan that demands more from Iraq's elected government, and gives our forces in Iraq the reinforcements they need to complete their mission. Our goal is a democratic Iraq that upholds the rule of law, respects the rights of its people, provides them security, and is an ally in the war on terror.
>
> In order to make progress toward this goal, the Iraqi government must stop the sectarian violence in its capital. But the Iraqis are not yet ready to do this on their own. So we're deploying reinforcements of more than 20,000 additional soldiers and Marines to Iraq. The vast majority will go to Baghdad, where they will help Iraqi forces to clear and secure neighborhoods, and serve as advisers embedded in Iraqi Army units. With Iraqis in the lead, our forces will help secure the city by chasing down the terrorists, insurgents, and the roaming death squads.

*President Bush Delivers State of the Union Address*, *January 23, 2007*, available at:  http://georgewbush-whitehouse.archives.gov/news/releases/2007/01/20070123-2.html (last visited July 12, 2012).

Colonel Vollmecke stated that the contracts were not initially developed for a semi-occupation environment and worked well at the beginning of the war when only a limited number of bases were involved.   However, he testified that "holistic" changes were not made to the contract as the war shifted toward semi-permanent occupation of Iraq by the joint forces with the assignment of soldiers to live in thousands of Iraqi hardstand buildings.   (*Id.* at 43).   As is set forth in the DODIG's Report, Colonel Vollmecke instituted several changes to the contracts after the accident to Staff Sergeant Maseth.   (*Id.* at 26-27).   The later adopted terms included explicit standards for electrical work and technical inspections and required that all contractor personnel be qualified to perform electrical work.   (*Id.*).

The evidence demonstrates that certain military personnel expected that KBR would perform its electrical work safely and in accordance with Western electrical standards.   These individuals, however, had limited knowledge of the actual requirements that the military set forth in the contract with KBR.

Among them, Brigadier General Satterfield testified that he had limited knowledge of Task Order 139, indicating that he had "read" the task order but was not directly involved in contracting.   (*Satterfield Depo* at 141, Pl. Ex. E, Docket No. 268 at 7).   Despite same, he provided testimony concerning his understanding of KBR's agreement with the military.   (*Id.*).   General Satterfield believed that the electrical standard required under the contract was the British standard.   (*Id.* at 146-147).   He further explained that the military's "good enough" standard did not apply to electrical safety issues and that the military's election of Level A or Level B maintenance should not have lowered the contractual performance requirements imposed on KBR under the contract.   (*Id.*).   General Satterfield also testified that he did not believe that rewiring the RPC buildings or upgrading the electrical facilities would be new work outside of Level B

maintenance permitted without further direction by the military under the LOGCAP contract.  (*Id.* at 158-160, 162-163).

The base camp mayors at the RPC, SSG Skaggs and CW2 David Carrier, both testified that their expectations were that KBR would have performed grounding and bonding on its work at the RPC in response to service order requests as a part of KBR's general performance duties. (Docket No. 265 at § II, ¶¶ 79-82). They also confirmed that KBR neither requested that it be authorized to rewire LSFB1 nor sought authorization to perform grounding and bonding at the base because such duties were outside the scope of KBR's contract. (Docket No. 265 at § II, ¶¶ 74, 77).  For his part, SSG Skaggs testified that he was unaware of the scope of the electrical deficiencies at LSFB1 and claimed that if he would have been made aware of such deficiencies, he would have initiated the process to have the building rewired or repaired.   (Docket No. 265 at § II, ¶¶ 54, 74, 77, 78).

### I.  Service Order Requests / Shocking Incidents

The evidence shows that KBR was never specifically directed to repair the deficiencies in LSFB1 which were identified in the technical inspection report, (Docket No. 262 at ¶ 166), despite the fact that KBR presented the technical inspection report to the military in February 2007 and again, on November 5, 2007.  (Docket Nos. 262 at ¶¶ 168-170; 265 at ¶¶ 168-170).  In addition, like the prior subcontractor, WGI, the military never directed KBR to upgrade the substandard electrical systems in the RPC buildings.  (Def Ex. 26, Docket No. 263-37:48).  KBR did, however, respond to several work orders and complete maintenance work at LSFB1 and in the surrounding area.

With respect to service order requests, Plaintiffs have identified nine work orders which they argue have some relevance to the instant case, including:

- Work Order D-1682 (June 14, 2006) stating "Please ground our hot water heater, people are getting shocked while showering";

- Work Order D-1940 (July 4, 2006) stating "install grounding wire for the water heater and motor pump";

- Work Order D-5204 (February 13, 2007) noting a problem at "Pump for LSF Headquarters Inop";

- Work Order 1208997 (June 23, 2007) "pipes (shower and sink) have voltage-got shocked in shower and sink";

- Work Order 120811 (July 8, 2007) (no description);

- Work Order 1109481 (June 23, 2007) stating "install grounding on panel";

- Work Order 1109702 (June 26, 2007) describing installation of wire on grounding panel;

- Work Order 1205258 (July 8, 2007) "water pump leaking on top of building thru roof";

- Work Order 2193735 (November 2, 2007) "WP pulsating badly."[12]

(*See* Docket No. 265 at § II, ¶ 87; Pl. Ex. U, Docket No. 276).  The work order documents do not explicitly state that work was to be performed by KBR in accordance with any electrical standards.  (*Id.*).  KBR responded to the identified service order requests and the documents are marked as if the work was completed.  (*Id.*).  KBR disputes the relevance of these work orders because none of them refer to a complaint that the water pump on the roof at LSFB1 caused an electrical shock and also argues that certain of them did not even pertain to LSFB1.  (Docket No.

---

[12] The Court notes that the November 2, 2007 Work Order initiated by Staff Sergeant Maseth was raised by counsel at the motion hearing, (*see* Docket No. 294 at 104), although it is not referenced in Plaintiffs' concise statement of material facts, (*see* Docket No. 295, §§ I, II). Defense counsel didn't object.  Hence, as is discussed in further detail in note 31, *infra*, the Court has considered same.

283 at ¶ 87).   To this end, Juan Castellanos testified that the work orders from June of 2007 describing the installation of grounding and wires on the "panel" did not pertain to LSFB1 but to an exterior main distribution panel for which KBR had full maintenance responsibilities.  (*See* Docket No. 283 at ¶ 87.f., 87.g; *Castellano Depo* at 142, Def Reply Ex. 8, Docket No. 284-8).  Castellanos' account is the only witness testimony in the record to which the parties have directed the Court to substantiate these work orders.   In fact, the only competing evidence that Plaintiffs have cited is their experts' interpretations of the work orders, but these individuals have no actual knowledge of what area or building of the RPC the work orders described.[13]  (*See* Docket No. 265 at § II, ¶ 87).   Thus, because Castellanos' testimony is uncontroverted, work orders 1109481 (June 23, 2007) and 1109702 (June 26, 2007) may have no bearing on this case.

Several soldiers testified that they were shocked in the shower and bathroom facilities in LSFB1, including Sergeant First Class Justin Hummer, and MSG Mark Layman.  (Docket No. 265 at § II, ¶¶ 88, 90, 91, 94).   There is also evidence that another soldier, Faris Shamoon,[14] was shocked at LSFB1.  (Docket No. 265 at § II, ¶ 92).   The last of these shocking incidents was reported in the summer of 2007.   However, there is no evidence that links the source of their shocks to the subject water pump.   (Docket Nos. 262 at ¶ 191; 265 at § I, ¶ 191; Def. Ex. 36, Docket No. 263-61 at ¶ 22).   The soldiers each testified that the shocks subsided for some time after KBR responded to the work orders they submitted.  (Docket No. 262 at ¶ 181, n.2; Pl. Ex. U, Work Orders D-1682; D-1940; D-5204; 208997).   But, the soldiers also explained that they did not consider the shocks as a serious issue when compared to the other risks they faced as they served during in the war in Iraq.  (Docket Nos. 262 at ¶ 182; 265 at § I, ¶ 182).

---

[13]       The Court recognizes that Plaintiffs' expert, Childs, had significant experience at the RPC and LSFB1 and was familiar with the locale.  (*See* Pl Ex. AA).

[14]       The Court notes that Shamoon was not deposed, but all parties agreed that his deposition testimony was not necessary for resolution of the present motion.  *See* n. 16, *infra*.

In November of 2007, the military, through base camp Mayor SFC Skaggs, requested that KBR install a generator near LSFB1 to power an ECCM jamming device[15] for protecting against vehicle-borne improvised explosive devices.  (Docket No. 262 at ¶ 183; 265 at § I, ¶ 183).  KBR representatives toured the area with military officials and advised them that "the electrical power system in the area of LSFB1 should not be used to provide power for the generator because the wiring was in 'very poor condition' and 'everything was maxed out.'  KBR and military personnel observed the substandard wiring for LSFB1, including wiring into the building that bypassed the breaker, wiring that had splices that needed to be replaced, and tar on the panel inside LSFB1."  (Docket No. 262 at ¶ 184).  KBR provided the military with an "Electrical Summary" of the area which reflected that the electrical system was operating at 100% capacity, and included pictures of the deficient wiring in the electrical boxes.  (Pl. Ex. X, Docket No. 277-1 at 2).  The parties dispute whether KBR requested that it be permitted to rewire the entire area at that time.  (Docket Nos. 262 at ¶¶ 184, 185; 265 at § I, 184, 185).  In any event, despite the information provided by KBR, on December 4, 2007, SFC Skaggs specifically requested that KBR immediately "install a generator **with full O&M support** at ECP 66 (LSF Gate)."  (Docket No. 263-51 at 23) (emphasis added).  He added that "[t]he generator is necessary to provide power to a new ECCM device that is integral to force protection" and "[t]his installation is required due to the inadequate electrical system currently in place."  (*Id.*).  SFC Skaggs' request was approved and the military directed KBR to perform such work on December 6, 2007.  (*Id.* at 24).  Later that month, the military directed KBR to remove the generator.  (Docket No. 262 at ¶ 185).  Then, SFC Skaggs and

---

[15]     SSG Daniel C. Wilson testified that a "jamming device" is "a device used to jam" or disrupt signals from cell phones and other instruments which were used by enemy forces to detonate car bombs remotely.  (Docket No. 263-20, Def Ex. 11, *Wilson Depo* at 45-46).  The jamming devices were set up by the military near the entry gates to the base in order to protect the base residents from such an attack.  (*Id.*).

another soldier installed the ECCM jamming device into the existing electrical system, ignoring KBR's warnings that the system was at full capacity.  (*Id.*).

   *J.   Warnings to Staff Sergeant Maseth*

   Prior to the accident, Staff Sergeant Maseth was warned by two of his fellow soldiers of the electrical hazards present at LSFB1 during October of 2007.  SFC Hummer testified that he told Maseth that electrical shocks "had been an ongoing problem."  (Docket Nos. 262 at ¶ 178; 265 at § I, ¶ 178).   Hummer specifically referenced shocks in the shower to Maseth.  (*Id.*). Hummer also warned Maseth to "watch himself" and to "make sure that he checked the water with his hand before he got in" the shower.  (*Id.*).  Similarly, Staff Sergeant Matthew Newsom testified that he recalled warning Maseth of the electrical problems in the shower around the time that Maseth arrived at the base.  (Docket Nos. 262 at ¶ 179; 265 at § I, ¶ 179).  Beyond warning of the risk of electrical shock, SSG Hummer testified that he also told Maseth that the entire building needed rewired in order to fix the electrical shock problem.  (Docket Nos. 262 at ¶ 180; 265 at § I, ¶ 180).

   The evidence presented to the Court also demonstrates that Staff Sergeant Maseth received and acknowledged a fire inspection report of LSFB1 dated November 19, 2007. (Def. Ex. 34-B, Docket No. 263-59 at 5-9).  The report was prepared by KBR employee, Inspector Captain James Cook, and identifies certain electrical deficiencies at LSFB1.  (*Id.* at 8).  A chart titled "BUILDING - FIRE RISK MANAGEMENT SURVEY" identifies electrical deficiencies including frayed and improper wiring. (*Id*. at 5). A report titled "HAZARD/DEFICIENCY INSPECTION RECORD" states that Kitchen Room B has "spliced wires near stove/ oven" and that Room H had a "Hot Water Heater hard wired into outlet" and "Dryer unit hard wired into

outlet." (*Id.* at 7). Both of these documents were signed by Staff Sergeant Maseth as Fire Marshall. (*Id.* at 7, 9).

### K. January 2, 2008 Accident

The parties do not dispute that, on January 2, 2008, Staff Sergeant Maseth was tragically electrocuted while showering in his living quarters in building LSFB1 at the RPC. (Docket Nos. 262 at ¶ 187; 265 at § I, ¶ 187). Staff Sergeant Maseth's exposure to electric current caused him to suffer cardiac arrest, which resulted in his death. *See Harris*, 618 F. Supp. 2d at 414. The source of the electric current was determined to be a water pump located on the roof of LSFB1. (Docket Nos. 262 at ¶ 189; 265 at § I, ¶ 189). "The insulation on wires inside the pump had melted and the conductors came into contact with the metal casing of the pump, which energized the metal casing of the motor pump and attached water pipes." (*Id.*).

### L. LSFB1 and the Subject Water Pump

The parties agree that LSFB1 lacked a grounding and bonding system and that **every** electrical component of LSFB1 was not grounded at the time of the accident. (Docket Nos. 262 at ¶¶ 188, 190; 265 at § I, ¶¶ 188, 190) (emphasis added). Further, the subject water pump which malfunctioned was likewise ungrounded and the pipes connecting the water pump to the shower facilities in LSFB1 were not bonded. (Docket Nos. 262 at ¶ 190; 265 at § I, ¶ 190). There is no direct evidence in the record proving that KBR installed the subject water pump. Instead, Plaintiffs argue that testimony of SSG Jarvis and MSG Mark Laymon "suggests that KBR installed water tanks and a water pump on the roof of LSFB1 after April 2006 but before January 2008." (Def. Ex. 36, Docket No. 263-61 at ¶ 20; Docket No. 295 at § I, ¶ 197). However, the testimony of Jarvis and Laymon demonstrates only that water pumps were positioned differently in a photograph taken in 2006 and a later photograph taken in 2008. (*Id.*). Plaintiffs have been

27

unable to identify any witness to testify that KBR actually installed the water pump under any work orders issued to KBR.  (Docket Nos. 262 at ¶ 197; 265 at § I, ¶ 197).  And, KBR's internal investigation was likewise unable to determine if KBR completed such installation.  (Docket No. 265 at § I, ¶ 197; Pl. Ex. G, Docket No. 269).

In any event, the parties agree that "[t]he completed discovery has not uncovered any evidence that, prior to January 2, 2008, the pump was the source of any electrical shock." (Docket Nos. 262 at ¶ 191; 265 at § I, ¶ 191).  Indeed, Plaintiffs admit that they "are not aware of whether the specific pump that caused the shock on January 2, 2008 … had ever previously been the source of a shocking incident at LSFB1." (*Id.*; Def. Ex. 36, Docket No. 263-61 at ¶ 22).  KBR admits that it replaced a pressure switch on the subject water pump in July of 2007.  (Docket No. 262 at ¶ 198).  However, Plaintiffs and their expert witnesses concede that the pressure switch was not a casual factor in the failure of the water pump and the subsequent electrocution.  (Docket No. 265 at § I, ¶ 198).  Instead, Plaintiffs take the position that when installing the pressure switch on the water pump, "KBR employees should have seen that the water pump was not grounded" and installed such grounding materials to make the water pump safe.  (*Id.*).

*M.  Parallel Investigations and Results*

On July 24, 2009, the DODIG issued a comprehensive report discussing the circumstances of the January 2, 2008 accident, titled "Review of Electrocution Deaths in Iraq: Part I - Electrocution of Staff Sergeant Ryan D. Maseth, U.S. Army."  (Def. Ex 31, Docket No. 263-54; Docket Nos. 262 at ¶ 201; 265 at § I, ¶ 201).  This report concluded that "[w]ith respect to the death of SSG Maseth, multiple systems and organizations failed, leaving him and other U.S. Service members exposed to unacceptable risk of injury or death." (*Id.*).  The DODIG identified problems with all entities involved at the base, including the military chain of command, the

contracting community and the defense contractors such as KBR.  (*Id.*).  The DODIG commented

that: the military chain of command did not properly ensure that the initial renovations of the base

facilities were free of electrical hazards and did not identify the potential risks posed by the

remaining electrical hazards; the civilian contracting agencies failed to include explicit electrical

standards in their contracts with KBR and did not establish minimum requirements for the

contractor's electrical work force and training; and KBR perpetuated electrical hazards by failing

to ground equipment it installed at the base, did not bring grounding issues at other facilities to

the attention of the military command, did not maintain sufficient operating procedures for

conducting technical inspections and did not properly train its personnel on electrical safety

issues.  (*Id.* at ¶¶ 201-03).

The Department of the Army also issued its Final 15-6 Report in July of 2009.  (Def Ex.

39, Docket No. 263-64, Docket No. 265 at ¶ 205).  The Army concluded that "there was no single

person or organization entirely responsible for electrical safety in RPC, and whose act or omission

caused SSG Maseth's death. His death resulted from a series of causal factors that are not

attributable to a single person or organization."  (*Id.*).  This report highlights problems caused by

failures of the DCMA, KBR and the U.S. Army.  (Def Ex. 39, Docket No. 263-64 at 4-5).

Regarding its own role, the Army pointed out that "[t]here were systemic failures in US Army

training and electrical safety awareness that prevented soldiers from understanding the dangers

and potential risk associated with the electrical issues they encountered."  (*Id.* at 5).

On August 7, 2009, the Department of the Army Criminal Investigative Command issued

a press release outlining the findings of its criminal investigation into the circumstances of Staff

Sergeant Maseth's death.  (Docket No. 262 at ¶ 206; Def Ex. 40, Docket No. 263-65).  This

publicly available document states that "[t]he investigation revealed that there were numerous

entities and individuals, both contractors and government employees, who breached their respective duties of care. However, none of those breaches, in and of themselves, were the proximate cause of [SSG Maseth's] death. The investigation was closed with a finding that there is insufficient evidence to prove or disprove any criminal negligence in [SSG Maseth's] death." (*Id.*).

KBR was issued a Level III Corrective Action Request ("CAR") by the DCMA on September 11, 2008. DCMA initially claimed that KBR's contract required that it perform its electrical maintenance services according to National Electrical Code ("NEC") standards. (*Id.* Docket Nos. 262 at ¶ 209; 265 at § I, ¶ 209). However, as is noted above, the former Commander of DCMA Iraq-Afghanistan during 2006 and 2007, Colonel Kirk Vollmecke, disagreed with this assessment, testifying that the NEC did not apply to KBR's work. (Docket Nos. 262 at ¶ 210; 265 at § I, ¶ 210). Moreover, the DODIG reviewed the CAR and concluded that there were no explicit electrical standards set forth in KBR's contracts with the military. (*Id.*).

### N. Post-Accident Contractual Changes and Facility Upgrades

The record reflects that the military commissioned KBR to upgrade the electrical facilities at LSFB1 approximately one month after the accidental death of Staff Sergeant Maseth pursuant to an administrative change letter issued on February 1, 2008. (Docket Nos. 262 at ¶ 199; 265 at § I, ¶ 199). Specifically, KBR was directed to "rewire the building and ensure proper grounding of all electrical units, systems and components." (*Id.*). The contractual provisions at issue in this case were also revised. To this end, the DODIG report explains that after the accident the following changes were made to the LOGCAP III Statement of Work:

- Added explicit electrical standards for performance of operations and maintenance work. Prior to the electrocution, the Government relied on the general requirement to meet "Army

regulatory standards" and the presumption that a contractor is obligated to provide quality and professional workmanship.

- Added minimum requirements for contractor electrical workforce training and certification. Again, prior to the electrocution, the Government in good faith relied on the contractor to provide a workforce that was qualified to perform electrical tasks assigned.

(Def. Ex 31, Docket No. 263-54 at 58).

   O.  *Plaintiffs' Claims and Expert Evidence*

Plaintiffs bring wrongful death and survival claims against KBR seeking both compensatory and punitive damages.  (Docket No. 209).  Plaintiffs have repeatedly argued that their claims are "narrow," focusing on KBR's alleged negligence.  (*See* Docket No. 264 at 5, 21, 23, 36, 39, 43, 57).  However, Plaintiffs' challenges to KBR's conduct are numerous and broad. To this end, they claim that KBR was negligent:

a.  In failing to remedy the electrical grounding conditions at the RPC;

b.  In failing to remedy the defective and hazardous condition caused by the electrical service to the water pump at LSFB1;

c.  In failing to ground and bond the breaker panel box in LSFB1;

d.  In failing to recognize that the breaker panel box in LSFB1 was ungrounded;

e.  In failing to institute and follow proper paperwork procedures to ensure that problems, complaints, and work were adequately documented;

f.  In hiring workers that it knew or should have known were unskilled and unqualified to perform the tasks they were assigned;

g.  In failing to properly supervise its workers;

h.  In failing to order supplies for which it was paid under its contracts with the U.S. government;

i.  In failing repeatedly to diagnose the electrical hazards in LSFB1;

j.      In failing to recognize a pattern of electrical hazards in LSFB1 and the RPC in general;

k.      In failing to recognize the fatal consequences that could result from metal water pipes becoming electrified;

l.      In failing to recognize that the electrical hazards in LSFB1 could be fixed without rewiring the building;

m.      In failing to recognize that the electrical hazards in LSGB1 could be fixed at a cost of less than $2,500;

n.      In purchasing and using at the RPC electrical equipment it knew or should have known was counterfeit;

o.      In failing to rewire the RPC;

p.      In failing to connect the water pump to a circuit breaker;

q.      In permitting the use of an unsafe water pump that fell below accepted U.S. safety standards;

r.      In failing to employ a lock-out / tag-out procedure on the unsafe electrical systems;

s.      In failing to warn the residents of the RPC of the known hazards posed by the faulty electrical systems;

t.      In failing to otherwise provide a safe alternative for the use of the soldiers stationed at the complex;

u.      In intentionally, willfully, and outrageously ignoring known and preventable hazards with blatant disregard for the safety of SSG Maseth and other members of the United States military; and

v.      In otherwise failing to maintain the RPC in a reasonable and prudent manner so as to prevent injury to U.S. troops there stationed.

(*Id.* at ¶ 33).  From Plaintiffs' perspective, "the core issue of this case [is] why KBR failed to properly ground and bond LSFB1 when it had both ample opportunity and contractual authority to do so."  (Docket No. 285 at 1).

Plaintiffs have submitted two expert reports in support of their claims.  James Childs is proffered as an expert in electrical codes and electrical safety.  (Pl Ex. AA, Docket No. 279-1). He is a licensed Master Electrician, certified electrical inspector, and has extensive experience in both the private and public sectors, including serving as the Senior Master Electrician on Task

Force Safe, a group tasked with investigating electrical issues in Iraq in 2008 by General David Petraeus. (*Id.* at 2-3). With respect to the water pump and electrical work at LSFB1, Childs opines that:

- The pressure switch was not properly installed. The grounds were cut. The wires shorted out inside the pump to the metal pump case, energizing the metal pump and associated piping. This caused the metal water piping of the building to become energized with 200 volts whenever the pressure switch closed energizing the pump.

- My inspection of the LSF-1 building and the photographs provides the evidence to establish what caused the electrocution of SSG Ryan Maseth. KBR did not properly bond the metal water piping of the building as required by code, either NEC or British Code. KBR also did not assure the installation of an equipment grounding conductor in the branch circuit to the pump. Even apart from the codes, these practices are a violation of safe electrical practices and placed inhabitants of LSF-1 at risk for shock or electrocution.

(*Id.* at 5-6).

Dr. John Tobias is an electrical engineer and scientist proffered as an expert in electrical safety. (Pl. Ex. BB, Docket No. 279-2). Plaintiffs state that Dr. Tobias was engaged "to provide an opinion, from an electrical engineering perspective, about the quality of KBR's electrical work at LSFB1 and whether anything could have been done, short of rewiring the entire facility, to make the facility safe and avoid the death of SSG Maseth." (Docket No. 299 at 7). Among his conclusions, Dr. Tobias found that:

- Incorrect grounding was a primary factor in SSG Maseth's death. KBR electricians did not ground and bond the pump and piping system correctly, despite having several opportunities to do so under the auspices of work orders submitted.

- KBR did not live up to the electrical standards of either the LOGCAP or CENTCOM contracts, nor did KBR perform its work to a minimal degree of electrical safety.

- KBR could have grounded the pump and water pipes within the context of work orders that it received with the same, or

33

substantially less, material and effort than it actually expended in improperly attempting electrical work; and

- KBR's electricians did not exercise a minimally safe level of skill and KBR had no oversight of their work.

(Pl. Ex. BB, Docket No. 279-2 at 8). Ultimately, Dr. Tobias concludes that:

> While complete rewiring, done correctly, would [remediate the shock hazard], it was certainly not the only method available. Earlier in this report I pointed out five techniques for remediating the shock hazard [Tobias Report 4-5]. One of these methods, bonding the water piping and electrical ground, would singly have prevented SSG Maseth's death and could have easily been done with far less effort and materials than was expended on other work orders listed. Review of the work order history … shows that significant materials and effort was expended to incorrectly earth (system) ground the pump. If these same materials and efforts were correctly applied to provide an equipment grounding conductor for the pump, and/or bond the water piping to the electrical ground, the shock hazard would have been averted.

(*Id.* at 7).

### P.  KBR's Liability Defenses and Expert Evidence

KBR has denied liability in this case and raised numerous affirmative defenses to Plaintiffs' claims. (Docket No. 217). Among them, KBR has set forth traditional defenses to negligence, i.e., lack of proximate causation, assumption of the risk, contributory negligence and comparative negligence. (*Id.*). KBR intends to vigorously defend liability in this case if it were to go to trial. (Docket No. 261 at 32, n. 14).

Most recently, KBR has challenged the expert testimony of both of Plaintiffs' experts, Childs and Tobias via a *Daubert* motion, which is presently pending before the Court. (Docket No. 290). In its motion, KBR argues that the proffered expert opinions "lack foundation and fail to meet the standards of reliability and fit established by *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993), and incorporated into Federal Rule of Evidence 702." (*Id.* at 2).   In part,

KBR relies on the testimony of its own expert witness on electrical safety, John Loud.   (Def. Ex.

32, Docket No. 263-55).   Loud is an electrician who is currently employed by Exponent, Inc. as a

Principal Engineer.   (*Id.*).   He has extensive practical experience and has lectured on electrical

injuries and electrocutions and testified in numerous court proceedings.   (*Id.*).   Loud rejects the

opinions of Childs and Tobias to the extent that they believe that the electrical shock risk at

LSFB1 could have been eliminated without rewiring the entire building.  (*Id.*).   In brief summary,

Loud suggests that:

> Upgrading the system by installing an ad hoc grounding system
> while performing other repairs was not possible and it was in
> violation of the KBR contract. Grounding and bonding LSFB-1 in
> accordance with recent electrical codes required a complete system
> upgrade. Indeed, such a project was directed in the Military
> Administrative Contracting Officer's Change Letter (ACL) issued
> after this incident at an estimated cost of $50,000. It was not
> possible to just add a single wire to bond the pipes because there
> was no grounding system in the main electrical panel to which to
> attach it. Simply driving a ground rod would not have been
> effective or code compliant. Bonding the pipes alone is also not
> adequate or code compliant because resistive or insulated joints
> cannot be relied upon to trip protective devices. Without knowing
> exactly what caused this incident prior to its occurrence, the only
> way to eliminate electric shock hazards in LSFB-1 was to upgrade
> and rewire the entire building to comply with the recent electrical
> codes, which was prohibited by the KBR contract.

(*Id.* at 11).

III.    PROCEDURAL HISTORY

After the parties completed a period of limited discovery, this Court denied KBR's initial

motion to dismiss Plaintiffs' claims relying on the political question doctrine and combatant

activities exception to the Federal Tort Claims Act, without prejudice, in a Memorandum Opinion

and Order issued on March 31, 2009.  *Harris*, 618 F. Supp. 2d at 434.   This Court later denied

KBR's motion requesting that the Court certify the legal questions presented by these defenses

and to authorize the filing of an interlocutory appeal.  *Harris v. Kellogg, Brown & Root Services, Inc.*, 2009 WL 1248060 (W.D. Pa. Apr. 30, 2009).  Despite the denial of an interlocutory appeal, KBR appealed the Court's March 31, 2009 ruling to the United States Court of Appeals for the Third Circuit on April 30, 2009.  (Docket No. 166).  The Court of Appeals dismissed KBR's appeal and remanded the case for further proceedings, without addressing the merits of KBR's arguments as to the political question doctrine and/or the combatant activities exception to the FTCA.  *Harris*, 618 F.3d 398.

Shortly after the matter was remanded from the Court of Appeals, KBR attempted to limit discovery to the defenses it raised in its earlier motion to dismiss.  *Harris v. Kellogg, Brown & Root Services, Inc.*, 2010 WL 4614694 (W.D. Pa. Nov. 5, 2010).  The Court denied KBR's motion and ordered the parties to complete discovery as to Plaintiffs' claims and KBR's defenses but again stated that KBR was free to bring the present motion at the conclusion of discovery.  *Id.*

Plaintiffs were granted leave to submit an Amended Complaint, which was filed on January 26, 2011.  (Docket No. 209).  KBR then filed an Answer to same on February 15, 2011.  (Docket No. 217).  While discovery was ongoing, KBR brought a motion seeking the application of substantive Iraqi law to the legal issues in this case, rather than the state laws under which Plaintiffs' claims are based.  The Court denied KBR's motion after considering all of the parties' evidence and arguments on whether Iraqi law should be applied to this matter but declined to further rule on whether the laws of Pennsylvania, Texas or Tennessee should apply to particular legal issues in this case going forward.  *See Harris v. Kellogg, Brown & Root Services, Inc.*, 796 F. Supp. 2d 642 (W.D. Pa. 2011).  KBR sought reconsideration of this ruling, which was again denied by the Court.  (Docket No. 248).

The Court has held periodic telephone status conferences to address the status of discovery in this case.  At the conference on November 28, 2011, the parties advised that fact discovery was completed regarding KBR's defenses under the political question doctrine and the combatant activities exception to the FTCA.[16]  (Docket No. 252).  As a consequence, the Court set deadlines for the briefing of KBR's renewed motion and also ordered the parties to submit their evidence and arguments pursuant to the procedural requirements of Local Rule 56.  (Docket No. 253).  Accordingly, KBR submitted its renewed motion to dismiss, brief in support, concise statement of material facts and appendix on January 20, 2012.  (Docket Nos. 260-63).  Plaintiffs responded with their brief in opposition, responsive concise statement of material facts and appendix on February 22, 2012.  (Docket Nos. 264-79).  KBR brought its reply brief, response to Plaintiffs' additional facts and supplemental appendix on March 6, 2012.  (Docket Nos. 282-84).  Plaintiffs, in turn, filed a sur-reply on March 20, 2012.  (Docket No. 285).  The Court then heard oral argument from the parties during a motion hearing on March 30, 2012.  (Docket No. 286).  Subsequently, the Court has received and reviewed the transcript of those proceedings.  (Docket No. 294).

After receiving leave of court to do so, KBR filed its supplemental brief on May 30, 2012.  (Docket No. 298).  The Court provided Plaintiffs the opportunity to file a supplemental brief by June 6, 2012, but Plaintiffs declined such invitation.  Hence, all briefing on the pending motion has now concluded.

Because the Court has heard oral argument and reviewed all of the parties' submissions, KBR's renewed motion is ripe for disposition.

---

[16]     Counsel for the parties advised at the motion hearing that three depositions remained outstanding (i.e., Colonel Leon Parrott, Faris Shamoon, and Timothy Shea) but confirmed that the testimony of these three potential witnesses was not necessary for the disposition of the present motion.  (*See* Docket No. 286).

IV.    LEGAL STANDARD

KBR has again moved to dismiss Plaintiffs' Amended Complaint under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  (Docket No. 260).  Plaintiffs do not dispute that the Rule 12(b)(1) standard should govern the disposition of the instant motion.[17]  (Docket Nos. 264, 285). Therefore, the Court will analyze the present motion under Rule 12(b)(1).  A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the lack of subject matter jurisdiction over a plaintiff's claims.  *See* Fed.R.Civ.P. 12(b)(1).  "At issue in a Rule 12(b)(1) motion is the court's 'very power to hear the case.'" *Petruska v. Gannon University*, 462 F.3d 294, 302 (quoting *Mortenson v. First Federal Savings and Loan Association*, 549 F.2d 884, 891 (3d Cir. 1977)).  As it is the party asserting jurisdiction, a plaintiff "bears the burden of showing that its claims are properly before the district court." *Development Fin. Corp. v. Alpha Housing & Health Care*, 54 F.3d 156, 158 (3d Cir.1995); *see also Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)("[w]hen subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff must bear the burden of persuasion").  In reviewing a motion to dismiss pursuant to Rule 12(b)(1), the court must distinguish between facial attacks and factual attacks. *Petruska*, 462 F.3d at 302.

---

[17]    The Court had suggested in prior decisions that KBR's renewed motion should be evaluated under Rule 56 and the summary judgment standard.  *See Harris v. Kellogg, Brown & Root Services, Inc.*, Civ. A. No. 08-563, 2010 WL 4614694, at *2 (W. D. Pa. Nov. 5, 2010).  Plaintiffs have not objected to the Court's evaluation of the present motion under Rule 12(b)(1).  Therefore, the Court considers any challenge to the appropriate standard of review to have been waived by Plaintiffs.  *See Belitskus v. Pizzingrilli*, 343 F.3d 632, 645 (3d Cir. 2003) (citation and quotation omitted) ("[i]t is well established that failure to raise an issue in the district court constitutes a waiver of the argument."); *see also* Fed.R.Civ.P. 61 ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.").  The Court of Appeals did not address this issue in conjunction with KBR's appeal, but it can be reasonably inferred from that decision that Rule 12(b)(1) is the appropriate standard.  *Harris v. Kellogg Brown & Root Services, Inc.*, 618 F.3d 398, 403 (3d Cir. 2010) ("[B]ecause the presence or absence of a political question is such a fact-intensive inquiry, *see Baker*, 369 U.S. at 217, 82 S.Ct. 691, a better-developed record could give rise to another colorable motion to dismiss.").  In any event, the Court does not believe that Plaintiffs have raised any "genuine disputes as to any material fact" which would preclude the entry of summary judgment in favor of KBR on the political question defense.  Indeed, KBR has now convinced this Court through competent evidence that this case is barred by the political question doctrine and that a jury cannot resolve the disputed facts in this record.  Alternatively, the Court also holds that this case is preempted by the combatant activities exception to the FTCA.

Like its initial motion, KBR's renewed motion asserts a factual attack on the pleadings. When a defendant launches a factual attack on subject matter jurisdiction, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Petruska*, 462 F.3d at 302 (quoting *Mortenson*, 549 F.2d at 891). In a factual attack, the court must weigh the evidence relating to jurisdiction, with discretion to allow affidavits, documents, and even limited evidentiary hearings. *Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 514 (3d Cir. 2007).

## V.     DISCUSSION

The Court now turns to KBR's renewed motion to dismiss, which marks the second occasion that the Court has been tasked with analyzing KBR's defenses under the political question doctrine and the combatant activities exception to the FTCA.  (Docket Nos. 260, 261). This Court rejected KBR's initial motion to dismiss advocating these defenses in a Memorandum Opinion issued on March 31, 2009.  *See Harris*, 618 F.Supp.2d at 415-17, 434; *see also Harris*, 2010 WL 4614694.  However, the Court emphasized this decision was not final, permitting reconsideration of these rulings if fact discovery illuminated political questions that were not readily apparent in the limited record which was previously presented or if KBR discovered additional facts necessary to establish its preemption defense under the combatant activities exception to the FTCA.  *See id.*

At this juncture, the record before the Court is much more robust as fact discovery on KBR's present defenses has been completed.[18]  (Docket Nos. 262, 263, 265-279, 283-284). The parties have likewise completed expert discovery and submitted their expert reports for the Court's consideration on both the motion to dismiss and KBR's *Daubert* challenge brought to

---

[18]     The military has cooperated with the parties throughout the discovery process, and this Court has not been called upon to resolve any disputes between the parties and the military.

exclude the testimony of Plaintiffs' experts at trial.   (*See e.g.*, *Childs Report*, Pl Ex. AA, Docket No. 279-1; *Tobias Report*, Pl Ex. BB, Docket No. 279-2; *Loud Report*, Def Ex. 32, Docket No. 263-55).   Several Executive agencies have also concluded their investigations into the facts and circumstances of Staff Sergeant Maseth's death, and many reports produced by these investigations have been publicly released and made a part of this Court's record.   (Def Exs. 31, 39, 40).

This Court has presided over this matter since its initial removal from the Court of Common Pleas in 2008 and has reviewed all of the parties' pleadings, briefing and evidence throughout this case and provided counsel with every opportunity to present their arguments, including the most recent oral argument on the motion to dismiss.   (*See* Docket No. 286, 294). Given same, the Court is well versed in the parties' positions vis-à-vis liability in this case and, as framed, it appears that if it would go to trial, the case would largely be tried as a battle of electrical experts – with Plaintiffs' experts offering their opinions that KBR could have made the shower in LSFB1 safe from electrical shocking hazards when it responded to certain work orders in 2006 and 2007 and KBR's expert opining that the entire building needed rewired in order to eliminate the risk of electrical shocks in the showers.  (*See e.g.*, *Childs Report*, Pl Ex. AA, Docket No. 279-1; *Tobias Report*, Pl Ex. BB, Docket No. 279-2; *Loud Report*, Def Ex. 32, Docket No. 263-55).   Plaintiffs have alleged that KBR negligently responded to these work orders, in violation of its contracts with the military.   (Docket Nos. 209, 264, 285).   KBR has countered that its negligence, if any, was not the proximate cause of Staff Sergeant Maseth's accident and that the Plaintiffs' negligence claims are barred by assumption of the risk and contributory negligence or limited by comparative negligence principles.   (Docket Nos. 261, 282).   KBR's liability position is further buttressed by evidence that the military was aware of the specific risk of

electrical shocks in the showers in Iraqi hardstand buildings throughout the Iraq war theatre yet did not direct KBR or prior contractors to bring the electrical systems in the buildings up to Western construction standards nor contractually require KBR to perform its electrical services in accordance with the NEC or British standards.  (*See* Def Exs. 2, 22, 24; Docket Nos. 262 at ¶¶ 86-91; 265 at § I, ¶¶ 86-91).

In this Court's estimation, the military presence looms large over nearly every aspect of this case.  Specifically, the military exerted control over all aspects of the RPC, including: base security; base life activities; the designation of buildings as living quarters; assignment of soldiers to certain living quarters; the availability of alternative housing and showering facilities; and the terms and conditions of the engagement of government contractors, like KBR, to perform discrete support functions at the base.  (Docket Nos. 262 at ¶¶ 51-52, 54-55; 265 at § I, ¶¶ 51-52, 54-55; Def Ex. 7, Docket No. 263-16; *Task Order 139* at §§ 1.1, 7.1).

There is still no binding precedent from the Supreme Court of the United States or the United States Court of Appeals for the Third Circuit analyzing the political question doctrine or the combatant activities exception to the FTCA as applied to a government contractor providing logistical support services to the military in an active war zone.  *See Harris*, 618 F.3d 398 (appeal dismissed for lack of jurisdiction); *see also Bootay v. Kellogg, Brown & Root Services, Inc.*, 437 F.App'x 140 (3d Cir. 2011) (affirming dismissal on other grounds).[19]  However, the legal landscape has shifted considerably since this Court last analyzed KBR's defenses in this case.  In the prior decision, this Court surveyed the three known decisions of Courts of Appeals which considered the political question defense in this context, *see e.g., Koohi v. United States*, 976 F.2d 1328, 1330-31 (9th Cir. 1992), *McMahon v. Presidential Airways*, 502 F.3d 1331 (11th Cir.

---

[19]     In *Bootay v. Kellogg, Brown & Root Services, Inc.*, the Court of Appeals affirmed the decision of the Honorable Terrence McVerry dismissing that case on grounds that KBR did not owe a duty to the soldier who alleged he was injured by his exposure to harmful chemicals released by KBR in Iraq.

2007), and *Lane v. Halliburton*, 529 F.3d 548 (5th Cir. 2008), and recognized that no Court of Appeals had dismissed a tort action against a government contractor providing wartime support to the military under the political question doctrine. *See Harris*, 618 F.Supp.2d at 419 ("The Courts of Appeals that have analyzed the political question doctrine in this context have rejected the theory, at least at the motion to dismiss stage."). That statement no longer rings true as the United States Courts of Appeals in the Eleventh and Fourth Circuits have held that cases brought against KBR for alleged negligence toward soldiers in the Iraq war theatre were properly dismissed under the political question doctrine. *See Carmichael v. Kellogg Brown & Root Servs., Inc.*, 572 F.3d 1271 (11th Cir. 2009) (affirming district court decision that political question doctrine applied to bar claims against government contractor); *see also Taylor v. Kellogg Brown & Root Servs. Inc.*, 658 F.3d 402 (4th Cir. 2011) (affirming district court decision dismissing case under the political question doctrine).

With respect to the preemption defense under the combatant activities exception to the FTCA, the United States Court of Appeals for the D.C. Circuit has given much broader application than did this Court in its prior analysis of this defense, which was based largely on the *Koohi* decision. *See Saleh v. Titan*, 580 F.3d 1 (D.C. Cir. 2009) (finding that claims by detainees alleging mistreatment by contractors were preempted), *cert denied*, 131 S.Ct. 2055 (2011). *Saleh* remains the leading case in this area because two other Courts of Appeals have followed our Circuit and dismissed appeals challenging denials of the combatant activities defense as premature. *See Martin v. Haliburton*, 618 F.3d 476 (5th Cir. 2010); *see also Al Shimari v. CACI Intern., Inc.*, 679 F.3d 205 (4th Cir. 2012). The *Saleh* decision has been followed by other district courts, including the Southern District of New York in *Aiello v. Kellogg Brown & Root Services, Inc.,* 751 F.Supp.2d 698 (S.D.N.Y. 2011), which found that a negligence suit arising out of

42

KBR's provision of operations and maintenance services under Task Order 139 was preempted under the combatant activities exception to the FTCA.

With this background, the Court will now address the parties' arguments and the evidence presented related to KBR's defenses under the political question doctrine and combatant activities exception, in turn.

### A. Political Question Doctrine

In *Marbury v. Madison*, the United States Supreme Court held that "[q]uestions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court." *Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 170, 2 L.Ed. 60 (1803). "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). To determine if a case or controversy constitutes a non-justiciable political question, the Court must ascertain "whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." *Baker*, 369 U.S. at 198. In *Baker*, the Supreme Court set forth the following factors to be analyzed in this determination:

> Prominent on the surface of any case held to involve a political question is found
>
> (1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department;"
>
> (2) "a lack of judicially discoverable and manageable standards for resolving it;"
>
> (3) 'the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;"

(4) "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;"

(5) "an unusual need for unquestioning adherence to a political decision already made;"

(6) "or the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

369 U.S. at 217.  "A finding of any one of the six factors indicates the presence of a political question." *Gross v. German Foundation Indus. Initiative*, 456 F.3d 363, 377 (3rd Cir. 2006) (citing *INS v. Chadha*, 462 U.S. 919, 941, 103 S. Ct. 2764, 77 L.Ed.2d 317 (1983)).  However, "[u]nless one of these formulations is *inextricable* from the case at bar, there should be no non-justiciability on the ground that a political question is present." *Baker*, 369 U.S. at 217 (emphasis added).  In evaluating whether a case presents a political question, a court must "undertake a 'discriminating inquiry into the precise facts and posture of the particular case.'" *Gross*, 456 F.3d at 378 (quoting *Baker*, 369 U.S. at 217); *see also Lane,* 529 F.3d at 568 ("different cases involving different claims require their own discriminating inquiry under *Baker*").  Further, the case must be evaluated as it would be tried, and both the claims and defenses must be examined to determine if a political question precludes review of the case.  *See Carmichael*, 572 F.3d at 1292; *Taylor*, 658 F.3d at 409.  In its motion, KBR relies primarily on the first, second and fourth factors under *Baker*.  (Docket No. 261).  Hence, the Court's analysis of this case will focus on these factors.

###### 1. Textually Demonstrable Commitment to Coordinate Political Branches

"[T]he first *Baker* formulation is primarily concerned with direct challenges to actions taken by a coordinate branch of the federal government."  *Lane*, 529 F.3d at 560 (citing *McMahon*, 502 F.3d at 1359).  KBR, a private corporation, is not a coordinate branch of the

federal government.   Therefore, in order for KBR to invoke the "textual commitment" factor, it faces a "double burden." *Id*.  KBR must first "demonstrate that the claims against it will require reexamination of a decision *by the military*.  Then, it must demonstrate that the military decision at issue is ... insulated from judicial review." *Id*. (quoting *McMahon* 502 F.3d at 1359-60 (emphasis in original; citation omitted)).

When evaluating claims against a private military contractor in a war zone, the key question is "whether a court will have to consider the wisdom of military operations and decision-making, or whether it need only consider the private contractor's performance." *Getz v. Boeing*, Civ. A. No. 07-6396, 2008 WL 2705099, at *6 (N.D. Cal. July 8, 2008).  With respect to the types of military decisions that cannot be considered in a court of law, the Supreme Court has recognized that:

> [t]he complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches. The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability. It is this power of oversight and control of military force by elected representatives and officials which underlies our entire constitutional system.

*Gilligan*, 413 U.S. at 10.  In cases arising out of the recent war in Iraq, courts have found that the political question doctrine precluded tort suits against private contractors in situations involving: the operation of a military convoy, *see Carmichael*, 572 F.3d 1271, *see also Whitaker v. Kellogg, Brown & Root Services, Inc.*, 444 F. Supp. 2d 1277 (M.D. Ga. 2006); the provision of power generation services used in the maintenance of war tanks, *see Taylor*, 658 F.3d 402; and the provision of security services at a military base to protect the occupants from hostile actions, *see Smith v. Halliburton Co. et al.*, Civ. A. No. 06-462, 2006 WL 2521326 (S.D. Tex Aug. 30, 2006).

In our first decision, this Court reviewed the limited factual record, analyzed the contractual provisions at issue as well as the facts bearing on KBR's performance under those provisions, and determined that the high level military decisions involved in housing soldiers at a military base in Iraq were not textually committed to the Executive Branch. *Harris*, 618 F. Supp. 2d at 422-27. We found that certain contractual provisions granted KBR control over its performance of the work on the base and discretion to decide how and when work was to be performed, permitting judicial evaluation of Plaintiffs' claims. *Id.* Our analysis then focused on a technical inspection conducted by KBR and its performance of many service order requests instituted by military personnel. *Id.* Ultimately, this Court concluded that KBR's performance could possibly be evaluated without questioning the military decisions which were apparent in the case. *Id.*

At this stage, KBR contends that the formulations of the political question doctrine set forth in *Carmichael* and *Taylor* undermine this Court's earlier analysis and conclusion that it is possible to consider KBR's alleged negligence in isolation from the high level military decisions which precipitated KBR's engagement. (Docket No. 261). KBR further argues that its defenses to Plaintiffs' claims must be considered – in the context of the policies, judgments and decisions of the military – all of which KBR maintains contributed to the death of Staff Sergeant Maseth. (*Id.*). In reply, Plaintiffs continue to contend that this is a simple tort suit which does not challenge any military judgments and the Court's earlier decision should stand. (Docket No. 264). For the following reasons, the Court now agrees with KBR that given the current record, the Court cannot overlook sensitive military judgments and decisions which are implicated in this case thereby barring this action from further judicial consideration.

Returning to our earlier decision, the underlying theme was that KBR was potentially liable in this case because its contractual agreements with the military provided it with discretion in the manner in which it performed its operations and maintenance functions at the RPC and the control it exerted over its own employees' actions. *See Harris*, 618 F. Supp. 2d at 422. Based on the then limited factual record, the Court hypothesized that KBR's alleged negligence could possibly be considered in isolation from the high level military decisions that KBR had identified. *Id.* But, *Carmichael* and *Taylor* persuade this Court that a broader consideration of Plaintiffs' claims and KBR's defenses is necessary in order to determine if any military decision-making will be implicated at a trial of this case. *See Carmichael*, 572 F.3d at 1292; *see also Taylor*, 658 F.3d at 409. Moreover, the facts established through discovery and the opinions of the parties' electrical experts, now demonstrate to this Court that the military's involvement cannot be divorced from any negligent act or omission of KBR.

The Court turns initially to Plaintiffs' arguments and supporting evidence. Plaintiffs' opposition to the present motion is essentially twofold: first, that their claims are narrowly tailored to challenge only KBR's alleged negligent conduct; and second, that KBR's negligence based defenses do not "legitimately implicate" military judgments in this case. (Docket Nos. 264, 285). As set forth below, the Court disagrees that all of Plaintiffs' claims are narrowly tailored but also finds that KBR's defenses to Plaintiffs' remaining claims are properly supported and do legitimately implicate military decision-making.

First, Plaintiffs' claims are not as narrowly tailored as they contend but are very broad in scope. (Docket No. 209). In this regard, their Amended Complaint identifies at least 22 separate duties which were allegedly breached by KBR in this case.[20] (*Id.* at ¶ 33(a)-(v)). Further, their

---

[20]     Plaintiffs have not sought the Court's leave to narrow their claims to date to coincide with their legal arguments.

supporting arguments are very general in nature.  They have not pointed to evidence in the record which supports each of KBR's 22 alleged breaches nor have they analyzed how each of these claims can proceed without an impermissible analysis of sensitive military judgments.[21]

In the Court's view, many of the claims, as pled, directly implicate the sensitive military judgments cited by KBR and are not supported.  For example, Plaintiffs allege that KBR was negligent, among other things, "in failing to remedy the electrical grounding conditions at the RPC"; "in failing to rewire the RPC"; "in failing to warn the residents of the RPC of the known hazards posed by the faulty electrical systems"; "in failing to otherwise provide a safe alternative for the use of the soldiers stationed at the complex"; and, "in otherwise failing to maintain the RPC in a reasonable and prudent manner so as to prevent injury to U.S. troops there stationed." (Docket No. 209 at ¶ 33(a), (o), (s), (t), (v)).  Despite Plaintiffs' position that these claims relate only to work KBR actually performed at LSFB1, none of the above-cited breaches pertain to any service order request[22] that the military submitted to KBR for the performance of electrical services at LSFB1.  Instead, these claims appear to challenge the scope of the duties assigned to KBR by the military in the LOGCAP and CENTCOM contracts.  As such, it is apparent to the Court that the claims which are pled in paragraphs 33(a), (o), (s), (t) and (v) of the Amended Complaint are barred under the political question doctrine because such claims are not supported by any service orders.

---

[21]    As is discussed in § IV, *supra*, Plaintiffs have the burden to present evidence supporting their claims in order to oppose KBR's renewed motion to dismiss.  They have been on notice that KBR would be given an opportunity to renew its motion to dismiss since the Court denied KBR's initial motion to dismiss in March of 2009, without prejudice, and have been repeatedly advised on numerous occasions that such a motion was forthcoming at the conclusion of discovery.  (*See* Docket Nos. 153, 165, 195, 199, 253). In this Court's opinion, Plaintiffs should have been prepared to fully support all of the claims in their Amended Complaint at this time or should have selectively withdrawn or dismissed those claims that they cannot fully support.

[22]    As is discussed later in this section, Plaintiffs rely on the following work orders in support of their claims: (1) Work Order D-1682 (June 14, 2006); (2) Work Order D-1940 (July 4, 2006); (3) Work Order D-5204 (February 13, 2007); (4) Work Order 1208997 (June 23, 2007); (5) Work Order 120811 (July 8, 2007); (6) Work Order 1109481 (June 23, 2007); (7) Work Order 1109702 (June 26, 2007); (8) Work Order 1205258 (July 8, 2007); (9) Work Order 2193735 (November 2, 2007).  (Pl Ex. U, Docket No. 276).

While the Court finds that these specific claims are not "narrowly tailored" as the Plaintiffs suggest, the Court believes that Plaintiffs have made a strong case that KBR negligently performed its electrical work at the RPC.  Taken at face value, their evidence may be sufficient to establish a prima facie case of negligence,[23] as they have presented evidence which supports findings that:

- KBR had a duty to respond to work orders at the base from 2006 through the date of the accident, January 2, 2008, and to perform its work safely under the CENTCOM and LOGCAP III contracts, (*see* Docket Nos. 262 at ¶ 117; 265 at § I, ¶ 117; *see also Task Order 139*);

- the soldiers who were exposed to electrical shocks in LSFB1 submitted work orders to KBR wherein they reported the shocks and requested that repairs be completed, (*see* Pl Ex. U, Docket No. 276; Docket No. 265 at § II, ¶¶ 88, 90, 91, 92, 94);

- Plaintiffs' well-qualified electrical experts, Childs and Tobias, opine that KBR could have eliminated the risk of electrical shock in the shower in Room 2 of LSFB1 in the context of the work orders which were submitted, (*see Childs Report*, Pl Ex. AA, Docket No. 279-1; *see also Tobias Report*, Pl Ex. BB, Docket No. 279-2); and,

- KBR's failure to recognize the risk in the shower and eliminate it in the context of the work orders to which they responded proximately caused the harm to Staff Sergeant Maseth, (*see id.*).

But, Plaintiffs' case is not infallible.   Plaintiffs do not have any "smoking gun" evidence which conclusively determines the liability issues in this case in their favor.   For example, they have no evidence that the military submitted any work order to KBR which explicitly states that a soldier was shocked in the shower in Room 2 of LSFB1 and also requests that KBR repair the subject water pump on the roof which malfunctioned on January 2, 2008.  (*See* Pl Ex. U, Docket No.

---

[23]   The Court notes that it has not resolved the choice of law issues in this case, among the potentially interested jurisdictions of Pennsylvania, Texas and Tennessee.  *See Harris*, 796 F. Supp. 2d 642.   The basic elements of negligence are the same in each jurisdiction and need not be discussed further here.

276).  In fact, they admit that the subject water pump was never the source of any prior report of an electrical shock before that date.  (Docket Nos. 262 at ¶ 191; 265 at § I, ¶ 191; Def Ex. 36).

Without this type of direct evidence of KBR's liability, Plaintiffs seek to prove their case circumstantially and through the opinions of their expert witnesses that KBR's responses to the submitted work orders should have caused its workers to ground and bond the water pump, the piping within LSFB1, or the building's entire electrical system, even though none of the submitted work orders expressly requested that this type of work be performed.  (*See Childs Report*, Pl Ex. AA, Docket No. 279-1; *see also Tobias Report*, Pl Ex. BB, Docket No. 279-2).  Their experts meticulously detail the steps KBR could have taken in response to these work orders which would have potentially eliminated the risk of electrical shock in the shower.  *See e.g. Childs* at 7 ("KBR could have bonded the water lines with just a few feet of wire and a couple of hours of labor. … [T]his would not have been a separate job, but, rather, a necessary safety component of the work orders that KBR responded to."); *Childs* at 8 ("the bonding of LSF-1 would have only taken an experienced electrician a couple of hours and less than one hundred dollars of material.  This should have been a necessary safety component of KBR's work under the existing work orders."); *Tobias* at 9 ("While complete rewiring, if done correctly, would [remediate the shock hazard], it was certainly not the only method available. […] One of these methods, bonding the water piping and electrical ground, would singly have prevented SSG Maseth's death and could have easily been done with far less effort and materials than was expended on other work orders listed.").  Plaintiffs argue that KBR should have acted in the manner described by their experts because the military granted KBR discretion to perform its work in the manner it saw fit and did not inspect KBR's work after it was completed.  (Docket No. 264 at 48-49).  They also point out that KBR was contractually obligated to notify the

military if the requested repairs could not be performed, exceeded certain specified cost thresholds, or reached beyond the scope of the contracts.  (*Id.* at 18).  The Court acknowledges that Childs and Tobias make a compelling case of how KBR could have performed its maintenance services to eliminate the risk of electrical shock in the shower, however, as we discuss below, their opinions rely on a disputed factual predicate and contractual provisions which are ambiguous, at best.  As such, Plaintiffs' case is particularly susceptible to KBR's defenses.

The Court also believes that KBR has presented substantial evidence supporting its defenses in this case, thereby undermining Plaintiffs' position that these defenses are not legitimate.  Moreover, the evidence that KBR has presented to defend against Plaintiffs' claims directly implicates sensitive judgments of the military which are shielded from judicial review.  The Court will address the parties' evidence with respect to each of the proffered defenses.

Most prominent among KBR's defenses is its defense to causation whereby it argues that the military's actions were the sole or superseding cause of the accident.  *See Lane*, 529 F.3d at 561 ("The central issue will be causation. If we must examine the Army's contribution to causation, 'political question' will loom large.").  Hence, at trial KBR will challenge the military decision making.  Admittedly, the Court has not yet resolved the disputed issue of whether the laws of Pennsylvania, Texas, or Tennessee will apply to the substantive issues in this case, including causation.  *See Harris*, 796 F. Supp. 2d at 658-660 (citing PA.SSJI (CIV), § 3.17; *Michaels v. Avitech, Inc.*, 202 F.3d 746, 753 (5th Cir. 2010), *which quoted Coleman v. Equitable Real Estate Investment Management, Inc.*, 971 S.W.2d 611 (Tex. Ct. App. 1998); *Russell v. Anderson County*, 2011 WL 486900, at *11-12 (Tenn. Ct. App. Feb. 11, 2011), *which quoted McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991)).  Although there are some differences

in the law of causation among these jurisdictions, the laws of each provide that proximate causation sets the boundaries of a defendant's liability in negligence. *Id.* In each state, a defendant can establish a legitimate defense to a negligence claim by proving that its own conduct was not the proximate cause of the harm to the plaintiff and may do so by pointing to evidence that a third party's actions were the true proximate cause of the harm. *Id.* Therefore, the Court's analysis "would remain the same regardless of which state's law applied." *See Carmichael*, 572 F.3d at 1288 n.13. Here, KBR argues that "[i]f this case goes to trial, [it] will be forced to use military witnesses and documents to prove that SSG Maseth's tragic death was caused by discretionary decisions made by personnel at all levels of the military, from Commanding Generals to SSG Maseth himself. A trial would inevitably pit military personnel against each other and force them to explain or defend their discretionary wartime decisions." (Docket No. 261 at 44).

This is not a hollow position. Indeed, KBR has now presented substantial evidence which demonstrates that the military was aware not only of the fact that the hardstand buildings in the RPC were ungrounded with substandard electrical systems, as the Court recognized in our prior decision, *see Harris*, 618 F. Supp. 2d at 404-05, but also that military personnel were aware of the specific risk of electrocution in shower facilities posed by the deficient electrical systems in hardstand buildings throughout the Iraq war theatre. For example, KBR has submitted the declaration of General Vines, who recounts that "[w]e chose to assign personnel to live in these pre-existing structures, notwithstanding their electrical deficiencies. All of us, including myself, lived in buildings with similar deficiencies." (Docket Nos. 262 at ¶ 91; 265 at § I, ¶ 91). Soldiers and commanders alike were subject to shocking incidents caused by deficient electrical work at the base. But, military commanders felt that the shocking incidents were minor when compared

to other pressing matters at the base such as power distribution and protection from indirect fire. (Docket No. 262 at ¶¶ 90, 91). Considering the circumstances, General Vines opined that the tragic incident involving Staff Sergeant Maseth could have occurred at any of the bases in Iraq where existing hardstand structures were used to house soldiers, because they all suffered from the same electrical deficiencies and subjected soldiers to similar risks. (*Id.*).

KBR's evidence also shows that a number of soldiers were electrocuted in the Iraq war theatre in 2004 and 2005 due to accidental exposure to ungrounded electrical systems, causing injuries and deaths to soldiers, including two electrocution deaths which occurred in shower facilities. (*See* Def Exs. 2, 22, 24). It is important that these incidents all occurred *before* KBR was engaged to perform operations and maintenance services under either the CENTCOM (2006) or LOGCAP III contracts (February 2007). (*See* Docket Nos. 262 at ¶ 117; 265 at § I, ¶ 117; *see also Task Order 139*). The information regarding the specific risk of electrocution from ungrounded electrical systems was then circulated within the military chain of command via all of the following: an Army Safety Publication which warned soldiers of potential electrical hazards; a presentation by LTC Carey outlining the electrical hazards which he provided to base camp mayors and military commanders; and an internal DCMA memo which acknowledged the safety issues presented by the electrical facilities and recommended changes to tighten up ambiguous contractual provisions. (Def Exs. 2, 22, 24). The dissemination of these warnings all *predate* the military's engagement of KBR pursuant to the LOGCAP III contract in February of 2007. Hence, the duties that the military did and did not assign to KBR under that contract cannot be analyzed without considering the facts which precipitated the military's decisions. *See Task Order 139*. Because there is evidence that the military was aware of the potential risk posed by deficient electrical systems *before* KBR was engaged as a contractor at the base, the Court believes that

KBR has presented a sufficient factual foundation from which it can reasonably argue that the military's actions in knowingly exposing soldiers to the risk of electrical shock in the showers of Iraqi hardstand buildings were the proximate cause of harm to Staff Sergeant Maseth in this case, rather than KBR's own actions.

The parties dispute whether the military's decision to house soldiers in hardstand buildings was based on a stated military policy, i.e., whether as KBR advocates that this decision involved a calculated war time trade-off between hardstand buildings which provided greater protection to soldiers from attacks than the alternative prefabricated containerized housing units used by the military at other bases or whether, as Plaintiffs advocate, the choice was a result of the failure of the military to appreciate the gravity of the risk posed by the ungrounded electrical systems which, in turn, was compounded by KBR's deficient electrical work.  (Docket Nos. 262 at ¶¶ 61, 114; 265 at § I, ¶¶ 61, 114).  However, a federal district court is not constitutionally permitted to resolve this type of dispute when, as here, KBR's position is supported by competent evidence such as General Vines' declaration[24] and the other evidence cited in the preceding pages of this Opinion.  During wartime, the military bears the responsibility for the safety of our soldiers.  Yet, the nature of war requires military commanders to conduct risk assessments of numerous risks that would be unacceptable in civilian life which they must weigh on a daily basis.  As is discussed below, in the court system, we lack any judicially manageable standards under which the military's wartime decision-making can be evaluated.  *See Saleh*, 580 F.3d at 7 ("it is clear that all of the traditional rationales for tort law-deterrence of risk-taking behavior,

---

[24]     Indeed, General Vines declared that "[s]pecial operations personnel are a unique breed of soldier, trained to operate and fulfill their missions under difficult and dangerous conditions.  Because of the nature of their assignments, they often must endure austere living arrangements, using available facilities.  They frequently live apart from other military personnel and must place security over comfort, given the special nature of their operations."  (Docket No. 263-15 at ¶ 13).

compensation of victims, and punishment of tortfeasors-are singularly out of place in combat situations, where risk-taking is the rule.").

There are several other aspects of KBR's defense to causation which show that further adjudication of this case will implicate sensitive military judgments.  Principally, as this Court interprets the LOGCAP III contract,[25] its terms do not completely shift responsibility for the potential risks associated with soldiers living and showering in hardstand buildings with known ungrounded electrical systems to KBR.  *See Task Order 139*.  At most, this agreement demonstrates that the military and KBR *shared* such responsibility, leaving open KBR's argument that the military's actions – and not its own – were the proximate cause of the harm.

On this point, the military command structure at the base cannot be understated.  At the RPC, the Mayor's Cell was tasked with the responsibility for all life support functions at the base, including operations and maintenance of electrical and plumbing systems.  (Docket Nos. 262 at ¶ 57; 265 at § I, ¶ 57).  As a consequence, if a contractor such as KBR was not engaged to perform operations and maintenance services at the base, these tasks would be solely the responsibility of the military through the Mayor's Cell.  Further, a government contractor is only able to act when authorized to do so by the military and in the manner set out in the parties' contractual arrangement.  *See LOGCAP III contract, SOW 7.1* ("The Contractor is obligated to follow and adhere to the Governing directives and applicable documents as listed in the contract and the SOW.").  Under Task Order 139, the Mayor's Cell – which oversaw all life support functions at the base – was granted the authority to determine whether Level A or Level B maintenance was

---

[25]     The Court notes that a similar analysis of the CENTCOM contract is not necessary because there is insufficient evidence to demonstrate that KBR installed the water pump during the pendency of this contract and Plaintiffs admit that they have no evidence that the water pump caused any electrical shocks requiring service at any time prior to January 2, 2008.  (Docket Nos. 262 at ¶ 191; 265 at § I, ¶ 191; Def Ex. 36 (Plaintiffs "are not aware of whether the specific pump that caused the shock on January 2, 2007 . . . had ever previously been the source of a shocking incident at LSFB1.")).

appropriate for the buildings.  *See Task Order 139, Appx F.1.2* ("Prioritization of facility levels (A, B and C) is the responsibility of the Mayor['s] Cell.").   Level A maintenance required preventative maintenance of the facilities and periodic inspections for defects in electrical systems, including checks for grounding.  *Id.* at *Appx F.2.1 "Level A, Full Maintenance", F.4, "Preventative Maintenance"*.   The Task Order further provides that "[t]he purpose of these inspections is for safety and to save the government money by identifying deficiencies while they are still small and easy to fix."  *Id. at Appx F.4.1.*   On the other hand, Level B maintenance required only that KBR respond to service order requests and fix the problems initially identified by military personnel.  *Id.* at *Appx F.2.2.3* ("Any repairs or replacement that need to be done on the facility will be initiated with a service order request by the customer.").   The service order requests were funneled from the soldier on the ground, through the Mayor's Cell and then to KBR for performance.   After receiving the service order request from the Mayor's Cell, a KBR employee would respond to the order, identify/diagnose the problem and fix it, as appropriate.  *Id.* at *Appx F.2.2.* ("Upon receipt of service request, the contractor shall conduct an assessment to determine feasibility of repair or replacement of existing items.  The assessment shall be provided to the Mayoral Cell.").   KBR was also not authorized to unilaterally perform "new work" without first obtaining approval from the Mayor's Cell and repairs which exceeded certain cost thresholds required approval by the Mayor's Cell.  *Id.* at *Appx F.2.2.2.3.* ("If the assessment exceeds the scope of repair or replacement; the contractor shall return the service request to the Mayoral Cell for disposition.").   Finally, the contract provides that KBR perform its services safely for the benefit of all those at the base, including military personnel but the term "safety" is undefined.  *See Task Order 139* at § 1.1.2 ("Worksite Safety.  The contractor shall be responsible for safety of employees and base camp residents during all contractor operations …").

Given these contractual provisions, the military retained considerable control over operations and maintenance services at the base even though it delegated certain work to KBR which, in turn, supervised its own employees' performance without military involvement or inspection of same.   Indeed, as the Mayor's Cell was ultimately responsible for base life support functions at the base and through the LOGCAP III contract and Task Order 139 delegated only certain limited maintenance responsibilities to KBR, both the military and KBR effectively *shared* maintenance and operations responsibilities for the electrical facilities at the base.   (Def. Ex. 7, Docket No. 263-16 at 32, ¶ 10 ("In the military, unit commanders have full responsibility for the health, safety and welfare of their unit members.")).   It was the military that declined to engage KBR to refurbish the existing buildings by updating the electrical systems, as well as to conduct preventative maintenance services and periodic inspections of the electrical facilities and also decided not to perform these functions using its own personnel.   (Docket Nos. 262 at ¶ 135; 265 at § I, ¶ 135).   Under this contractual arrangement, the military retained the responsibility for troop safety stemming from its decisions to limit maintenance at the base by maintaining the buildings "as is" without preventative maintenance or inspections while KBR was only responsible to "safely" perform its work on the base – a standard which is undefined in the agreements.   *See Task Order 139*.   Thus, this Court cannot find that the military completely shifted to KBR the risk of loss potentially caused by electrical shocks to base camp residents that may have been prevented by the election of a higher level of operations and maintenance services or the direction to refurbish the buildings and upgrade the systems.

A convincing example of the military's retention of control over the level of operations and maintenance services KBR provided at the RPC occurred in late 2007.   At that time, base camp Mayor SFC Skaggs directed KBR to install a generator near LSFB1 and also requested that

KBR provide "full O&M" services to the generator, meaning that service was to be provided as Level A maintenance under Task Order 139.  (Docket No. 262 at ¶ 183; 265 at § I, ¶ 183; *Task Order 139, Appx. F., § F.2.1.* ("Level A, Full Maintenance")).  The purpose of the generator was to power an ECCM jamming device which protected the base and its residents from vehicle-borne improvised explosive devices.  (Docket No. 263-51 at 23).  Thus, the military retained the ability to assign Level A maintenance to certain equipment and facilities and apparently did so in instances, such as this one, where the military believed that Level A maintenance was necessary to protect base camp residents from potential hostilities.

The evidence surrounding the generator installation also demonstrates that the military ignored warnings from KBR concerning the state of the electrical facilities in the LSFB1 area.  In this regard, KBR representatives advised military personnel in person and through written correspondence that the electrical systems in that area were "maxed out" and recommended that the ECCM device be operated through the generator rather than the electrical system.  (Docket No. 262 at ¶ 184; Pl. Ex. X, Docket No. 277-1 at 2).  The military initially followed KBR's recommendation and ordered KBR to install the generator.  (Docket No. 263-51 at 23). However, within a month, military personnel directed KBR to remove the generator and SFC Skaggs and other military personnel installed the ECCM directly into the electrical system, contrary to KBR's recommendation.   (Docket No. 262 at ¶ 185).   Again, this evidence shows that the military conducted its own risk assessment and would act contrary to KBR's recommendations on electrical safety, if the military believed that it was necessary to do so.

In addition, the evidence of work KBR actually performed at the base does not foreclose KBR's argument that the military's actions alone were the proximate cause of Staff Sergeant Maseth's death because Plaintiffs' case largely relies on circumstantial evidence which is

particularly susceptible to KBR's empty chair defense that challenges the military's decisions.

For example, the parties dispute whether it was KBR that installed the ungrounded water pump in

2006 at LSFB1 that ultimately failed in this case.   Plaintiffs maintain that it did, relying on

photographs of LSFB1 from 2006 and 2008 and the corroborating testimony of two soldiers to

show that the water pumps and tanks were moved on the roof of the building during that time

period.   (Def Ex. 36, Docket No. 263-61 at ¶ 20; Docket No. 295 at § I, ¶ 197).   Plaintiffs'

evidence supporting their contention that KBR installed the water pump is speculative and weak,

at best.   Yet, Plaintiffs ask that the Court and a jury infer from the movement of the water pumps

and equipment and the fact that KBR had an operations and maintenance contract at the base

during this time period, that KBR must have installed the water pump.   (Docket No. 265 at § I, ¶

197).   The DODIG investigators apparently found this information[26] sufficient to reach the

conclusion that KBR installed the water pump in its findings.   (*See* Def Ex. 31 at 3-4).   But, the

DODIG was not restricted by the Rules of Evidence, and its conclusion is possibly inadmissible at

trial.[27]   (*Id.*).   KBR denies that it installed the water pump, stating that its internal investigation

has not unearthed any work order which shows that its representatives actually performed the

---

[26]        The report also mentions that the installation of new water tanks on the roof of LSFB1 was completed by a KBR subcontractor from Card Industries and, from this, the DODIG surmises that the water pumps would have been installed concurrently.  (Def Ex. 31 at 3-4).  Yet, this Court has not been presented with the underlying evidence (such as the statement from the KBR subcontractor) to substantiate this assertion in the DODIG Report.

[27]        The Court notes that when ruling on a motion for summary judgment, a district court may consider inadmissible evidence only if the court first determines that such evidence could be presented in an admissible form at trial. *See Palfrey v. Jefferson-Morgan Sch. Dist.*, 355 F. App'x 590 (3d Cir. 2009) (citing *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990); *Williams v. Borough of West Chester*, 891 F.2d 458, 466 n. 12 (3d Cir. 1989)).  As the Court noted in a prior decision, *see Harris*, 2010 WL 4614694, at *4, the DODIG Report is likely inadmissible to prove the fact that KBR installed the water pump. *See e.g.* FED. R. EVID. 803(8) ("The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness … [a] record or statement of a public office if … it sets out … in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation"); *Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1342 n.4 (3d Cir. 2002) (setting forth factors to consider to determine if agency reports are admissible under Rule 803(8)); *Hallett v. United States*, 877 F. Supp. 1423, 1428 (D.Nev. 1995) (holding that a Department of Defense report was inadmissible).

installation.[28]   (Docket No. 265 at § I, ¶ 197, Pl Ex. G, Docket No. 269).   Because the evidence is

disputed as to whether KBR, rather than the military or another subcontractor, installed the water

pump, the Court believes that KBR can legitimately defend its position that it did not cause the

water pump to be installed without proper grounding and bonding.   KBR is likewise able to

support its position by relying on the facts that: none of the 144 buildings in the RPC were

properly bonded or grounded; none of the electrical elements of LSFB1, including the equipment

and appliances, were bonded or grounded; and the military never explicitly directed it to ground

and bond its work on the base through the contracts. (*See* Docket Nos. 262 at ¶¶ 125, 188, 190;

265 at § I, ¶¶ 188, 190).

Plaintiffs' remaining claims rely on KBR's failure to properly respond to work orders on

the following dates: June 14, 2006; July 4, 2006; February 13, 2007; June 23, 2007; June 26,

2007; and July 8, 2007.   (Docket No. 265 at § II, ¶ 87).   This evidence is likewise hotly contested

between the parties.   (Docket Nos. 265 at § II, ¶ 87(a)-(g); 283 at ¶ 87(a)-(g)).   While several of

these work orders contained complaints of electrical shocks by service members,[29] Plaintiffs

admit that they have no evidence that the subject water pump was the source of any of the

electrical shocks which were suffered by the soldiers.[30]   (Docket Nos. 262 at ¶ 191; 265 at § I, ¶

191; Def Ex. 36 (Plaintiffs "are not aware of whether the specific pump that caused the shock on

January 2, 2007 … had ever previously been the source of a shocking incident at LSFB1.")).

However, Plaintiffs have identified work orders requesting service to the subject water pump.   To

---

[28]        The Court notes that Plaintiffs did not bring a motion to compel or any other challenges to KBR's production during discovery.

[29]        The Court understands from the layout of LSFB1 included in the DODIG Report that LSFB1 had two separate restroom facilities.   (*See* Def Ex. 31, Docket No. 263-54 at 14, Figure 2, Floor Plan of LSFB1).   As KBR points out, the shocks that were reported by soldiers did not all occur in the restroom adjacent to Room 2, where the Maseth accident took place but many occurred in the restroom adjacent to Room 6.   (Docket No. 283 at ¶ 87).   In addition, the reported shocks required service to the water heaters which were located in three separate locations surrounding the building, rather than to the water pump and tanks located on the roof of the building.   (*Id.*).

[30]        The Court notes that the work that KBR actually performed in response to these service order requests caused the shocking incidents to subside for some time.   (*See* Docket Nos. 262 at ¶ 181; 265 at § I, ¶ 181).

this end, the July 8, 2007 work order pertained to a complaint from SSG Hummer that a water tank was leaking. (Docket No. 265 at § II, ¶ 87(h)). KBR responded to this request and replaced a pressure switch attached to the subject water pump. (*Id.*). However, Plaintiffs and their experts admit that the pressure switch did not cause the water pump to malfunction. (Docket No. 265 at § I, ¶ 198).

In all, Plaintiffs do not have direct evidence creating a causal link between the subject water pump and a prior electrical shock incident. Yet, Plaintiffs and their experts suggest that KBR's workers who responded to the subject work orders should have: bonded the water pipes that became electrified in addition to fixing (or attempting to fix) the reported electrical problems with the lack of grounding on the water heater and electric panels; or, recognized that the water pump was ungrounded when they replaced the pressure switch and, then, either grounded the water pump or sought approval do to so from the Mayor's Cell. (Docket No. 265 at § I, ¶ 198). The former base camp mayors both testified that they would have authorized such work if KBR had presented such a request to them. (Docket No. 265 at § II, ¶¶ 54, 74, 77-82). But, without direct evidence of KBR's performance of faulty work on the subject water pump, KBR's liability position can be fairly defended by pointing to the ambiguities in the contract and the fact that the contract contained provisions which were not elected, like Level A maintenance, which would have explicitly required KBR to conduct periodic checks for grounding of all equipment, including water pumps, every 60 days. *See Task Order 139* at *Appx F.4.1.* ("A Category. Inspection should be conducted every 60 days, but can be modified by the base camp mayor for more or less frequent inspections on an individual basis. The purpose of these inspections is for safety and to save the government money…"). The subject water pump was last serviced on July

8, 2007, and Staff Sergeant Maseth's death did not occur until January 2, 2008.[31]  (*See* Docket Nos. 265 at § II, ¶ 87(h); 262 at ¶ 187; 265 at § I, ¶ 187).  If Level A maintenance was ordered by the military, KBR would have been contractually required to have conducted grounding checks on the water pump multiple times from the start of the contract in February of 2007 and two or three times between the last service call and the accident.  *See Task Order 139* at *Appx F.4.1.* As one of the stated purposes of inspections and grounding checks was for "safety", the ambiguous nature of the pertinent provisions in the contract lends support to the argument that the military's decision to exclude preventative maintenance was a causal factor in the accident.  *See id.* Therefore, the military's decision to exclude language requiring preventative maintenance and periodic inspections every 60 days from the contract – the purpose of which was to ensure "safety" of the facilities – is directly implicated by the parties' respective positions on proximate causation.

Another point of contention between the parties is whether the risk of electrical shock in the shower at LSFB1 could have been eliminated without direction from the military to rewire the entire building.  (Docket Nos. 262 at ¶¶ 166-167; 265 at § I, ¶¶ 166-167).  This dispute is the center of the battle of electrical experts in this case.  (*See* Docket Nos. 289-293, 299, 302-303). KBR's expert, John Loud, contends that a complete rewire of the building was necessary to

---

[31]     At the motion hearing, Plaintiffs' counsel suggested that a work order initiated by Staff Sergeant Maseth on November 2, 2007 also involved the subject water pump.  (*See* Docket No. 294 at 104).  This work order is not referenced in Plaintiffs' response to KBR's concise statement of material facts or their own counterstatement of material facts.  (Docket No. 295, §§ I, II).  Thus, under Local Rule 56, which the parties were ordered to follow in the instant motion practice, this Court may disregard such evidence as it is the Plaintiffs' burden to present facts using the concise statement procedure.  Despite same, the Court has independently located the referenced work order in the record.  (Pl. Ex. U, Docket No. 276 at 12).  Counsel is correct that Staff Sergeant Maseth reported: "wp pulsating badly" in the work order dated November 2, 2007.  (*Id.*).  The remainder of the work order, including the sections filled out by KBR staff, is almost illegible but it appears to state that KBR repaired the pressure switch.  (*Id.*).  From this work order alone, the Court is unable to determine whether it involves the subject water pump or what relevance, if any, this document has to the case.  In any event, the November work order would not undermine the Court's position that Level A maintenance would have required KBR to conduct bi-monthly inspections and grounding checks while the operative portions of the contract under which KBR worked were ambiguous and lacked explicit performance standards.  (*See Task Order 139*).

eliminate the risk of electrical shock.  (Def. Ex. 32).  Plaintiffs' experts, Jim Childs and Dr. John Tobias, concede that a complete rewire would eliminate the risk, but they also conclude that the electrical shock risk could have been addressed by KBR within the context of the aforementioned work orders.  (Pl Exs. AA, BB).  The facts underlying these competing opinions are disputed although both parties agree that the military never issued an order directing KBR to upgrade the electrical facilities until after the accident.  While KBR has moved to exclude the opinions of Plaintiffs' experts under *Daubert*, (*see* Docket No. 289), Plaintiffs have not sought to exclude the opinions of Loud, the defense expert, by filing a *Daubert* challenge, (*see* Docket No. 255); instead, Plaintiffs will rely on cross examination at trial.  Plaintiffs' tactics, while understandable, undermine their position that KBR's defenses do not legitimately implicate military judgments. Without seeking to exclude Loud's testimony, Plaintiffs have, in effect, conceded that his opinions will be placed before the jury.  Of note, only the military had the authority to direct KBR to rewire LSFB1, and Loud's opinion that the risk of electrical shock could not have been eliminated absent such an order challenges the sensitive military judgment of whether the military should have commissioned KBR or another contractor to upgrade the electrical systems by rewiring the building.  (*See* Def Ex. 32 at 11).

The presence of such nonjustiable issues is even more apparent if the Court delves deeper into the disputed facts on the issue of the safety of LSFB1, contractual negotiations with KBR and the limited technical inspection which was completed by KBR before it assumed operations and maintenance responsibility at the RPC.  Plaintiffs suggest that KBR should have recognized that the electrical systems posed significant risks to soldiers and that KBR should have marked the building as "unserviceable" – effectively condemning it.  (Docket No. 265 at § II, ¶¶ 51-54). KBR cites the same technical inspection report as further evidence of its warnings to the military

of the poor condition of the electrical systems and, again, faults the military for not ordering that LSFB1 be rewired.  (Docket No. 262 at ¶¶ 152-156).  KBR representatives presented the technical inspection report to military officials on two separate occasions, once in February of 2007 and a second time in November of 2007.  (*Id.* at ¶¶ 168-170).

In this Court's estimation, the evidence KBR has submitted with respect to the contractual aspects of the technical inspection process is compelling, particularly the sworn statements of Colonel Kirk Vollmecke, Commander of DCMA.  (Def Ex. 29 at 12-85).  He offered wide-ranging statements regarding the LOGCAP III contract before the DODIG investigators and the role of DCMA staff in contractual negotiations.  (*Id.*).  During his interview, he explained that the military had waived the requirement that KBR conduct technical inspections of the buildings at the RPC and authorized KBR to commence work under the LOGCAP III contract without fixing the electrical problems identified in the February 2007 technical inspection, including the problems at LSFB1.  (*Id.* at 32, 36).  He also confirmed his belief that the LOGCAP III contract did not contain any explicit electrical standards requiring KBR to complete electrical work under the NEC or British Codes and it lacked any requirements regarding the certification of contractors performing electrical work on the base.  (*Id.* at 41-42, 52-55).  Colonel Vollmecke faulted DCMA staff for waiving the requirement of the technical inspections, accepting the many assumptions that KBR made in its PPE (including that the buildings were in good condition) and for directing KBR to commence work at the RPC without fixing the problems which KBR identified in the "limited" technical inspection report.  (*Id.* at 41-42).  He also expressed his dissatisfaction with the ambiguities in the contract, which in his mind left it without any explicit standards for the performance of electrical work or any requirements for the certifications of contractors performing electrical work.  (*Id.* at 52-55).

Colonel Vollmecke provided significant context for his testimony as well.  He explained that the contracts were not developed to account for the semi-permanent occupation environment that was present at that stage of the war in Iraq and believed that these agreements worked well at the beginning of the war when only a limited number of bases were involved.  (*Id.* at 41-43).  But, as the war progressed toward semi-permanent occupation of Iraq by the joint forces and the assignment of soldiers to live in thousands of Iraqi hardstand buildings, "holistic" changes were not made to the contract to keep up with the changing dynamics of the war.  (*Id.* at 43).  Moreover, the contractual negotiations with KBR took place in February of 2007, at a time when the United States – at the command of the President – had commenced execution of the "Surge" wherein the troop levels on the ground in Iraq were significantly increased (in excess of 20,000) in order to stabilize the country.  (*Id.* at 42).  The "Surge" added tremendous pressure to DCMA as the troop increases resulted in corresponding increases in the number of contractors, which required a significant amount of work from DCMA staff at the time.  (*Id.*).

Much of Colonel Vollmecke's testimony concerning the state of the agreements with contractors at the relevant time is corroborated by the February 1, 2007 Dickinson Memorandum – an audit report wherein Dickinson reports that the safety programs then-present in the war theatre were "substantially non-achievable due to the war environment." (Def Ex. 24).  He added that "[m]any products and facilities available in Iraq do not meet basic US standards nor a military risk analysis based on a generally acceptable 'good enough' standard.  The LOGCAP contract process influences KBR to inherit many facilities which are not intended for long term usage."  (*Id.*).  Dickinson also identified poor electrical conditions as a major safety threat on U.S. bases in his report.  (*Id.*).

This evidence, acquired from internal military sources, lends further credence to KBR's theory that the risk of electrical shock to which Staff Sergeant Maseth was exposed was the result of high level military cost-benefit and wartime risk management decisions rather than the result of KBR's own negligence.  In all, the Court finds that KBR's causation defense cannot be addressed without questioning multiple policy-based decisions made by military commanders.  *See Taylor*, 658 F.3d at 411-412 (analysis of KBR's contributory negligence defense could not be completed without reviewing reasonableness of military judgments).

KBR further argues that its defense of assumption of the risk bars consideration of this action by this Court.  (Docket No. 261).  The parties have not briefed the choice of law issue on assumption of the risk, although both have referenced Pennsylvania law during their arguments.[32] (*See* Docket Nos. 261, 264, 282, 285).  As such, the Court will look to Pennsylvania law to determine if KBR's defense of assumption of the risk is supported by evidence and legitimately implicates military judgments.  *See Travelers Cas. And Sur. Co. v. Ins. Co. of N. Amer.*, 609 F.3d 143, 170 (3d Cir. 2010) (quoting *Assicurazioni Generali, S.P.A. v. Clover*, 195 F.3d 161, 164 (3d Cir. 1999)) ("the first question to be answered [under Pennsylvania law] is whether the parties explicitly or implicitly have chosen the relevant law."); *see also Allegrino v. Conway E & S, Inc.*, Civ. A. No. 09-1507, 2010 WL 4052923, at *6 n. 16 (W.D. Pa. Oct. 14, 2010) (holding that Pennsylvania law applied as the parties did not argue choice of law issue and implied that

---

[32]     The Court notes that it appears that the states of Texas and Tennessee have abandoned the doctrine of assumption of the risk in favor of comparative fault statutory schemes.  *See Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 772 (Tex. 2010) (citing TEX. CIV. PRAC. & REM CODE § 33.001; *Farley v. M M Cattle Co.*, 529 S.W.3d 751, 758 (Tex 1975)); *see also Baggett v. Bedford County*, 270 S.W.3d 550, 554 (quoting *Perez v. McConkey*, 872 S.W.3d 897, 901 (Tenn. 1994) ("[w]e agree with those states that have abandoned all categories of implied assumption of the risk, as well as the traditional assumption of risk terminology, in the wake of judicial or statutory adoption of a scheme of comparative fault.  The types of issues raised by implied assumption of risk are readily susceptible to analysis in terms of the common-law concept of duty and the principles of comparative negligence law.").  But, as we recognized previously, *see Harris*, 796 F. Supp. 2d at 659, both Texas and Tennessee have similar statutes whereby plaintiffs may not recover if the jury finds that they were more than fifty percent responsible for their own injuries.  *See McIntyre v. Balentine*, 833 S.W.2d 52, 57 (Tenn. 1992); *see also* TEX CIV. PRAC. & REM CODE §§ 33.001, 33.003.  Further, as we discuss below, the same evidence of the military's decision of whether to provide ablution units on the base or not would be relevant under a comparative fault analysis.

Pennsylvania law applied by focusing their arguments on same).   Although a system of comparative negligence has been enacted by the Pennsylvania legislature, courts have recognized that the doctrine of assumption of the risk remains as a complete defense to negligence claims under Pennsylvania law.  *See Matharu v. Muir*, 29 A.3d 375, 388 n.4 (Pa. Super. Ct. 2011); *see also Zeidman v. Fisher*, 980 A.2d 637 (Pa. Super. Ct. 2009).   To prove assumption of the risk under Pennsylvania law, a defendant must show that a plaintiff fully understood and appreciated the specific obvious and avoidable danger which caused his injury and "nevertheless proceeded voluntarily to encounter [it]."   *Kaplan v. Exxon Corp.*, 126 F.3d 221, 226 (3d Cir. 1997) (quotation omitted).  In determining voluntariness, the court looks to whether the plaintiff had a reasonable alternative to encountering the risk.  *Id.*  (citation omitted).  The defense may show the plaintiff's knowledge and understanding of the risk through circumstantial, rather than direct, evidence.  PA. SSJI (CIV.) § 13.150 (2011).  Whether assumption of the risk bars a claim is an issue typically reserved for the jury.  *See Matharu v. Muir*, 29 A.3d at 388; *see also Zeidman*, 980 A.2d at 643.

Here, KBR has submitted evidence supporting each of the elements of its assumption of the risk defense.  There is certainly circumstantial evidence in the record which shows that Staff Sergeant Maseth had knowledge of the risk posed by the shower.  As the Court discussed above, KBR has presented evidence that the military had knowledge that the electrical systems in Iraqi hardstand buildings did not meet Western construction standards as well as the fact that certain individuals within the military chain of command were made aware of the specific risk of electrocution in the shower facilities in Iraqi hardstand buildings.  (Def Exs. 2, 22, 24; Docket Nos. 262 at ¶¶ 86-91; 265 at § I, ¶¶ 86-91).  KBR has also submitted evidence that warnings of

the risk in the shower were provided to Staff Sergeant Maseth himself.[33]   (Docket Nos. 262 at ¶¶ 178-180; 265 at § I, ¶¶ 178-180).   Two of his fellow soldiers testified that they advised Maseth of the shocking risk posed by using the shower in LSFB1 to which he was assigned.   (*Id.*).   They told him to "watch out" while he was showering.   (Docket Nos. 262 at ¶ 178; 265 at § I, ¶ 178).   Staff Sergeant Hummer further explained that Maseth should put his hand out to test the water before getting into the shower and even advised him that the problem would not be fixed unless the entire building was rewired.   (*Id.*).   Additional evidence shows that in November of 2007, KBR completed a fire inspection of the building which identified multiple electrical hazards throughout the building.   (Def Ex. 34-B).   Staff Sergeant Maseth signed the report as fire marshal for the building, and it can be reasonably inferred from this evidence that he was aware that the entire building had yet to be rewired when he entered the shower on January 2, 2008.   (*Id.*).

The issue of whether Staff Sergeant Maseth voluntarily encountered the risk of potential electrocution in the shower involves the consideration of any reasonable alternatives which were available to him at the time of the accident.   *See Kaplan*, 126 F.3d at 226.   In this Court's opinion, this issue cannot be decided without implicating sensitive military judgments concerning the facilities made available to soldiers at the RPC for housing and showering.   In fact, the Court believes that both parties' positions on voluntariness cannot be resolved without taking into account the military's decision-making which precipitated Staff Sergeant Maseth's own choice to take a shower on January 2, 2008.

---

[33]     The Court notes that Plaintiffs' counsel asserted at oral argument that perhaps Staff Sergeant Maseth believed that KBR had corrected the electrical shock issues in the shower.   (*See* Docket No. 294 at 51).   However, there is no evidence in the record which supports this position.   In fact, as the work orders described above were submitted to KBR and responded to prior to Maseth's arrival on the base in the fall of 2007, and the warnings were given to him by Hummer and Newsome after his arrival, it is clear that Maseth was warned of the problems, despite the fact that KBR had responded to work orders and attempted to fix the issues.

From their view, Plaintiffs submit that the act of taking a shower does not involve sensitive military decisions.  (Docket Nos. 264, 285).  However, the parties do not dispute that the military controlled all aspects of the facilities planning relevant to the RPC, including where soldiers were housed and the showering facilities made available to them.  (Docket Nos. 262 at ¶¶ 51-52; 265 at § I, ¶¶ 51-52).  There is also no evidence in the record which suggests that KBR was delegated any duty to evaluate all of the shower facilities and determine if ablution units – prefabricated countainerized shower units – should be used rather than the showers which were present in the Iraqi hardstand buildings.  *See Task Order 139*.  In addition, as a soldier, Staff Sergeant Maseth was required to follow orders from his commanding officers, and KBR had no authority to direct him where to live or shower.  (Docket Nos. 262 at ¶¶ 54-55; 265 at § I, ¶¶ 54-55).  The military assigned Staff Sergeant Maseth to his living quarters in LSFB1 and made the shower facility available to him.  Consequently, his estate contends that it was reasonable for him to use the shower which the military provided him.  (Docket Nos. 264, 285).  KBR's position relies on the fact that ablution units were available to soldiers at the RPC and provided a safer option than the showers in the hardstand buildings.  (Docket Nos. 261, 282).  Although KBR does not have any specific evidence that Staff Sergeant Maseth was aware of the ablution units or expressly declined to use such facilities on January 2, 2008, it was not KBR's duty – contractual or otherwise – to make this alternative type of facility available to him.  That option remained with the military.

From the Court's perspective, neither party can prove its case on the voluntariness issue without implicating the sensitive military judgment of whether reasonable alternatives were available to Staff Sergeant Maseth for showering in LSFB1.  Plaintiffs must either admit that Maseth voluntarily encountered the risk in the shower, an admission which would undermine

their case, or take the position that his actions were involuntary such that he was acting in response to military orders and directly challenge the military's decisions concerning the shower facilities which were made available to him at the base.   On its behalf, KBR argues that the ablution units should have been more widely available at the base and that the military should not have permitted Staff Sergeant Maseth and other soldiers to use the shower facilities within the Iraqi hardstands, but, instead, should have required the soldiers to use the ablution units.   To support this argument, KBR would have to put on evidence about the number and placement of the ablution units, as well as evidence concerning the apparent military decision to permit showers in the hardstand buildings.   Any decision by this Court resolving these factual and legal disputes would necessarily pass judgment on the military's choices regarding what type of shower facilities it made available to soldiers at the base, something this Court is ill-equipped to evaluate.

Although KBR has specifically argued in its papers that its assumption of the risk defense cannot be further adjudicated given the above-cited evidence, it is apparent to the Court that its other defenses of contributory negligence and comparative negligence present non-justiciable political questions for the same reasons.   We simply cannot determine if Staff Sergeant Maseth himself acted negligently with respect to his own safety without evaluating whether the military made alternative showering facilities available to him.   And, that decision was solely within the purview of the military.   *See Taylor*, 658 F.3d at 411-412 (analysis of KBR's contributory negligence defense could not be accomplished without reviewing reasonableness of military judgments).   We also fail to see any way in which a jury could apportion liability among these parties under a comparative negligence analysis without evaluating the military's role in this case. Indeed, under Texas law, which may ultimately apply here given that it is the state of KBR's headquarters and the location of many of its activities, a jury may be tasked with apportioning the

percentage of responsibility for a plaintiff's harm among parties and non-parties, including defendants which are immune from suit like the United States in this case.  *See Fisher v. Haliburton*, 667 F.3d 602, 621 (5th Cir. 2012) (citing TEX. CIV. PRAC. & REM. CODE § 33.004(l)) (noting that § 33.004(l) potentially implicates political questions because it permits a jury to assess fault against parties "who are not subject to the court's jurisdiction or who are immune from liability to the claimant" even though that party has no liability in the case).  As the Court of Appeals for the Fifth Circuit suggests, permitting a jury to conduct such an assessment would clearly run afoul of the principles of separation of powers which we are counseled to avoid in *Baker*.  *Id.*

Considering these facts, the Court holds that this case involves sensitive military judgments which are not subject to judicial review.  The funding of the military is committed to the sound discretion of the legislature while the decisions concerning what type of operations and maintenance services to be provided at a military base in a war zone are committed to the executive branch.  *See Gilligan*, 413 U.S. at 10.  The potential trade-offs between the safety of troops from hostile actions and other hazards on a military base in an active war zone versus the condition of electrical facilities on the base and the military's allocation of scarce battlefield resources to enhance the safety of electrical facilities versus using such funds for other wartime activities cannot be determined in a court of law thousands of miles away.  (*See* e.g., Docket Nos. 262 at ¶ 90 (General Satterfield testifying that shocking incidents were minor when compared to other pressing matters such as power distribution and protection from indirect fire); ¶ 91 (General Vines declaring that '[w]e chose to assign personnel to live in these pre-existing structures, notwithstanding their electrical deficiencies. All of us, including myself, lived in buildings with similar deficiencies.'"); ¶ 204 ("Speaking of safe, from your perspective as a 1SG or CSM, would

you rather have your soldiers live in a hardstand building or a CHU when mortars are going off nearby? Where do the soldiers want to live?")). Weighing these factors requires professional military judgment which this Court is not authorized to review without violating the separation of powers of the three branches of our federal government. *See Baker*, 369 U.S. at 217.

For these reasons, the Court finds that the first factor under *Baker* has been established and this case must be dismissed.

### 2.    Judicially Discoverable and Manageable Standards

With respect to the second *Baker* factor, "[a] political question looms menacingly when a claim suffers from 'a lack of judicially discoverable and manageable standards for resolving it.'" *Lane*, 529 F.3d at 560 (quoting *Baker*, 369 U.S. at 217). "One of the most obvious limitations imposed by [Article III, § 1, of the Constitution] is that judicial action must be governed by *standard*, by *rule*." *Id*. (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 278 (plurality opinion)) (emphases in original). "Courts have frequently held that certain military judgments are outside the competence of courts" as courts are not equipped with appropriate standards to resolve the questioning of these judgments. *McMahon*, 502 F.3d at 1363 (discussing *Gilligan*, 413 U.S. 1). The type of judgments that are insulated from judicial review involve inherently military activities including combat operations, training exercises, and the equipping and control of military forces. *See Id*.

In light of this precedent, the Court's analysis of the second factor under *Baker* flows from the examination of the first factor. By their nature, sensitive military judgments are without judicially manageable standards as "courts lack standards with which to assess whether reasonable care was taken to achieve military objectives while minimizing injury and loss of life." *Aktepe v. United States*, 105 F.3d 1400, 1404 (11th Cir. 1997). Although we previously found

that the flexible standards of negligence law would likely permit the Court to discover and adopt a manageable legal standard in this case, *see Harris*, 618 F.Supp.2d at 427-30, after consideration of the fully developed factual record, we believe that the military's risk assessment concerning the continued use of the shower facilities in the Iraqi hardstand buildings which posed a known electrocution risk to soldiers cannot be evaluated under traditional state law tort standards.   The military's decisions furthered its objective of force protection from hostilities (whether the base was subject to actual attacks or not) and responded to the allocation of scarce defense resources among the many war hazards to which soldiers were possibly subject in Iraq.   A federal court lacks the competence to evaluate these policy decisions.  *See Taylor*, 658 F.3d at 412, n.13 ("Here, we have no discoverable and manageable standards for evaluating how electric power is supplied to a military base in a combat theatre or who should be authorized to work on the generators supplying that power.").

We likewise cannot determine whether KBR acted (or failed to act) with due care toward Staff Sergeant Maseth because the contracts at issue in this case did not shift the risk of loss associated with the soldiers' exposure to known electrical hazards from the military to KBR. Instead, the contracts delegated only certain discrete duties to KBR, and the military necessarily retained the duties which were not assigned under the contracts.  *See Task Order 139*; *see also* Pl Ex. A. As such, KBR's activities at the RPC are inextricably intertwined with the policy-based decisions made by the military and the issue of proximate causation cannot be evaluated without questioning these military decisions. *See Carmichael*, 572 F.3d at 1295 (explaining "it would be impossible to determine that [KBR's conduct] alone was the sole cause of the accident or to possibly apportion blame without ruling out the potential causal role played by pivotal military judgments").  In addition, KBR's defenses of assumption of the risk, contributory negligence and

comparative negligence raise further questions which are not suited for judicial review.  *See Taylor*, 658 F.3d at 411-12 (holding that defense of contributory negligence would implicate sensitive military judgment regarding power generation).

This case is even more problematic in that Plaintiffs' liability theory relies primarily on their assertion that KBR was required to perform its electrical work to NEC or British electrical standards but they have been unable to produce evidence which convinces this Court that either of these standards applied to the work that KBR actually performed at LSFB1.  (Pl Exs. AA, BB). The Court previously suggested that Plaintiffs could prove the duty owed by KBR and the standard of care with reference to the terms of its contracts with the military, internal operating procedures, or possibly by undertaking a duty through its performance of service order requests at the base.  *Harris*, 618 F. Supp. 2d at 428-29 ("The applicable duty owed by KBR to Staff Sergeant Maseth, if any, can be defined with reference to common law negligence principles as well as the LOGCAP III Contract, Task Order 139, service order requests at LSF-B1, and KBR's internal operating procedures.").  But, the evidence in the present record is insufficient to demonstrate that any specific performance requirements were set by the military.  Plaintiffs have provided the Court with testimony from General Satterfield that the applicable standard was the British standard and the base camp mayors, Skaggs and Carrier, testified that they expected that KBR would complete grounding and bonding as a part of any electrical work they performed on the base.  (*Satterfield Depo* at 141, 146-47, 158-60, 162-63, Pl. Ex. E, Docket No. 268; (Docket No. 265 at § II, ¶¶ 54, 74, 77, 78).  However, these individuals had limited knowledge, if any, of the actual contractual agreements.  (*Satterfield Depo* at 141, Pl. Ex. E, Docket No. 268 at 7). And, as is discussed in the prior section of this Opinion, and as confirmed by Colonel Vollmecke, the contractual provisions which were applicable to the work orders in this case did not explicitly

require performance to either electrical standard and the contractual condition that KBR complete technical inspections of the buildings was waived.  (Def Ex. 29 at 52).  Plaintiffs have likewise failed to persuade the Court that KBR admitted that the NEC applied to the circumstances of this case through the deposition testimony of Rule 30(b)(6) witness Paul Hardin.[34]  (Pl Ex. L).  At most, he testified equivocally that KBR would have performed to NEC standards in certain situations but could not at the RPC because all of the buildings there needed to be rewired.  (*Id.*).  In this Court's opinion, this isolated testimony by Hardin is insufficient to create a binding judicial admission by KBR that the NEC applied to all of its work at the base.  *See In re Teleglobe Comm. Corp.*, 493 F.3d 345, 377 (3d Cir. 2007) (citing *Glick v. White Motor Co.*, 458 F.2d 1287, 1291 (3d Cir. 1972)) ("[t]o be binding, admissions must be unequivocal" and admissions "must be statements of fact that require evidentiary proof, not statements of legal theories.").  Plaintiffs have not argued that KBR's standard operating procedures required it to perform to these Western electrical standards but, having reviewed the procedures provided in the record, they appear to set forth performance standards consistent with Hardin's testimony rather than require performance under the Western electrical standards.[35]  (*See* Pl Ex. U, Docket No. 276 at 33-35).  Further,

---

[34]     Plaintiffs rely on a very brief exchange during Mr. Hardin's deposition to establish his purported judicial admission on behalf of KBR.  That passage is as follows:

> Q. Okay. Is -- was KBR, when they would make repairs based on a work order,
> did they do their repairs, electrical repairs in accordance with NEC standards?
>
> A. Yes, when capable of, depending on the conditions as what they come across.
> A lot of these buildings needed to be rewired, sir.

(Pl. Ex. L, Docket No. 271-1).

[35]     Although neither party has explicitly relied on KBR's Standard Operating Procedures in their respective arguments, section 4.1. titled "Ground Resistance Maintenance" appears consistent with Hardin's explanation of KBR's practices.  (Pl Ex. U, Docket No. 276 at 33-35).  To this end, section 4.1.1 provides that the "Ground Resistance reading shall be in compliance with the USNEC, British Standard (BS), or the Authority Having Jurisdiction (AHJ).  **Depending on the location of the installation.**"  (*Id.* at 35) (emphasis added).  Here, the location of installation was the RPC in Baghdad, Iraq, a location without any established electrical standards.

Colonel Vollmecke offered further explanation of this distinction during his statements to the DOD investigators.  (Docket No. 263-52).  To this end, he explained that "anybody knows NEC or British standard really should be host nation driven to the environment, because ultimately you're going to turn the facilities over.  And so if

Plaintiffs have not established that a course of conduct was in place whereby KBR routinely performed its electrical work to these Western electrical standards; indeed, the evidence shows the opposite – that no electrical elements of LSFB1 were grounded or bonded as were the electrical systems in all of the other 143 buildings in the RPC. (Docket Nos. 262 at ¶¶ 188, 190; 265 at § I, ¶¶ 188, 190). Instead, KBR maintained the electrical systems "as is" under the CENTCOM contract and performed only reactive Level B maintenance under Task Order 139. *See* Pl Ex. A; *see also Task Order 139*.

Without any explicit contractual language supporting their position, or an alternative means of proof to establish the electrical standards used at the base, Plaintiffs and their experts contend that this Court and ultimately, a jury, should evaluate KBR's performance in relation to American and/or British electrical standards, based only on KBR's general duty in the agreements to perform its work in a "safe" manner. (Pl Exs. AA, BB). This Court cannot hold KBR to a standard of care that was not explicitly present in its contracts with the military. It was the military's responsibility to implement contractor performance requirements by including such electrical standards in the contracts. *See Army Reg. 715-9* at 3-2(f) (stating that contractor employees are "not under the direct supervision of military personnel in the chain of command," but that the "contracting officer ... or [his] designated liaison ... is responsible for monitoring and implementing contractor performance requirements"); *see also Carmichael*, 572 F.3d at 1283 (quoting same). The military (through DCMA) failed to do so. (Docket No. 263-52 at 52). If this Court were to equate the use of the term "safety" in the agreement as a means to import the Western electrical standards into the relationship, it would undermine the military command structure and question the military's decisions in failing to include such explicit language in the

---

they're a quasi-British standard, why wouldn't we want to do that? Why would we want to give the Iraqis NEC when, in fact, their grids aren't even set to that. That's stupid." (Docket No. 263-52 at 54-55).

agreement.   While negligence claims involve inherently flexible standards, without explicit contractual duties requiring KBR to perform its electrical maintenance activities to American or British standards, the standard of care cannot be based on general considerations of "safety," an undefined and ambiguous term.   As is demonstrated by the testimony of many military witnesses, and other evidence of record, our civilian society's general understanding of the term "safety" cannot be introduced into combat areas where sensitive military policy-based judgments must be made to shield our troops from all of the hazards that a war presents.   (*See* Docket No. 262 at ¶ 125 (questioning of Skaggs, RPC Mayor at the time of SSG Maseth's accident, "Q: From an electrical standpoint, was [LSFB-1] a safe building? A: I – *you would have to define "safe,"* sir. I – I personally have lived in worse buildings than this … Q: When you said define "safe," from an electrical standpoint, would this building – LSF-B1, would it conform to the National Electrical Code?. . .A: No, sir. No, sir. But no building there would. And that's the whole 144 buildings. *None of them would conform.*")).   Hence, the term "safety" as it relates to electrical maintenance on the base cannot be interpreted without questioning the military's discretionary decision to house troops in these facilities with known electrical problems and its awareness of the electrocution risk posed by the electrical system and shower facilities.   These types of decisions are committed to the Executive branch and cannot be reviewed by this Court.

As a result, the Court finds that this case lacks judicially discoverable and manageable standards and must be dismissed based on the application of the second *Baker* factor to the factual record in this case.

3.      Lack of Respect Due to Coordinate Branches

For many of the reasons we have already expressed, the Court believes that the fourth *Baker* factor, which considers "the impossibility of a court's undertaking independent resolution

without expressing lack of the respect due coordinate branches of government," also bars consideration of this case. *Baker*, 369 U.S. at 217. To this end, we share the views of the Court in *Aktepe v. United States*, that:

> adjudicating this case would express a lack of respect for the political branches of government by subjecting their discretionary military and foreign policy decisions to judicial scrutiny, notwithstanding the judiciary's relative lack of expertise in these areas. The interjection of tort law into the realms of foreign policy and military affairs would effectively permit judicial reappraisal of judgments the Constitution has committed to the other branches.

105 F.3d at 1404 (citing *Tiffany v. United States*, 931 F.2d 271, 278 (4th Cir. 1991)). Although the United States is not a party to this case and is immune from any lawsuit brought against it by Staff Sergeant Maseth's estate and any contribution action brought against it by KBR, given the facts established by KBR regarding the military's decision-making at the base, the Court cannot preclude KBR from presenting its evidence which attempts to place responsibility on the military for the accident involving Staff Sergeant Maseth. *See Feres v. United States*, 340 U.S. 135 (1950) (United States immune from soldier's claim against United States military for injuries incident to service); *see also Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666 (1977) (*Feres* doctrine extended to bar third party's claim for contribution or indemnity against United States arising from soldier's injuries incident to service). Simply put, to permit this case to go forward would place the military and its wartime practices on trial. As a consequence, this case must be dismissed.

This holding finds further support in the government agency reports issued by the Department of Defense Inspector General, Department of the Army and Department of the Army Criminal Investigative Division. (Def Exs. 31, 39, 40, 41). When this Court issued its initial decision in March of 2009, the Executive Branch reports on the death of Staff Sergeant Maseth

had not yet been completed and released.  *See Harris*, 618 F. Supp. 2d at 431.  This Court found

that adjudication of this case while those investigations were pending would not express a lack of

respect to the coordinate branches of the federal government because those investigations were

not evaluating the case under the same legal standards as the negligence principles that would be

applied in this forum.  *Id.*  While we again acknowledge the different legal standards pertaining to

a civil tort action and the findings of these agencies, all of the completed reports point to systemic

failures by many entities involved in the operation and maintenance of the RPC, making each

significant contributors to Staff Sergeant Maseth's electrocution and death.  (Def Exs. 31, 39, 40,

41; Docket Nos. 262 at ¶¶ 201-206; 265 at § I, ¶¶ 201-206).  Indeed, the Executive branch reports

find fault not only with KBR's performance of its operations and maintenance services and its

failure to identify potential risks of harm at the base, but also with the DCMA and the military

chain of command for their respective roles in the accident.  (*Id.*).

        In addition, the Executive reports contain factual findings and legal conclusions which

Plaintiffs directly challenge in this case.  For example, the DODIG report concludes that the

LOGCAP III contract did not contain explicit electrical standards and this report and the

Department of the Army 15-6 Report both state that KBR's contracts did not set forth baseline

standards for its employees' electrical certifications and/or training.    (Def Exs. 31, 39).

Moreover, all of the Executive reports indicate that the military's decisions were causal factors

contributing to the accident.  (Docket No. 262 at ¶¶ 201-206).  To this point, the Army CID report

concludes that it could not determine that any single individual or entity's actions were the

proximate cause of the accident in this case.  (*Id.* at ¶ 206).

        As such, Plaintiffs' claims will test the propriety of the Executive branch's

pronouncements regarding the circumstances surrounding Staff Sergeant Maseth's death.   It

would be incompatible with those Executive findings for this Court to hold KBR to the electrical standards advocated by Plaintiffs – which are not explicitly stated in the contractual agreements and for which the Executive agencies have determined their own personnel shared some fault. Further, whether KBR should have done more to make the base "safe" and prevent Staff Sergeant Maseth's death simply cannot be evaluated in the context of this case without considering the military's initial risk assessment to permit soldiers to live and shower in the Iraqi hardstand buildings which presented a known risk to his safety.  With the benefit of hindsight, it is apparent that if greater emphasis had been placed on the potential risk posed by the hardstand buildings, this accident may have been avoided and Staff Sergeant Maseth would likely be alive and well. "But the political question doctrine does not permit us to mimic the constitutional role of the political branches by guessing how they would have conducted the nation's foreign policy had they been better informed." *El-Shifa Pharmaceutical Industries, Co. v. U.S.*, 607 F.3d 836, 845 (D.C. Cir. 2010).  Given the persuasive precedent we have discussed above, we cannot permit a jury to make such a determination.  Accordingly, the Court finds that the fourth *Baker* factor has also been established precluding further litigation of this case in this Court.

### 4.    Conclusion as to Political Question Doctrine

After conducting a "discriminating inquiry" into the detailed factual record in this case, the Court concludes that further consideration of this case would violate the doctrine of separation of powers between the co-equal branches of our federal government.   From this Court's perspective, it would be impossible to evaluate this case without questioning sensitive military policy-based decisions over which no judicially manageable standards can be crafted, and requiring military personnel to appear at trial and defend these wartime policies would offend the

constitutional principles we have discussed.  *See Baker*, 369 U.S. at 217.  As a consequence, this case must be dismissed.

### B.  Combatant Activities Exception

Given that the Court has determined that this case presents non-justiciable political questions, we may decline to consider KBR's alternative basis for dismissal under the combatant activities exception to the FTCA.  *See Taylor*, 658 F.3d at 412 ("Because the political question doctrine deprives the federal courts of jurisdiction to resolve Taylor's negligence claim, a ruling on the FTCA issue would be little more than an advisory opinion on a constitutional question."). However, for completeness, and because the Court believes that this defense independently supports dismissal of the case at this stage, a brief discussion is included.

As this Court previously recognized, the FTCA authorizes "damages to be recovered against the United States for harm caused by the negligent or wrongful conduct of Government employees, to the extent that a private person would be liable under the law of the place where the conduct occurred." *Boyle v. United Technologies Corp.*, 487 U.S. 500, 511 (1988) (citing 28 U.S.C. § 1346(b)).  The combatant activities exception to the FTCA, section 2680(j), provides an exception which precludes tort liability for "[a]ny claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war."  28 U.S.C. § 2680(j). Although not directly applicable to government contractors, several courts have extended the principles underlying this exception to preempt claims against government contractors.  *See e.g. Koohi*, 976 F.2d 1328; *Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486 (C.D. Cal. 1993); *Saleh*, 580 F.3d 1; *Aiello,* 751 F. Supp. 2d 698.

In *Koohi*, the United States Court of Appeals for the Ninth Circuit held that "the combatant activities exception was designed 'to recognize that during wartime encounters[,] no

duty of reasonable care is owed to those against whom force is directed as a result of authorized military action.'" *Koohi,* 976 F.2d at 1337. More recently, in *Saleh*, the Court of Appeals for the D.C. Circuit viewed the defense more broadly and recognized that "[d]uring wartime, where a private service contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor's engagement in such activities shall be preempted." *Saleh*, 580 F.3d at 9. Modern courts[36] have looked to *Johnson v. United States*, 170 F.2d 767, 769 (9th Cir. 1948), for its definition of "combatant activities,"

> 'Combat' connotes physical violence; 'combatant,' its derivative, as used here, connotes pertaining to actual hostilities; the phrase 'combatant activities,' of somewhat wider scope, and superimposed upon the purpose of the statute, would therefore include not only physical violence, but activities both necessary to and in direct connection with actual hostilities.

*Id.* The *Johnson* court further explained that:

> The rational test would seem to lie in the degree of connectivity. Aiding others to swing the sword of battle is certainly a 'combatant activity,' but the act of returning it to a place of safekeeping after all of the fighting is over cannot logically be cataloged as a 'combatant activity.'

*Id.* The Court also noted that "[t]he act of supplying ammunition to fighting vessels in a combat area during war is undoubtedly a 'combatant activity.'" *Id.* at 768, 770.

The parties debate the proper formulation of the test to be applied to evaluate this defense as each have offered slightly different interpretations of arguments presented by the Solicitor General in amicus briefs before the Supreme Court in conjunction with the *Saleh* case and before the Fourth Circuit in the *Al-Shimari* litigation.[37] (*See* Docket Nos. 261, 264, 282, 285). The

---

[36]   *See e.g., Koohi*, 976 F.2d at 1333 n.5; *Bixby v. KBR, Inc.*, 748 F. Supp. 2d 1224, 1245-46 (D. Or. 2010); *Taylor*, 2010 WL 1707530, at *10, *aff'd in part, rev'd in part*, 658 F.3d 402; *Aiello*, 751 F. Supp. 2d at 711-714.

[37]   The Court notes that the petition for writ of certiorari was denied in *Saleh*, 131 S.Ct. 2055 (2011), and the appeal in *Al-Shimari* was dismissed by the Court of Appeals for the Fourth Circuit, 679 F.3d 205. As such, neither Court directly addressed the position advocated by the Solicitor General in those briefs. The Solicitor General has

parties both suggest, however, that application of the *Johnson* test is appropriate.  (*Id.*).  The crux of the dispute here can therefore be simplified to an analysis of the evidence in this case in light of the *Johnson* definition of combatant activities, i.e., whether KBR was involved in "activities both necessary to and in direct connection with actual hostilities."  *Johnson*, 170 F.2d at 769.  Plaintiffs have largely conceded that the "necessary to" prong of this test has been met in this case but maintain that KBR's activities were not "in direct connection" with actual hostilities.  (*See* Docket No. 285 at 10 ("KBR's faulty performance of routine electrical maintenance at the LSFB1 were in no way 'in direct connection with actual hostilities.'")).  Thus, the Court can concentrate its analysis on the disputed second prong and, for the following reasons, we believe that KBR's activities at the base are sufficient to establish a direct connection with actual hostilities.

First, KBR's duties included maintenance of the electrical systems in the 126 buildings at the RPC.  *See Task Order 139*.  The evidence also shows that KBR was engaged by the military to ensure the flow of electricity within the base.  *Id.* at §§ 8.1.1 (Operations & Maintenance), 8.3 (Power Generation); 8.1.3.1 (Power Distribution).  Electricity was used on the base not only for life support functions like running the water pumps, water heaters and air conditioning equipment, but also to power devices which helped to protect soldiers from enemy attacks.  *Id.*  In fact, KBR received orders from the military in November of 2007 to install a generator for the purpose of powering an ECCM jamming device used to protect against vehicle borne improvised explosive devices. (Pl Ex. X, Docket No. 277).  In this order, SFC Skaggs states that "[t]he generator is necessary to provide power to a new ECCM device **that is integral to force protection.**"  (Pl Ex. X., Docket No. 277-1 at 6 (emphasis added)).  The generator was removed upon the military's request after some time, and military officers then plugged the ECCM device directly into the

---

not appeared in this case and has therefore not expressed any position regarding the applicability of the combatant activities exception to the FTCA directly to this Court.  Accordingly, the Court declines to rule on whether the test formulated in its briefs in the *Saleh* and *Al-Shimari* matters should be adopted here.

electrical system that KBR maintained.  (Docket No. 262 at ¶ 185).  Therefore, KBR's electrical

maintenance was not only necessary to support life activities on the base, as Plaintiffs concede,

but also was directly connected to force protection as the military actually plugged its war-time

defensive instruments used to ward off enemy attacks into the electrical facilities that KBR was

paid to maintain.  Certainly, aiding the military in its efforts to thwart enemy attacks on the base

by supplying power to the jamming device provides a "direct connection" between KBR's

discrete functions on the base and the military's combatant activities such that KBR was fully

integrated into force protection activities.  *See Saleh*, 580 F.3d at 9.  In this Court's opinion, the

engagement of a contractor in support of such preemptive defense mechanisms qualifies as

combatant activities under the *Johnson* definition.  *See Johnson*, 170 F.2d at 769; *see also Taylor*,

658 F.3d at 413 (J. Shedd, concurring) (finding that Taylor's claim was preempted under the

*Johnson* test for combatant activities).

Second, the broader definition of the combatant activities exception as formulated by the

*Aiello* Court likewise supports preemption in this case.  The District Court in *Aiello* recognized

that there was no evidence that the inhabitants of the base were either receiving or returning

enemy fire in active battle, which distinguished that case from the *Taylor* matter.  *See Aiello*, 751

F.Supp.2d at 713 (citing *Taylor*, 2010 WL 1707530 at *10 ("[i]f shelling and receiving shelling is

not combat, then combat has no meaning.")).  Despite the absence of actual fighting on the base,

the Court held that:

> [u]nlike the camp in *Taylor,* artillery was not fired from Camp
> Shield. That makes it a somewhat closer question, but the design,
> operation and maintenance of basic life-support facilities at a
> forward operating base, which served as a refit and re-arming point
> for soldiers involved in combat and which came under hostile fire,
> is necessary to and in direct connection with actual hostilities. It is
> therefore combatant activity.

*Id.* at 713.  The *Aiello* Court further recognized that maintenance of latrine facilities was directly related to the health of the soldiers inhabiting the base and, thus, "integral to sustaining combat operations."  *Id.* at 714.  Here, the parties dispute how much actual combat took place within the walls of the RPC.  The evidence shows that, among other things:

- the facilities at the LSF Compound within the RPC housed Special Forces units and soldiers, including Staff Sergeant Maseth;

- the Special Forces soldiers who lived in the LSF buildings would leave the base to conduct midnight raids on enemy forces and then return to refit and re-arm before engaging in further attacks;

- the Special Forces soldiers also provided military intelligence for the war effort in Iraq;

- Special Forces personnel were trained to operate and fulfill their missions under difficult and dangerous conditions and were expected to "endure austere living arrangements, using available facilities";

- there was a risk of mortar and shelling at the base but limited reports of such activities affecting base life;

- security for the base included the use of defensive instruments such as ECCM jamming devices and armed soldiers maintained a controlled entry point to the base which was located near LSFB1;

- warning shots were occasionally fired from the main entry point of the base to redirect unknown vehicles from the base and the ECCM jamming devices set up near the entry point prevented insurgents from remotely triggering IEDs;

- body armor was worn by some soldiers and contractors but not others in and around the LSF buildings; and

- soldiers generally felt that the RPC was a safer location to be housed than other areas of Iraq where intense fighting was more common.

(Docket Nos. 262 at ¶¶ 35-39, 47; 265 at § I, ¶¶ 35-39, 47; 265 at § II, ¶¶ 106-114; 283 at ¶¶ 106-114; 263-15 at ¶ 13; 277).   The military engaged KBR to provide discrete operations and maintenance services to the facilities used by these Special Forces soldiers in the LSF buildings, and the military controlled the terms and conditions of the contract and initiated all work that was performed by KBR on the base.   *See Task Order 139*.   The services performed by KBR at the base supported both the military's missions in Iraq, including the attacks led by Special Forces soldiers off the base, their gathering of intelligence in furtherance of the military's missions and the defensive mechanisms used by the military to protect base inhabitants from enemy attacks. Given these facts, under the broad *Aiello* formulation of the combatant activities exception, we hold that KBR was fully integrated in the combatant activities of the military at the base.   *See Aiello*, 751 F. Supp. 2d at 711-714.

For these reasons, the Court alternatively holds that KBR's motion to dismiss under the combatant activities exception is granted.

VI.    CONCLUSION

After carefully considering all of the parties' arguments and the extensive factual record in this case, this Court believes that dismissal is appropriate given the impact of the many military judgments which we have fully described above.   While we believe that Plaintiffs and their experts have made a compelling case challenging the safety of KBR's electrical work in LSFB1, we do not believe that this case can be further adjudicated without questioning the military's wartime decisions which directly affected the safety of the electrical facilities in the building.   It is not the role of the judiciary to pass judgment on the military's decisions which affect the safety of a military base located in an active war zone and we conclude that an evaluation of KBR's defenses cannot be divorced from these military decisions.   The Court points out that KBR's

performance has been critically evaluated by the political branches of our government.   For example, the DODIG Report found, among other things, that: KBR perpetuated electrical hazards by completing electrical work without proper grounding and bonding; employed personnel with inadequate electrical training and expertise; had deficient standard operating procedures; and failed to bring inconsistent contract specifications to the attention of government officials.   Based on the evidence of record before this Court, it appears that the DODIG conclusions are correct.

The Court does not reach its decision lightly.   We are certainly mindful of the loss of the Plaintiffs and the ultimate sacrifice made by Staff Sergeant Maseth.   Yet, based on the present record before this Court and the foregoing analysis, KBR's Motion to Dismiss [260] must be GRANTED, and this case is DISMISSED, with prejudice.   An appropriate Order follows.

_s/Nora Barry Fischer_
Nora Barry Fischer
U.S. District Judge

Date:   July 13, 2012

cc/ecf:  All counsel of record.