**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

CHERYL A. HARRIS, Co-Administratrix )
of the Estate of RYAN D. MASETH, )
deceased, and DOUGLAS MASETH, )
Co-Administrator of the Estate of RYAN )
D. MASETH, deceased, )
                               )
     Plaintiffs, )
                               )
     v. )       Civil Action No. 08-563
                               )       Judge Nora Barry Fischer
KELLOGG, BROWN & ROOT )
SERVICES, INC., )
                               )
     Defendant. )

## MEMORANDUM OPINION

### I. INTRODUCTION

This is a wrongful death and survival action brought by Plaintiffs Cheryl Harris and

Douglas Maseth ("Plaintiffs") against government contractor Kellogg, Brown & Root Services,

Inc. ("KBR"), arising from the death of Plaintiffs' son, Staff Sergeant Ryan Maseth, ("SSG

Maseth"), who was killed in 2008 while showering at a military base in Iraq where KBR had

operations and maintenance responsibilities under government contracts. (Docket No. 209). The

case returns to this Court on remand from the United States Court of Appeals for the Third

Circuit with specific directives to decide a conflict of law issue[1] concerning whether the claims

and defenses raised by the parties are governed by one of the proportional liability systems

---

[1]     The Court has previously held that Iraqi law does not apply to the case and denied KBR's subsequent motion for reconsideration challenging that decision. *See Harris v. Kellogg, Brown & Root Servs., Inc.*, 796 F. Supp. 2d 642 (W.D. Pa. 2011). Neither party appealed the Court's ruling that Iraqi law will not be applied nor have they provided the Court with any basis to revisit that decision at this juncture. Accordingly, that decision stands.

1

utilized by Texas or Tennessee which permit the jury to assign fault to immune non-parties, or Pennsylvania's joint and several liability system which permits the jury to only assign fault between the parties to the case. *See Harris v. Kellogg Brown & Root Services*, *Inc.*, 724 F.3d 458, 482 (3d Cir. 2013). The conflict of law decision is of great importance to the litigation because the Court of Appeals' Opinion provided a "framework that establishes the contours" of the political question doctrine, the application of which may result in certain of Plaintiffs' claims being rendered nonjusticiable if the jury is asked to assign a percentage of fault to the United States, as a non-party, which may be authorized by the apportionment laws of Texas and Tennessee. *Id.* In contrast, the Court of Appeals posited that the political question doctrine would not bar such claims if Pennsylvania's system of joint and several liability, which does not apportion fault among non-parties, is applied. *Id.*

Presently before the Court is KBR's motion for the application of Texas law which is opposed by Plaintiffs, who argue that Pennsylvania law should control. (Docket Nos. 319, 320, 321, 324, 326, 337, 338, 340). The parties have submitted affidavits and other documentary evidence for the Court's consideration and expressly declined the Court's invitation to engage in limited discovery on the conflict of law dispute. (Docket Nos. 321-1:8; 324-1:4; 337-1:2). This Court heard oral argument on June 2, 2015, (Docket Nos. 334, 336), and the motion has been fully briefed with the parties having submitted their respective brief, response, reply, sur-reply and post-hearing supplemental briefs and responses thereto. (Docket Nos. 319, 320, 321, 324, 326, 337, 338, 340). Through this process, KBR has effectively disavowed its alternative argument that Tennessee law should be utilized. (Docket No. 336 at 7). After careful consideration of all of the parties' arguments in light of the relevant evidence of record, and for

the following reasons, KBR's motion to apply Texas law [319] is DENIED and Pennsylvania law will be applied to the apportionment and liability issues in this case.

## II. FACTUAL BACKGROUND

### A. *Facts Relevant to Plaintiffs' Domicile*

Plaintiffs Cheryl Harris and Doug Maseth are the parents of SSG Maseth and administratrix and administrator, respectively, of his estate. (Docket No. 209). Both are Pennsylvania citizens and maintain residences here. (*Id.* at ¶¶ 1-2). Their son was born and raised in the Pittsburgh area. (Pl. Exs. A at ¶ 2; D at ¶¶ 3-4). After graduating from a local high school in 2001, SSG Maseth enlisted in the United States Army. (Pl. Exs. A at ¶ 2; D at ¶ 4). He received service orders effective June 18, 2011 that directed him initially to Fort Benning, Georgia for Boot Camp. (Pl. Exs. A at ¶ 3; D at ¶ 5). SSG Maseth thereafter received subsequent service orders transferring him to several bases located within the United States, including: Fort Benning, (from 6/18/01 to 1/30/02 and 11/04 to 3/12/04); Fort Polk, Louisiana, (from 1/31/02 to 11/03; 3/13/04 to 4/26/04 and 5/21/04 to 6/16/04); and, Fort Bragg, North Carolina, (from 4/27/04 to 5/20/04). (*Id.*).

On June 17, 2004, SSG Maseth was deployed to Iraq and stationed in Baghdad, as part of Operation Iraqi Freedom II. (Pl. Ex. A at ¶ 3). While serving his first tour in Iraq, on January 19, 2005, SSG Maseth reenlisted for an additional period of four years, to end around January 19, 2009, indicating on the reenlistment papers that his "home of record" was his father's Pittsburgh, Pennsylvania address. (Pl. Ex. B; Docket No. 321 at 12). SSG Maseth received orders to return to the continental United States in March of 2005 and was thereafter once again transferred between bases, including: Fort Polk (from 3/13/05 to 10/9/05); Fort Bragg (from

10/10/05 to 5/12/07); and Fort Campbell, which is located in both Tennessee and Kentucky (from 5/13/07 to 10/14/07).[2] (Pl. Ex. A at ¶ 3).

Two weeks after he was stationed at Fort Campbell, SSG Maseth purchased an off-base home in nearby Clarksville, Tennessee. (Pl. Exs. A at ¶ 5; D at ¶ 11). A Deed of Trust executed by SSG Maseth on May 31, 2007 indicates that he obtained a 30 year mortgage on the single family home which was financed through a Veteran's Administration Program. (Def. Ex. 3). Among the many boilerplate provisions, paragraph 6 provides that:

> **6. Occupancy**. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond the Borrower's control.

(Docket 324-3 at 8). In order to obtain this type of loan, SSG Maseth was required to make a certification under 38 U.S.C. § 3704(c)(1), which states that:

> [f]or the purposes of this chapter the requirement that the veteran recipient of a guaranteed or direct home loan must occupy or intend to occupy the property as the veteran's home means that the veteran as of the date of the veteran's certification actually lives in the property personally as the veteran's residence or actually intends upon completion of the loan and acquisition of the dwelling unit to move into the property personally within a reasonable time and to utilize such property as the veteran's residence.

38 U.S.C. § 3704(c)(1).

Plaintiffs concede that their son obtained a Tennessee driver's license. (Docket No. 326

---

[2]    There was some confusion as to the location of Fort Campbell in the initial briefing which referenced the base being located in Kentucky, only. However, as Plaintiffs point out, the base is located within both Kentucky and Tennessee. (Docket No. 337).

at 4). However, SSG Maseth's parents explain in their affidavits that SSG Maseth purchased the home as an investment, which was cheaper than rental options in the area and that he had no plans that they were aware of to make Clarksville, Tennessee his permanent domicile. (Pl. Exs. A at 5; D at ¶¶ 11-12). They further state that their son considered himself a Pennsylvanian, always filed Pennsylvania tax returns, maintained his 412-area code cell phone number, and nearly all of his family and friends lived in this area.[3] (*Id.*). In contrast, none of his family and friends lived in or around Clarksville, Tennessee. (Pl. Exs. A at ¶¶ 9-12; D at 12). Plaintiffs add that SSG Maseth lived in this home for only four and one half months until he received orders from the Army to return to Iraq for a second tour of duty. (Pl. Ex. A at ¶¶ 3, 5). SSG Maseth had two roommates who lived with him and paid him rent until their own deployments. (Pl. Ex. D. at ¶ 13). One of the roommates remained living at the home after SSG Maseth departed and continued to pay him rent. (*Id.*).

SSG Maseth was deployed to Iraq on October 15, 2007. (*Id.*). He was assigned to live in building LSF-B1 at the Radwaniyah Palace Complex ("RPC") outside of Baghdad. *Harris v. Kellogg, Brown & Root Services, Inc.*, 618 F. Supp. 2d 400, 414 (W.D. Pa. 2009). He passed away on January 2, 2008, after being electrocuted while showering in his living quarters. *Id.* At the time of his death, SSG Maseth had a little over one year remaining on his reenlistment commitment to the Army, which would have ended around January 19, 2009, absent a subsequent extension. (Pl. Ex. B).

SSG Maseth's remains were returned to Pennsylvania and he is buried in the National Cemetery of the Alleghenies in Bridgeville, Pennsylvania. (Pl. Ex. D. at ¶ 15). He died without

---

[3]        Plaintiffs point out that both of SSG Maseth's brothers were likewise in the military and returned to Pennsylvania following their service which took them outside of the Commonwealth. (Pl. Ex. A at ¶ 15).

a will. *See Certified Letters of Administration Bond Being Waived*, Case. No. Mc CH CV PB 08-0000027 (dated 3/13/08). Plaintiffs opened their son's estate in the Chancery Court of Montgomery County, Tennessee at Clarksville, Probate Division, and were issued certified letters of administration by that Court on March 13, 2008. *Id.* Thereafter, they initiated this lawsuit against KBR by filing it in the Court of Common Pleas of Allegheny County on March 24, 2008 and did not contest KBR's subsequent removal to this Court. (Docket No. 1). In April of 2008, Douglas Maseth filed a Pennsylvania tax return seeking a refund on behalf of his son for the money that had been withheld from his pay during 2007 as he was exempt from paying Pennsylvania income taxes due to his military service. (Pl. Exs. C at 44-47; D at ¶ 10). He likewise filed a federal return on behalf of his son. (Pl. Ex. C, Docket No. 321-3 at 38-44). At some point, Plaintiffs sold their son's house. (Pl. Ex. D at ¶ 13). They also initiated a second lawsuit against URS Corporation f/k/a Washington Group International on December 21, 2009, and that action was settled in 2011 with a stipulation for dismissal being filed on July 20, 2011. (Civ. A. No. 09-1673, Docket Nos. 55, 56).

  *B. Facts Relevant to KBR's Domicile*

  Plaintiffs have alleged that KBR is a domiciliary of Texas, where its principal place of business is located, and Delaware, where it is incorporated. (Docket No. 209 at ¶ 3). Nevertheless, they have presented evidence in an effort to undermine KBR's alleged connection to Texas which the Court has considered. (Docket Nos. 321-6; 337-1:2).

  KBR is one of many subsidiaries of KBR, Inc., an entity which was incorporated in Delaware on March 21, 2006, joining the M.W. Kellogg Company ("Kellogg") and Brown & Root, Inc., ("Brown & Root"), as a single entity. (Docket No. 3; Pl. Ex. F, Docket No. 321-6 at

7).  Halliburton had previously purchased both entities at different times, acquiring Houston-based Brown & Root in 1962 and Kellogg in 1998 as part of a merger with Dresser Industries. (*Id.*).  When KBR, Inc. was created, it was a wholly owned, indirect subsidiary of Halliburton and remained so until the entities were separated in a financial transaction on April 5, 2007. (*Id.*).  KBR, Inc. is a public company, traded on the New York Stock Exchange under the moniker "KBR."  (Docket No. 3).

The instant defendant, KBR, "is the primary Government & Infrastructure ["G&I] business entity, and also provides construction and industrial services."  (*Id.*).  According to the Form 10-K report filed by KBR, Inc. on February 26, 2008 for the fiscal year ended on December 31, 2007, it was incorporated in Delaware and headquartered in Houston, Texas. (Docket No. 337-1 at 4).  KBR, Inc. reported that a "significant portion of the G&I business unit's operations during that year related to the support of the United States government operations in the Middle East."  (Docket No. 337-1 at 9).  KBR, Inc. also indicated that it leased a high-rise office facility in Arlington, Virginia and maintained G&I operations out of that office. (*Id.* at 34).

Among the significant projects that KBR was involved in at the time included: the LogCAP III project with the U.S. Army for which it was providing worldwide, contingency support services under a cost-reimbursable contract; and the CENTCOM project for which it was providing construction of military infrastructure and support facilities to the U.S. Army in the Middle East under a combination fixed-price and cost-reimbursable contract.  (*Id.* at 10).  KBR, Inc. touts that it had global operations, conducting business in over 45 countries.  (*Id.* at 15).  In fiscal year 2007, KBR, Inc. generated eighty-nine percent (89%) of its revenues from business

operations in countries other than the United States and fifty percent (50%) of its revenues were

attributed to its work in Iraq on behalf of the United States. (*Id.*). One of the specific

disclaimers in the 10-K states the following:

> **Note 13. United States Government Contract Work**
>
> We provide substantial work under our government contracts to the United States Department of Defense and other governmental agencies. These contracts include our worldwide United States Army logistics contracts, known as LogCAP and U.S. Army Europe ("USAREUR").
>
> …
>
> **We have experienced and expect to be a party to various claims against us by employees, third parties, soldiers and others that have arisen out of our work in Iraq such as claims for wrongful termination, assaults against employees, personal injury claims by third parties and army personnel, and contractor claims.** While we believe we conduct our operations safely, the environments in which we operate often lead to these types of claims. We believe the vast majority of these types of claims are governed by the Defense Base Act or precluded by other defenses. We have a dispute resolution program under which most of these employee claims are subject to binding arbitration. However, an unfavorable resolution or disposition of these matters could have a material adverse effect on our business, results of operations, financial condition and cash flow.

(*Id.* at 90 (emphasis added)). Such disclosure was made prior to Plaintiffs' lawsuit being filed.

(*Id.* at 1-3).

According to Mark E. Lowes, KBR, Inc.'s Vice President of Litigation, KBR and its

parent corporations, KBR, Inc. and KBR Holdings, LLC, each maintain their corporate

headquarters in Houston, Texas at the KBR Tower. (Docket No. 324-1 at ¶¶ 6, 9). Lowes

acknowledges that these entities were incorporated in Delaware but points out that they have

only 337 regular employees in Delaware while they employ 6,993 individuals in Texas, with

more than half of them (3,562) working in Houston. (*Id.* at ¶¶ 7-8). He avers that the senior

executives and Board of Directors are all based in Houston and have no presence in Delaware. (*Id.* at ¶¶ 6, 9, 13). Lowes further states that while some KBR, Inc.-affiliated entities maintain a presence in Delaware, the instant defendant, KBR, has no presence in Delaware and does not conduct any operations within that state. (*Id.* at ¶ 12). KBR is also registered to do business within the Commonwealth of Pennsylvania but such filings indicate that it is a "foreign corporation" and provide Houston, Texas addresses for the listed officers. (Pl. Ex. G at 2).

### C. Government Contractors at the RPC

As this Court noted in a prior decision, during the occupation of Iraq, CPA Orders were issued that regulated the activities of government contractors operating within Iraq. *See* n.4, *infra*. The relevant portion of section 18 of Revised CPA Order 17[4] provides that:

> third-party claims including those for property loss or damage and for personal injury, illness or death or in respect of any other matter arising from or attributed to acts or omissions of … Contractors or any persons employed by them for activities relating to performance of their Contracts, whether normally resident in Iraq or not and that do not arise in connection with military operations, shall be submitted and dealt with by the Sending State whose personnel (including the Contractors engaged by that State), property, activities or other assets are alleged to have caused the claimed damage, in a manner consistent with the Sending State's laws, regulations and procedures.

(Docket No. 218-2 at § 18). In 2003, the Army hired an Iraqi subcontractor to renovate the RPC. The United States Army Corps of Engineers ("USACE") engaged Washington Group International to provide operations and maintenance services at the RPC from April 2003 through March or April 2006 under a series of contractual agreements. (Docket No. 263-67 at 1-2). This agreement reflects that USACE issued it out of Winchester, Virginia to WGI with a

---

[4] Revised CPA Order 17 was in effect at all times relevant to this case as it was issued in 2004 and remained in place through the accident involving SSG Maseth until its expiration on December 31, 2008. *See Harris*, 796 F. Supp. 2d at 650.

listed address in Boise, Idaho.[5] (*Id.* at 1-2).

The USACE next contracted with KBR to provide operations and maintenance services at the RPC under the CENTCOM program for the period of March 2006 through February 2007. (Docket No. 266). The CENTCOM contract states that it was issued by USACE out of Winchester, Virginia to KBR at its address in Arlington, Virginia. (*Id.*). The maintenance and operations responsibilities were then transitioned from the CENTCOM contract to the LogCAP III program overseen by the Defense Management Contract Agency ("DCMA"). KBR's predecessor, Brown & Root, had entered into the LogCAP III contract with the DCMA as of December 14, 2001. *See* KBR-M-000001. The base LogCAP III contract notes that it was issued out of Rock Island, Illinois to Brown and Root at its Arlington, Virginia address. *Id.* The transition was completed with the issuance of Task Order 139 in February of 2007, which did not include any addresses of record for the parties to same. *See Task Order 139.* However, other portions of the record indicate that "[t]he DCMA International Division, headquartered in Alexandria, Virginia, had responsibility for day to day management of the contract through its deployed DCMA Iraq/Afghanistan office in Baghdad, Iraq." (DOD-IG Report at 65; Docket No. 263-54 at 75). KBR likewise set up its own "headquarters" in Iraq at the Victory Base Complex in Baghdad. (*See Mayo Deposition* at 15; Docket No. 267-1 at 7). The base LogCAP III contract also contains a reference to 48 C.F.R. § 52.228-7, titled, Insurance-Liability to Third Persons, which addresses third party claims against the contractor, its need to obtain insurance covering such losses or to establish a government approved self-insurance program.[6] *See* KBR-

---

[5]  In their Complaint in Civ. A. No. 09-1673, Plaintiffs alleged that URS acquired WGI in November of 2007 and that URS itself was a Nevada corporation with a principal place of business in San Francisco, California. (Civ. A. No. 09-1673, Docket No. 1 at ¶¶ 3-4).

[6]  This provision states, in relevant part that:

M-000037.

*D. Liability Theories*

The parties do not dispute that, on January 2, 2008, SSG Maseth was electrocuted while showering in his living quarters in building LSF-B1 at the RPC. *Harris*, 618 F. Supp. 2d at 414. SSG Maseth's exposure to electric current caused him to suffer cardiac arrest, which resulted in his death. *Id.* The source of the electric current was determined to be a water pump located on the roof of LSF-B1. *Id.* at 414-15. Plaintiffs have brought wrongful death and survival claims against KBR under Pennsylvania statutes. (Docket No. 209). The Court of Appeals characterized Plaintiffs' claims[7] as proceeding under two separate liability theories: (1) the "installation theory" alleging that KBR negligently installed the water pump by failing to ground or bond it, with such installation occurring between March 2006 and February 2007 when KBR was

---

(c) The Contractor shall be reimbursed—
(1) For that portion (i) of the reasonable cost of insurance allocable to this contract and (ii) required or approved under this clause; and
(2) For certain liabilities (and expenses incidental to such liabilities) to third persons not compensated by insurance or otherwise without regard to and as an exception to the limitation of cost or the limitation of funds clause of this contract. These liabilities must arise out of the performance of this contract, whether or not caused by the negligence of the Contractor or of the Contractor's agents, servants, or employees, and must be represented by final judgments or settlements approved in writing by the Government. These liabilities are for—
(i) Loss of or damage to property (other than property owned, occupied, or used by the Contractor, rented to the Contractor, or in the care, custody, or control of the Contractor); or
(ii) Death or bodily injury.

48 CFR § 52.228-7. KBR has claimed that this provision may entitle it to indemnity from the government. *See KBR's Petition for Writ of Certiorari*, 2014 WL 108365 at *38, n.2 (Jan. 8, 2014) (citing 48 C.F.R. § 52.228-7(c)) ("KBR's contract required the government to reimburse KBR for virtually all contract-related costs, including most third-party litigation costs and money judgments not covered by liability insurance."). The United States also referenced this provision in its Amicus Brief filed with the Supreme Court. *See Brief for the United States as Amicus Curiae*, 2014 WL 7185602 at *20 (Dec. 16, 2014) ("Indeed, many military contracts performed on the battlefield contain indemnification or cost-reimbursement clauses passing liability and allowable expenses of litigation directly on to the United States in certain circumstances. See, e.g., 48 C.F.R. 52.228-7(c).").

[7]       As the Court of Appeals noted, Plaintiffs did not challenge this Court's dismissal of their claims alleging "failure to warn, remedy the risk, rewire the building, provide safe alternatives, and properly maintain the facility." *Harris*, 724 F.3d at 482, n.5. These claims are barred by the political question doctrine. *Id.*

operating under the CENTCOM contract; and, (2) the "maintenance theory" claiming that KBR failed to live up to its contractual duties under the CENTCOM and LogCAP III contracts and the relevant Task Order 139 while performing maintenance responsibilities at the LSF-B1 in response to service order requests. *See Harris*, 724 F.3d at 467. KBR has raised a host of affirmative defenses including proximate causation; contributory negligence; and assumption of the risk. (Docket No. 217).

With respect to the installation theory, the parties dispute whether it was KBR that installed the water pump that failed. *See Harris*, 724 F.3d at 473. The water pump was of Chinese origin, likely manufactured by Hensheng Industrial & Trading Co., Ltd. out of Zhejiang, China. (Docket No. 20-3 at 2). It was supposedly purchased locally in Iraq and was not built to standards required in the United States. (*Id.*). Plaintiffs point to evidence supporting its position that KBR installed the water pump between March 2006 and February 2007 while KBR was providing services under the CENTCOM contract.[8] *See Harris*, 724 F.3d at 473. KBR denies that it installed the water pump and argues that the installation must have occurred prior to its assuming any responsibilities at the RPC. *Id.* KBR contends that since it did not install the water pump, it must have been installed by one of the following: the military; the Iraqi subcontractor that completed the initial renovations; WGI; or some subcontractor hired by WGI.

---

[8] The Department of Defense-Inspector General ("DOD-IG") Report states several times that its investigation led to it finding that KBR installed the water pump. *See DOD-IG Report,* Docket No. 263-54 at 17 ("In February 2006 the KBR - Middle East Region Office replaced Washington Group International/Black and Veatch as the operations and maintenance contractor. The contract remained in force until February 2007. The pump that failed and led to SSG Maseth's electrocution was installed under this U.S. Army Corps of Engineers contract."); at 21 ("in April or May 2006, the water heater outside the laundry room was replaced after two Service members were shocked. The contractor replaced the water heater and grounded it to a metal pipe. KBR-Middle East Region Office did the work, and we believe they used the same subcontractor – Card Industries – as Washington International, Inc., used earlier."); at 58 ("KBR installed the pump on the roof which contributed to the electrocution of SSG Maseth, as well as adjacent water tanks during the first week of June 2006. At that time, KBR was performing operations and maintenance at the RPC under a contract with the U.S. Army Corps of Engineers.").

*Id.* It is undisputed that SSG Maseth was under service orders requiring him to be stateside during the entire pendency of the CENTCOM contract. (*See* Pl. Exs. A; D).

As to the maintenance theory, Plaintiffs have identified nine work orders which they believe would have led a reasonable contractor to ground and/or bond the water pump:

> • Work Order D–1682 (June 14, 2006) stating "Please ground our hot water heater, people are getting shocked while showering";
> • Work Order D–1940 (July 4, 2006) stating "install grounding wire for the water heater and motor pump";
> • Work Order D–5204 (February 13, 2007) noting a problem at "Pump for LSF Headquarters Inop";
> • Work Order 1208997 (June 23, 2007) "pipes (shower and sink) have voltage-got shocked in shower and sink";
> • Work Order 120811 (July 8, 2007) (no description);
> • Work Order 1109481 (June 23, 2007) stating "install grounding on panel";
> • Work Order 1109702 (June 26, 2007) describing installation of wire on grounding panel;
> • Work Order 1205258 (July 8, 2007) "water pump leaking on top of building thru roof";
> • Work Order 2193735 (November 2, 2007) "WP pulsating badly"

(Docket No. 276). These service order requests took place at times during KBR's operations and maintenance at the RPC under CENTCOM and LogCAP III, Task Order 139. It is generally undisputed that all service order requests were initiated by soldiers at the base, funneled through the office of the higher ranking officers in charge of life support functions on the base, known as the Mayor's Cell, where the requests were prioritized and then forwarded to KBR personnel in Iraq for completion. *See e.g., Harris*, 878 F. Supp. 2d at 556.

KBR denies that it performed negligently in response to these particular work orders and/or that they were otherwise related to the water pump that failed. Notably, SSG Maseth filled out the work order dated November 2, 2007. (Docket No. 276). He also filled out 13 other service order requests between October 20, 2007 and December 23, 2007 that were

processed by KBR. (*Id.* at 21-22). But, the November 2, 2007 service order request appears to be the only one that SSG Maseth initiated while he was at the base that involved the failed water pump. (*Id.*).

III. RELEVANT PROCEDURAL HISTORY

As noted above, this Court denied KBR's motion to apply Iraqi law on June 17, 2011. *Harris v. KBR*, 796 F. Supp. 2d 642 (W.D. Pa. 2011). The parties thereafter engaged in a period of discovery and then litigated a renewed motion to dismiss filed by KBR raising the political question doctrine and combatant activities exception to the Federal Tort Claims Act, which this Court granted on June 13, 2012. (Docket No. 306). The Court of Appeals reversed this decision and remanded the case for further proceedings in an Opinion dated August 1, 2013. *Harris*, 724 F.3d at 482. KBR petitioned the Supreme Court of the United States for a writ of certiorari but its application for same was denied on January 20, 2015. *Kellogg Brown & Root Services, Inc. v. Harris*, 134 S.Ct. 1152 (2015). The next day, the Court of Appeals issued its mandate remanding the matter back to this Court. (Docket No. 313).

After consulting with the parties, the Court established a briefing schedule on the threshold conflict of law issue. (Docket No. 316). KBR filed its motion for the application of Texas law and brief in support on March 13, 2015. (Docket Nos. 319, 320). Plaintiffs responded on April 10, 2015 by filing a brief in opposition and supporting exhibits. (Docket No. 321). KBR filed its reply brief and supporting exhibits on April 24, 2015. (Docket No. 324). Plaintiffs countered with a sur-reply brief on May 8, 2015. (Docket No. 326).

The Court convened a telephone status conference with counsel on May 13, 2015 at which time the parties confirmed on the record that discovery was not necessary on the pending

14

motion. (Docket Nos. 330, 335). The Court then heard oral argument from counsel during a motion hearing on June 2, 2015. (Docket No. 334, 336). Subsequent to the argument, the official transcripts of these proceedings were filed with the Court. (Docket Nos. 335, 336). Both parties filed supplemental briefs on July 16, 2015. (Docket Nos. 337, 338). After receiving leave of Court, KBR filed a response to Plaintiffs' supplemental brief on July 24, 2015. (Docket No. 340). Because the Court has heard oral argument and reviewed all of the parties' submissions, KBR's motion is now ripe for disposition.

## IV. LEGAL STANDARD[9]

In determining which jurisdiction's laws to apply to the apportionment and liability issues, this Court applies Pennsylvania's choice of law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). Pennsylvania conflicts law has combined a "governmental interest analysis" with the Restatement (Second) of Conflicts theory, thereby adopting a "hybrid" approach. *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir.2007) (citing *Melville v. American Home Assur. Co.*, 584 F.2d 1306 (3d Cir.1978) and *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796 (Pa. 1964)); *see also McDonald v. Whitewater Challengers, Inc.*, 116 A.3d 99, 106-07 (Pa. Super. Ct. 2015) (same).

This approach requires the Court to first determine whether there is a relevant difference between the law of the jurisdictions whose laws potentially apply, i.e., whether there is a conflict. *Hammersmith*, 480 F.3d at 230. If their respective laws are the same, there is no conflict at all and the choice of law analysis ends; the law of the forum, here Pennsylvania law, would apply.

---

[9] The Court notes that the parties rely upon the prior recitation of the legal standard for conflict of law issues set forth by the Court in its decision denying KBR's motion for application of Iraqi law, *see Harris*, 796 F. Supp. 2d 642. (Docket Nos. 320, 321). As there have been no intervening changes to these legal principles, *see McDonald*, 116 A.3d at 121, the Court restates the legal standard that was previously utilized.

*Id.* If the laws differ, the Court must examine the policies underlying the law of each jurisdiction and determine whether the conflict is "true," "false," or "unprovided for." *Id.*

"A true conflict exists when the governmental interests of [multiple] jurisdictions would be impaired if their law were not applied." *Budget Rent-A-Car Sys. v. Chappell*, 407 F.3d 166, 170 (3d Cir. 2005) (quoting *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 & n. 15 (3d Cir. 1991)). If a true conflict exists, the Court must then determine which state has the "greater interest in the application of its law." *Cipolla v. Shaposka*, 439 Pa. 563, 267 A.2d 854, 856 (1970). To this end, the Court must weigh each state's contacts on a qualitative scale according to their relation to the policies and interests underlying the particular issue. *Hammersmith*, 480 F.3d at 231 (citing *Shields v. Consol. Rail Corp.*, 810 F.2d 397, 400 (3d Cir. 1987)).

A false conflict exists only if one jurisdiction's governmental interests would be impaired by the application of another jurisdiction's law. *Budget Rent-A-Car*, 407 F.3d at 170. When there is a false conflict, the court must apply the law of the only interested jurisdiction. *Id.* If no jurisdiction's interests would be impaired if its laws were not applied, there is an "unprovided for" conflict and *lex loci delicti* (the law of the place of the wrong) continues to govern. *Budget Rent-A-Car Sys.*, 407 F.3d at 170 (citing *Miller v. Gay*, 323 Pa. Super. 466, 470 A.2d 1353 (1983)).

The relevant contacts for a tort are enumerated in Restatement (Second) of Conflict of Laws § 145(2)(a)-(d), and include:

> (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.

*Taylor v. Mooney Aircraft Corp.*, 265 F. App'x. 87, 91 (3d Cir. 2008).

> [T]he factors relevant to the choice of the applicable rule of law include (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 (1971).

Pennsylvania choice of law analysis "employs depecage, the principle whereby 'different states' laws may apply to different issues in a single case." *Taylor*, 265 F. App'x at 91 (citing *Berg Chilling*, 435 F.3d at 462; *see also McDonald*, 116 A.3d at 121, n.16.

V. DISCUSSION

At the outset, the parties agree that Iraq is: (a) the place where the injury to SSG Maseth occurred; (b) the place where the alleged conduct by KBR causing the injury occurred; and (d) the place where the relationship, if any, between SSG Maseth and KBR was centered. (Docket Nos. 320, 321, 324, 326). This Court reiterates its prior ruling that Iraqi law will not be applied to the claims and defenses in this litigation for the reasons previously expressed. *See Harris*, 796 F. Supp. 2d at 642. This ruling was not challenged on appeal by either party.[10] *Id.* Nor have the parties asked the Court to revisit it here. (Docket Nos. 320, 321, 324, 326). So, it remains final.

Thus, the Court proceeds to its choice of law determination without any further discussion of Iraqi law, although there are considerable contacts with that jurisdiction. Naturally,

---

[10]    As part of its prior analysis, this Court held alternatively that: KBR failed to meet its burden to demonstrate what the Iraqi law was under Rule 44.1 of the Federal Rules of Civil Procedure; and that Iraq has no interest in its laws being applied to a lawsuit between the family of an American serviceman who was allegedly harmed by the negligence of a government contractor on a U.S. military base during the Iraq war such that there is a false conflict between the laws of Iraq and those of Pennsylvania, Tennessee and Texas. *See Harris*, 796 F. Supp. 2d at 642.

the parties focus on the remaining contested factor at § 145(c) requiring an analysis of "the domicile, residence, nationality, place of incorporation and place of business of the parties." *Id.* They also dispute the application of this factor and of the other factors set forth in § 6 of the Restatement to the potentially applicable laws and facts of this case. *Id.* Before addressing the parties' positions on the choice of law factors, the Court first turns to each party's threshold challenges to their opponent's domiciles.

*A. Domicile Disputes*

1. Plaintiffs' Domicile is Pennsylvania

In the initial briefing, KBR argued that Plaintiffs' domicile was Tennessee because SSG Maseth purchased a home in that jurisdiction prior to his death and his parents were administering his estate in that state. (Docket No. 320). KBR's position followed the assessment by this Court in the Iraqi law decision that Tennessee was a potentially interested jurisdiction along with Pennsylvania and Texas and the Court of Appeals addressed the possible interest of all three states throughout its decision which remanded the matter to this Court to decide the conflict of law issues. (*Id.*). Plaintiffs countered KBR by arguing that the serviceman presumption should be applied to determining SSG Maseth's domicile and that the facts showed that he enlisted in the Army as a Pennsylvania domiciliary which was unchanged by his purchase of a home in Tennessee and the administration of his estate there. (Docket No. 321). KBR replied with further argument relying upon a Deed of Trust signed by SSG Maseth as part of his purchase of the home, suggesting that the contents of same established a change in his domicile. (Docket No. 324).

Prior to the motion hearing, the Court convened a telephone status conference at which

time the parties, through their respective counsel, all expressly agreed on behalf of their clients that fact discovery was not necessary prior to the Court resolving the disputed domicile and conflicts issues. (Docket Nos. 330, 335). Subsequently, at the motion hearing, KBR's counsel told the Court that:

> [h]aving taken a step back and looked at that specific issue [of SSG Maseth's domicile] within the larger context of our motion, we have concluded that the issue is really immaterial to the outcome of our motion. For that reason, we have decided it is not worth the time to continue to dispute it today and, therefore, for purposes of today's argument, we intend to assume that the plaintiffs are correct with respect to this issue, and we intend to assume that [SSG] Maseth was a Pennsylvania domiciliary and we'll move forward with that embedded in our argument and we'll explain why that does not alter our argument one iota.

(Docket No. 336 at 7). Plaintiffs pressed forward with their position on domicile in their supplemental brief, (Docket No. 337), which KBR did not counter in its response to Plaintiffs' supplemental brief, (Docket No. 340), despite being granted leave of court to do so.

In light of these concessions by KBR's able counsel, the Court finds that KBR has effectively abandoned its argument that Plaintiffs are domiciled in Tennessee. *See Lehman Bros. Holdings v. Gateway Funding Diversified Mortgage Servs., L.P.*, 785 F.3d 96, 102 (3d Cir. 2015) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633–34, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962) (parties cannot "avoid the consequences of the acts or omissions of [their] freely selected agent[s]. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent[.]")). Despite same, the Court proceeds with its analysis of this formerly disputed point, finding that the evidence of record supports Plaintiffs' position that they are domiciled in Pennsylvania.

It is uncontested that the Court should apply the federal diversity statute to determine

Plaintiffs' domicile, which provides that the domicile of an estate is the domicile of the decedent before he passed. *See* 28 U.S.C. § 1332(c)(2) ("the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent"). "[T]he domicile of an individual is his true, fixed and permanent home and place of habitation. It is the place to which, whenever he is absent, he has the intention of returning." *McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 286 (3d Cir. 2006) (quoting *Vlandis v. Kline*, 412 U.S. 441, 454 (1973)). "Thus, domicile is established by an objective physical presence in the state or territory coupled with a subjective intention to remain there indefinitely." *Washington v. Hovensa LLC*, 652 F.3d 340, 344 (3d Cir. 2011). Further,

> [a]n individual's domicile changes instantly if he takes up residence at the new domicile and intends to remain there. But a domicile once acquired is presumed to continue until it is shown to have been changed. This principle … gives rise to a presumption favoring an established domicile over a new one.

*Id.* at 345 (internal quotations omitted). For purposes of diversity jurisdiction, the burden is generally on the party seeking to change the opponent's domicile to prove such change by a preponderance of the evidence. *Cf. McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 389 (3d Cir. 2006).

Although there appears to be no binding authority from the United States Court of Appeals for the Third Circuit, several federal courts have recognized a serviceman presumption.[11] These cases generally hold that "[t]he domicile of a serviceman at the time of

---

[11] Pennsylvania courts have also recognized the serviceman presumption in determining domicile of parties in divorce cases. *See e.g., Bernhard v. Bernhard*, 668 A.2d 546, 127 (Pa. Super. Ct. 1995) ("a service person's domicile is presumed not to change from that person's domicile at the time of enlistment."); *Milam v. Milam*, 677 A.2d 1207, 1211-12 (Pa. Super. Ct. 1996) (same); *Zinn v. Zinn*, 475 A.2d 132, 133-34 (Pa. Super. Ct. 1984) (same). These cases similarly place the burden on the moving party to demonstrate a change of the serviceman's domicile by clear and convincing evidence. *Id.*

enlistment is presumed not to change, and evidence of an intention to change must be 'clear and unequivocal.'" *Turek v. Lane*, 317 F. Supp. 349, 350 (E.D. Pa. 1970) (citing *Sweeny v. District of Columbia*, 113 F.2d 25, 33 (D.C. Cir. 1940)); *see also Deckers v. Rose*, 592 F. Supp. 25, 27 (M.D. Fla. 1984) ("As a member of the military service, plaintiff is presumed to retain his domicile at the time of enlistment."). "Underlying this concept is a recognition that the selection of a residence of a person subject to military orders is not a voluntary choice, but the product of compulsion." *Krasnov v. Dinan*, 465 F.2d 1298, 1302 (3d. Cir. 1972). In these servicemen cases, courts have placed a heavy burden of proof on the party asserting a change in domicile. *Bowman v. DuBose*, 267 F. Supp. 312, 313-14 (D.S.C. 1967). To meet this burden, the party must present "clear and unequivocal" evidence of intent to change domicile. *Deckers*, 592 F. Supp. at 27; *Turek*, 317 F. Supp. at 350. Relevant to the factors at issue here, courts have held that establishing or purchasing off-base homes is insufficient to overcome the presumption and change the serviceman's domicile to the state of the off-base home. *See e.g.*, *Turek*, 317 F. Supp. at 350 ("[t]he mere establishment of an 'off-base' home is not enough"); *Bowman*, 267 F. Supp. at 314; *Stewart v. Johnson*, 2008 WL 2756720, *4-5 (S.D. Ala. 2008). The serviceman presumption has been applied by courts subsequent to the institution of the all-volunteer military. *See e.g., Stewart*, 2008 WL 2756720, at *4-5; *Deckers*, 592 F. Supp. at 27. In these cases, the presumption is not undermined by an individual engaging in activities that would naturally occur in the area near the service station including, opening bank accounts, obtaining licenses or similar undertakings. *See Deckers*, 592 F. Supp. at 28.

Applying these legal principles to the instant matter, the Court holds that SSG Maseth was domiciled in Pennsylvania at the time of his death. The Court notes it would reach this

decision regardless of whether the serviceman presumption is applied requiring clear and unequivocal evidence as is suggested in the serviceman domicile cases or if the lesser standard of making such showing by a preponderance of the evidence is utilized. *See e.g., Turek*, 317 F. Supp. at 350; *McCann*, 458 F.3d at 389. Returning to the facts of record, there is no dispute that SSG Maseth was a Pennsylvania domiciliary at the time of his initial enlistment in the United States Army in 2001 and after he reenlisted for an additional four years in 2005. (*See* Pl. Ex. B). While the objective facts show that SSG Maseth received military orders transferring him to Fort Campbell at which point he purchased a home in nearby Clarksville, Tennessee, where he resided for a period of four and one half months, the Deed of Trust presented by KBR does not establish that he had the subjective intent to remain in Tennessee indefinitely. *Washington*, 652 F.3d at 344. Hence, KBR has not convinced the Court that SSG Maseth's domicile changed from Pennsylvania to Tennessee. *Id.*

To this end, the "Occupancy" provision in the Deed of Trust required that SSG Maseth reside in the home within 60 days of the transaction, which he did. (Docket 324-3 at 8). He also agreed to use the property as his residence for at least one year after he moved in "unless extenuating circumstances exist which are beyond" his control and likewise met this condition as he moved out of the house upon his receipt of military orders in October of 2007 directing him to serve our country in Iraq. (*Id.*). The cited statutory language at § 3704(c)(1) simply required that SSG Maseth certify that he actually lived in the property as his residence at the time of the transaction or intended to move into the property and utilize it as his residence within a reasonable time. *See* 38 U.S. § 3704(c)(1). Again, this certification was fully satisfied because SSG Maseth moved into the home and lived there until he was transferred elsewhere. (Pl. Ex. A

at ¶¶ 3, 5). Accordingly, neither SSG Maseth's covenant nor his certification in the Deed of Trust persuasively demonstrate a "subjective intention to remain" in Tennessee indefinitely. *Washington*, 652 F.3d at 344.

Setting aside the serviceman presumption, the evidence of SSG Maseth's voluntary reenlistment in the Army for an additional four years to end around January 2009 firmly establishes that he simply could not have formed the subjective intent to remain in Tennessee indefinitely when he entered into the real estate transaction in May of 2007. (Pl. Ex. B). At that time he purchased the home, SSG Maseth was subject to military orders for an additional two and a half years and could have been transferred by the Army to any state or country, at any time, until his service was concluded. *See Krasnov*, 465 F.2d at 1302 (noting that orders of the military are compulsory). SSG Maseth rented rooms to other soldiers while he lived in the house and continued to do so even after he departed to serve his second tour of duty in Iraq. (Pl. Ex. D at ¶ 13). As he served as an absentee landlord while stationed in the Middle East, it appears more than reasonable that he would have done so upon his return to this country as his parents have suggested in their affidavits. (*See* Pl. Exs. A; D). Indeed, it is more likely than not that SSG Maseth would have had to continue to rent the house out, (or leave it vacant), because he was required to follow the military orders assigning him to a duty station until at least January of 2009 and there is no indication in the record of where the military would have transferred him after his second tour of duty in Iraq concluded.[12] As his parents declare, SSG Maseth had no reason to be in Tennessee aside from the military orders requiring him to be there. (*See* Pl. Exs. A; D). Stated another way, when he passed, SSG Maseth was a Pennsylvania domiciliary,

---

[12] After SSG Maseth concluded his first tour in Iraq, he was stationed at Fort Polk, Louisiana for approximately six months. (Pl. Ex. A). He was able to spend the first three weeks of this period on leave with his family in the Pittsburgh area. (*Id.*).

residing in Iraq, who owned real estate in Tennessee that he was actively renting to another individual. Such evidence does not suffice to change his domicile from Pennsylvania to Tennessee.

Finally, the fact that SSG Maseth's parents decided to open and administer his estate in Tennessee has little bearing on his *subjective intent* to return to that state after his service in Iraq concluded and would not overturn the above analysis. *See Washington*, 652 F.3d at 344. While it appears that Plaintiffs may have been able to open the estate in Pennsylvania, it seems that Tennessee was likely chosen for convenience and to limit the expenses of administration. SSG Maseth was single, had no children, died without a will and the encumbered asset that he owned and his parents needed to sell to satisfy the debt – the house – was located in Tennessee. KBR even admits that Plaintiffs may have had to open an ancillary proceeding in Tennessee to sell the real estate if the estate was opened in Allegheny County. (*See* Docket No. 338 at 11-12). Hence, opening the estate in Pennsylvania may have been duplicative and increased the costs of administration. Now that the house has been sold, SSG's Maseth's main creditor, the mortgage holder, was presumably satisfied through the sale, and all of his heirs are Pennsylvania domiciliaries, Tennessee has no interest in this litigation. All told, since the estate takes on SSG Maseth's domicile of Pennsylvania, his parents' activities after his death are not controlling.[13] *See* 28 U.S.C. § 1332(c)(2).

To conclude, Plaintiffs are considered to be domiciled in Pennsylvania for the purposes of the choice of law evaluation, making Tennessee's connection to this litigation de minimis.

---

[13]     KBR also points out that Douglas Maseth failed to report any rental income on behalf of his son on his 2007 federal tax return.    (Pl. Ex. C. at 39-44).    This fact has no bearing on the domicile issues and does not persuasively undermine Mr. Maseth's assertion that his son rented the home out after he was deployed to Iraq. Again, the parties declined to conduct discovery on these disputed issues and the Court rules on the record as it is presently constituted.  (Docket No. 330).

## 2. KBR's Domicile is Texas

With respect to KBR's domicile, Plaintiffs do not generally dispute that KBR is headquartered in Texas. (Docket No. 321). However, they point to several pieces of evidence suggesting that the state of KBR's headquarters has less connection in the present choice of law contest in an effort to undermine Texas' supposed governmental interests. (*Id.*). Among other things, Plaintiffs argue that Delaware is the state of KBR's incorporation and it maintains an office in Delaware. (*Id.* at 16). Plaintiffs also point to the fact that KBR is registered to do business in the Commonwealth of Pennsylvania. (*Id.*). They further contend that Texas' interest is lessened because KBR has significant operations throughout the United States and the world, from which most of its revenue is generated. (*Id.*). KBR counters that the state of its headquarters in Texas is the most relevant contact in a conflict of law dispute. (Docket No. 324). The Court essentially agrees with KBR that it is a Texas domiciliary; although, it will consider the claims-specific contacts to other states that KBR may have in the context of the overall choice of law evaluation, as is described below.

Briefly, the Supreme Court has held that a corporation's domicile is determined by the "nerve center" test. *See Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010). A corporation's "nerve center" is "where a corporation's officers direct, control, and coordinate the corporation's activities." *Id.* In choosing the "nerve center" test, the Supreme Court specifically rejected other approaches to domicile relying upon the location(s) of a company's business activities. *See Hertz*, 559 U.S. at 92-93. The Third Circuit has followed the "nerve center" test since its adoption. *See Johnson v. Smithline Beecham Corp.*, 724 F.3d 337, 347-48 (3d Cir. 2013).

Here, the relevant evidence supports a finding that the "nerve center" of KBR's

operations is Texas. Such evidence includes: KBR's 10-K from fiscal year 2007 which clearly states that Texas is the state of its headquarters; the affidavit of Lowes delineating the relationships between the KBR entities and stating that KBR is headquartered in Texas; and KBR's registration to do business in Pennsylvania providing that Texas is the location of all of its officers. (Docket Nos. 321-6 at 7; 324-1; 337-1 at 4; Pl. Ex. G at 2). The evidence of record further demonstrates that KBR's contacts with Delaware and Pennsylvania are not related to the claims in this case. (Docket No. 324-1 at ¶¶ 6, 9, 13; Pl. Ex. G). Plaintiffs have not presented any evidence that persuasively undermines this finding. (*See* Docket Nos. 321, 326, 337). Accordingly, for choice of law purposes, the Court will consider KBR to be a domiciliary of Texas as that state is the nerve center of its operations. *See Hertz*, 559 U.S. at 92-93. Yet, in the context of the evaluation below, the Court must also consider KBR's claim-specific contacts that it had with Virginia, a jurisdiction from where KBR entered into the CENTCOM and LogCAP III agreements with the Government and where its G&I operations were based around the time of the facts in this case.

###### B. *Choice of Law Analysis*

The Court now turns to its choice of law analysis, starting with the uncontested finding by the Court of Appeals that there is an "actual conflict" between the laws of Pennsylvania and Texas regarding the apportionment of fault to non-parties and their respective systems of joint and several versus proportional liability. *See Harris*, 724 F.3d at 474-77. The Court focuses its efforts on Pennsylvania and Texas as KBR has requested, which is particularly appropriate given the finding that Plaintiffs are domiciled in Pennsylvania rather than Tennessee. *See* § V.A.1, *supra*. To be clear, the Court utilizes the versions of the competing laws that were in effect on

the date of the SSG Maseth's death, January 2, 2008, as there were amendments to the laws of both jurisdictions subsequent to that event. *See* 42 Pa.C.S.A. § 7102(b) (West 2004); Act No. 2011–17, 195th Pa. Gen. Assemb. (2011) (eliminating joint-and-several liability for actions that accrue after the law's enactment); *see also* Tex. Civ. Prac. & Rem. Code Ann. §§ 33.003, 33.004; Acts 2011, 82nd Leg., ch. 203, § 6.02, eff. Sept. 1, 2011 (repealing certain provisions of § 33.04 for actions that accrued after Sept. 1, 2011). Having found that there is an "actual conflict" between the potentially applicable laws of Pennsylvania and Texas, the Court must next classify the conflict in laws as either "true," "false" or "unprovided for." To do this, the Court looks to the policies underlying the laws of each jurisdiction and determines whether each jurisdiction has a governmental interest in applying its own laws. *Budget Rent-A-Car*, 407 F.3d at 170.

Plaintiffs and KBR similarly argue that this case presents a "false conflict" as between the laws of Pennsylvania and Texas. (Docket Nos. 320, 321, 324, 326). Again, a false conflict exists if only one jurisdiction's governmental interests would be impaired by the application of another jurisdiction's law and the result of a false conflict is to apply the law of the only interested jurisdiction. *Budget Rent-A-Car*, 407 F.3d at 170. Plaintiffs advocate that Texas law will not be compromised if Pennsylvania law is employed because Texas allegedly has no interest in protecting KBR from being jointly and severally liable for harm caused to SSG Maseth by its overseas operations in Iraq. (Docket Nos. 321, 326). KBR suggests that Pennsylvania law would not be impaired if Texas law is utilized in this situation as Pennsylvania purportedly has no interest in its domiciliary pursuing KBR for joint and several liability for its role in the harm caused to SSG Maseth occurring outside of the Commonwealth. (Docket Nos.

320, 324).

The Court disagrees with the parties' assessment of this case as presenting a false conflict. Rather, in this Court's estimation, this case presents the quintessential "true conflict" situation described in *Cipolla*, 267 A.2d at 565, because the Plaintiffs are seeking to invoke their resident "plaintiff-protecting rules" of Pennsylvania and KBR, of Texas, is pursuing the "defendant-protecting rules" of that jurisdiction. As is explained in further detail below, the laws of each of these jurisdictions would be impaired if they are not applied in this case, taking the case out of the "false conflict" category and requiring an assessment of which jurisdiction has a greater interest in the application of its laws. *See id*.

The Court moves on to its assessment of the relevant laws and underlying policies, starting with Pennsylvania. The potentially applicable Pennsylvania law does not permit the jury to apportion any percentage of liability to non-parties for the harm caused to plaintiff. *See Ball v. Johns–Manville Corp.*, 625 A.2d 650, 659-60 (Pa. Super. Ct. 1993) (quoting *Kemper National P & C Companies and American Motorists Ins. Co. v. Smith*, 615 A.2d 372, 380 (Pa. Super. Ct. 1992)) ("We are aware of no principle of Pennsylvania law that allows a jury to make a finding of liability against a party who has not been sued. In fact, as a panel of this court has recently observed: 'While some states ... [permit] the apportionment of liability among all tortfeasors, even those who have not been made parties, Pennsylvania's statute does not so provide.'"). Pennsylvania also maintained traditional joint and several liability[14] pursuant to which any defendant found liable for the harm to the plaintiff is jointly and severally liable for the full amount damages. *See* 42 Pa. C.S. § 7102(b) (West 2004) ("The plaintiff may recover the full

---

[14]     Pennsylvania eliminated traditional joint and several liability for many torts in 2011. *See Harris*, 724 F.3d at 474, n.12 (citing Act No. 2011–17, 195th Pa. Gen. Assemb. § 1 (2011)).

amount of the allowed recovery from any defendant against whom the plaintiff is not barred from recovery."). Under this scheme, "[a]ny defendant who is so compelled to pay more than his percentage may seek contribution" from any other defendants, up to their proportionate amount of the damages. *Id*.

The policies underlying Pennsylvania's apportionment and liability scheme "'reflect[…] Pennsylvania's commitment, often reaffirmed in the decisions of our appellate courts that the plaintiff should be fully compensated for his injuries.'" *Andaloro v. Armstrong World Industries, Inc.*, 799 A.2d 71, 81 (Pa. Super. Ct. 2002) (quoting *Baker v. AC&S, Inc*., 729 A.2d 1140, 1151 (Pa. Super. Ct. 1999)); *see also Lebegern v. Forman*, 471 F.3d 424, 431 (3d Cir. 2006) (quoting *Griffith*, 203 A.2d at 807) ("Pennsylvania has a strong and clear interest in providing full recovery in survival actions. The Pennsylvania Supreme Court has said that, when it is the domicile of the decedent and his family, the state is 'vitally concerned with the administration of [the] decedent's estate and the well-being of the surviving dependents to the extent of granting full recovery, including expected earnings.'"). A jury's apportionment of a percentage of fault to a non-party would serve no real purpose in this type of system and attempts to do so have been denied by the courts as this type of procedure is not authorized by the legislature. *See Kemper*, 615 A.2d at 379-80.

Under Pennsylvania's scheme, the "tortfeasor's recourse for paying more than its proportionate share of the verdict is to sue the nonpaying joint tortfeasors in contribution." *Id.* (quoting *Baker v. AC & S*, 755 A.2d 664, 669 (Pa. 2000)). Thus, the burdens of litigating contribution claims with joint tortfeasors and the risks of non-payment by those entities due to default or immunity rests with the defendant found jointly and severally liable. *Id.* This is

29

undoubtedly a "plaintiff-protecting" system that provides multiple avenues to pursue recovery against joint tortfeasors and increases the likelihood that the plaintiff will receive full recovery of his damages resulting from such harm. *See e.g., Andaloro*, 799 A.2d at 81; *Lebegern*, 471 F.3d at 431. Accordingly, Pennsylvania has an interest in the application of its joint and several liability system because its governmental concerns favoring full recovery for plaintiffs would be furthered if Pennsylvania law was utilized.

In contrast, the operative Texas law, § 33.003 of the Civil Practice & Remedies Code, authorizes the trier of fact to determine the percentage of responsibility to each person's causing or contributing in any way to the plaintiff's harm including: (1) each plaintiff or claimant; (2) each defendant; (3) "each settling person"; and (4) "each responsible third party who has been designated under Section 33.004." Tex. Civ. Prac. & Rem. Code Ann. §§ 33.003 (2003). As part of this legislation, which has undergone legislative changes with the Acts of 1987, 1995, and 2003,[15] Texas essentially adopted a modified comparative fault system that did not completely eliminate joint and several liability. *See Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1133 (5th Cir. 1995) (citing Tex. Civ. Prac. & Rem. Code Ann. § 33.013) (Texas' "approach limits the application of the traditional rule [of joint and several liability] to situations where the defendant from whom satisfaction is sought bears at least a minimum percentage of the responsibility."). Rather, under Texas' statutes, each defendant is liable only for the percentage of damages equal to the defendant's percentage of responsibility as found by the trier of fact, <u>except</u> that a defendant who is found responsible for greater than 50 percent of the harm is held jointly and

---

[15] Again, the subsequent amendments effective September 1, 2011 are not considered as part of this evaluation. Acts 2011, 82nd Leg., ch. 203, § 6.02, eff. Sept. 1, 2011 (repealing certain provisions of § 33.04 for actions that accrued after Sept. 1, 2011).

severally liable with the other persons that contributed in some way to the harm.[16] *Id*. at §§ 33.013(a), 33.013(b)(1).[17]

Texas' proportional liability system was created in response to its prior system of comparative negligence which included joint and several liability principles akin to those described above and the changes were made as part of an effort to correct a perceived unfairness in that system which favored plaintiffs. *See Kimbrell v. Molinet*, 288 S.W.3d 464 (Tex. App. Ct. 2008). Among other things, the previous system permitted a plaintiff to control the litigation by bringing his suit against a deep pocketed defendant with marginal responsibility for the harm and to hold that defendant fully responsible for the plaintiff's losses via joint and several liability. It was then up to the defendant to seek recovery from other responsible individuals via a separate cause of action. The risk of such third party litigation including default and immunity of those third parties remained with the defendant. One of the main purposes of the changes was to move toward a system that "holds defendants responsible for their own conduct." *MCI Sales and Serv., Inc. v. Hinton*, 329 S.W. 3d 475, 505 (Tex. 2010).

Texas' proportional liability system works by permitting the defendant to ask the jury to apportion liability as between the parties in the case (plaintiff and defendant) as well as any

---

[16]　　The Court notes that the 1987 version of § 33.013 provided a twenty percent (20%) threshold. *See* Acts 1987, 70th Leg., 1st C.S., ch. 2, § 2.09, eff. Sept. 2, 1987. The statute was amended in 1995 increasing this threshold to fifty percent (50%), where it remained under the 2003 Acts and still does at present. *See* Acts 1995, 74th Leg., ch. 136, § 1, eff. Sept. 1, 1995.

[17]　　Texas' apportionment procedures do not apply to any claim for exemplary damages, i.e., "any damages awarded as a penalty or by way of punishing … include[ing] punitive damages," § 41.001(5), as a defendant found responsible for exemplary damages is liable for the full amount of exemplary damages awarded by the jury. *See e.g.,* Tex. Civ. Prac. & Rem. Code Ann. § 33.002(c)(2) ("This chapter does not apply to … (2) a claim for exemplary damages included in an action to which this chapter otherwise applies."); 41.006 ("In any action in which there are two or more defendants, an award of exemplary damages must be specific as to a defendant, and each defendant is liable only for the amount of the award made against that defendant."). Further, "exemplary damages may be awarded only if damages other than nominal damages are awarded," such that Texas does not permit a plaintiff to pursue exemplary damages if compensatory damages are not awarded. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.004.

settling parties and anyone else properly designated as a responsible third party, if certain procedural requirements are met and a sufficient evidentiary foundation is laid demonstrating such responsibility.[18] The 2003 amendments at issue here enabled a defendant to more "liberally designate responsible third parties regardless of limitations or personal jurisdiction," than did prior versions of same. *Kimbrell v. Molinet*, 288 S.W.3d 464, 468 (Tex. Ct. App. 2008). Each of the persons or entities constituting a settling party and a responsible third party are "included in the list of parties the jury may consider for allocation of responsibility for the plaintiff's damages." *Coachmen Ind., Inc. v. Alternative Serv. Concepts*, 2008 WL 2787310, at *2 (S.D. Tx. Jul. 15, 2008). In practice, this system provides a defendant an opportunity to <u>avoid</u> joint and several liability by authorizing it to persuade the jury to apportion more than 50% liability to the other individuals and entities on the verdict slip. *Id.* (citing Davd W. Holman, *Responsible Third Parties*, 46 S. Tex. L. Rev. 869, 870 (2005) ("In Texas tort law, the 'responsible third party' is anything but. He is not really a 'party,' and he is not really 'responsible.' He has but one reason to exist: that is, to allow a liable defendant to **avoid** joint and several liability.") (emphasis in original)). If the jury apportions less than 50% responsibility to the defendant, its

---

[18]       Plaintiffs claim that any motion by KBR to designate the United States as a responsible third party would be untimely under the current version of § 33.004. (Docket Nos. 321, 326). KBR counters that the amended version of the statute upon which Plaintiffs rely in support of this argument did not become effective until September 1, 2011. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 33.003, 33.004; Acts 2011, 82nd Leg., ch. 203, § 6.02, eff. Sept. 1, 2011 (repealing certain provisions of § 33.04 for actions that accrued after Sept. 1, 2011).

       Plaintiffs further attempt to bring an as-applied challenge to the constitutionality of the responsible third party statute, relying primarily on the decision by the Montana Supreme Court in *Plumb v. Fourth Judicial District Court, Missoula County*, 927 P.2d 1011 (Mont. 1996). (Docket Nos. 326, 337). A decision by the Montana Supreme Court interpreting and declaring a Montana statute unconstitutional is not binding on this Court in its assessment of the Texas statute at issue in this case. *Cf. Wisconsin v. Mitchell*, 508 U.S. 476, 484 (1993) (federal courts are bound by a state court's construction of its own state statute). In any event, the Court need not delve into the alleged timeliness and Constitutional issues raised by Plaintiffs because, for the reasons fully set forth herein, the Court agrees with their assessment that even if KBR was permitted to designate the United States as a responsible third party under Texas law, that the proper choice of law analysis results in Pennsylvania law being applied to this case.

liability – and compensatory damages – are limited to the percentage found by the jury. Tex. Civ. Prac. & Rem. Code Ann. §§ 33.013(a), (b)(1). Texas' proportional liability system, however, does not fully protect a defendant from joint and several liability, it merely reduces the number of potential defendants that could be found jointly and severally responsible to one. *See Bay Rock Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 298 S.W.3d 216, 223 (Tex. App. Ct. 2009) ("mathematically, only one person can be greater than 50% responsible; therefore, at most, only one defendant can ever be jointly and severally liable under the statute.").

Texas courts have described the evolving proportional liability system as one of seeking a more appropriate balance between plaintiffs and defendants. *See e.g.*, *Withers v. Schneider National Carriers*, 13 F. Supp. 3d 686, 688 (E.D. Tex. 2014) (quoting Justin C. Roberts & Randell C. Roberts, *Can Immune Parties Really Be Responsible?: An Analysis of the Current Interpretation of the Texas Responsible Third Party Statute and Its Vulnerability to Constitutional Challenge*, 43 St. Mary's L.J. 559 (2012)). This system promotes recovery for plaintiffs to a lesser degree than traditional joint and several liability because it places a greater burden on the plaintiff to demonstrate that any defendant should be held jointly and severally liable for the full amount of damages. Tex. Civ. Prac. & Rem. Code Ann. §§ 33.013(a), (b)(1). A plaintiff must prove that a defendant was more than 50% responsible for joint and several liability to attach. *Id.* Texas' system is defendant-protecting in the sense that it was designed to shield defendants that are not greater than 50% responsible for the harm from joint and several liability; defendants in this category are not burdened with responsibility for the full amount of a plaintiff's damages or for the litigation and default risks attendant to pursuing other entities for their fair share of the loss-those risks stay with the plaintiff that fails to meet the 50%

responsibility threshold as to any defendant. *See Bay Rock*, 298 S.W.3d at 232-33. Texas does not, however, protect a defendant that is found to be 51% responsible from the burdens of joint and several liability as defendants in this category remain responsible for the full amount of the plaintiff's losses and such defendants must assume the litigation and default risks associated with pursuing joint tortfeasors for their share. *See id.* (rejecting a 51% defendant's argument that it was unfair for it to be jointly and severally liable for the additional 49% damages attributed to responsible third party that was immune from suit). Overall, Texas operates a generally "defendant-protecting" scheme pursuant to which a defendant has an opportunity to avoid joint and several liability by having the jury apportion damages between the parties in the case, settling persons and any appropriately designated responsible third parties. Tex. Civ. Prac. & Rem. Code Ann. § 33.004. This system would be generally impaired if Texas-domiciliary KBR is not permitted to utilize it here.

From this analysis, the Court concludes that there are competing governmental interests between the laws of Pennsylvania and Texas which would be impaired if their respective laws were not applied in this case, presenting a "true conflict" between the laws of these jurisdictions. *Cipolla*, 267 A.2d at 856. The next step in the Court's assessment is to determine which of the jurisdictions has a "greater interest" in the application of its laws by weighing each state's contacts on a qualitative scale in relation to the policies and interests underlying the particular issue. *Id.*

Turning first to the parties' contacts, the main case-specific contacts for both of the parties are their respective domiciles in Pennsylvania and Texas. To reiterate those contacts, SSG Maseth was domiciled in Pennsylvania as he enlisted and later reenlisted in the Army as a

Pennsylvania resident. (Pl. Exs. A; B; D). The beneficiaries of SSG Maseth's estate, his parents, reside in the Commonwealth. (Docket No. 209). Pennsylvania is also the forum state. Plaintiffs have no connection to Texas; SSG Maseth never served there as he was assigned to bases in Iraq; North Carolina; Georgia; Louisiana; and Kentucky/Tennessee. (Pl. Exs. A; D). SSG Maseth owned and lived in a home in Tennessee for four and one half months and later rented it out for around two and half months. (*Id.*). The property was sold by his parents after his death to satisfy his main creditor, i.e., the mortgage loan holder. (*Id.*). His estate is being administered in Tennessee but the facts before the Court suggest that the estate remains open only because of the claims that Plaintiffs are pursuing against KBR in this case.

As to KBR, it is domiciled in Texas as its headquarters is located in Houston, from which it directs all of its operations. *See* § V.A.2, *supra*. KBR is incorporated in Delaware and registered to do business in Pennsylvania but the operations that it conducts in these jurisdictions are unrelated to the G&I business activities that are relevant to this case. (Docket Nos. 324-1 at ¶¶ 6, 9, 13; Pl. Ex. G). KBR's G&I division conducts operations out of KBR's Arlington, Virginia office from which the LogCAP III and CENTCOM contracts were generated. (Docket Nos. 337-1 at 9; 266 at 4; KBR-M-00001). KBR also had a separate Iraq headquarters at the Victory Base Complex in Baghdad where its day-to-day operations and maintenance activities were guided by its personnel on the ground in Iraq. (Docket No. 267-1 at 7). But, Houston remains the "nerve center" of KBR's case-related business activities. *See Hertz*, 559 U.S. at 92-93.

After undertaking this qualitative evaluation of the parties' contacts and governmental interests, it is this Court's opinion that Pennsylvania has the greater interest in the application of

its laws. Pennsylvania has the more relevant and significant contacts to the present case. Pennsylvania also has a stronger interest in the application of its joint and several liability system which does not permit the apportionment of fault to non-parties and promotes full recovery for plaintiffs harmed by tortfeasors in wrongful death and survival actions. *See e.g., Andaloro*, 799 A.2d at 81; *Lebegern*, 471 F.3d at 431. Texas' governmental interests are diminished by the facts that: KBR's government contracts were entered into out of its offices in Virginia; its G&I Middle East G&I operations were based in Virginia; and at all times relevant to this case it was providing operations and maintenance services under those government contracts in Iraq.

Beyond these diminished contacts, however, it remains that Texas has not completely eliminated joint and several liability for all classes of defendants. Tex. Civ. Prac. & Rem. Code Ann. § 33.013(a), (b)(1). As is explained above, one defendant can still be held jointly and severally liable under Texas' apportionment regime and Texas does not shield this majority (more than 50% responsible) defendant from the consequences of joint and several liability.[19] *Id.*. Embedded in Texas' policies, therefore, is the principle that the plaintiff's rights to full recovery outweigh the majority (more than 50% responsible) defendant's rights to be protected from joint and several liability and the resulting consequences. *See Bay Rock*, 298 S.W.3d at 222-23. In particular, Texas courts have recognized that the legislative policies of Texas are

---

[19]    As an illustration of these points, if Texas law were applied, a verdict form presented to jurors in this case could look like this:

What percentage of negligence that caused the harm to SSG Maseth was attributable to the following:

a) SSG Maseth                                          _____
b) KBR                                                        _____
c) WGI/URS (settling party)                     _____
d) the United States (responsible 3d party)    _____

The total of a) through d) must equal 100%.

*See generally Bay Rock*, 298 S.W.3d at 220.

furthered when a defendant in this category is held responsible for the remaining liability and damages that a jury attributed to a responsible third party, even when the responsible third party is immune from suit and the jury apportioned it 49% of the harm. *Id.* Again, Texas promotes its policy of balance by providing defendants an opportunity to <u>avoid</u> joint and several liability by adding non-parties to the jury form and asking the jury to apportion fault to those persons which may or may not result in the defendant being in the class of defendants protected from joint and several liability. *See Coachmen Ind.*, 2008 WL 2787310, at *2. Given same, the Texas policies seeking balance between the claimant and joint tortfeasors only truly assist a marginal defendant that is liable for less than 50% of the harm. But, even under Texas law, Plaintiffs would still generally have an opportunity to prove to the jury that KBR should be held jointly and severally responsible for the harm it allegedly caused to SSG Maseth. Tex. Civ. Prac. & Rem. Code Ann. § 33.013(a), (b)(1). If Plaintiffs were unable to prove that KBR was more than 50% responsible, Plaintiffs would remain able to recover damages against KBR in an amount limited to the percentage of fault attributed to KBR by the jury. *Id.*

The Court next looks to the application of these laws to the instant case as it has been framed by the Court of Appeals in its decision. This Court has been directed to not permit Plaintiffs' claims for compensatory damages to go to the jury under Texas law because asking the jury to apportion any percentage of fault to the United States as a responsible third party would require the jury to evaluate unreviewable military decisions and thereby render such claims nonjusticiable. *Harris*, 724 F.3d at 473, 482. In that situation, the jury will not even be able to evaluate whether KBR is a majority (more than 50%) defendant or a marginal (50% or less) defendant. *Id.* KBR would be shielded from all liability due to the United States' presence

on the jury form rather than spared only from a percentage of liability and damages if it were determined to be a marginal (50% or less) defendant or not protected at all from joint and several liability if it were a majority (more than 50%) defendant.   Hence, Texas' policy of balance would be impaired only to the extent that KBR would not have the opportunity to try to avoid joint and several liability through those procedures but the balance between the parties that Texas law seeks to effectuate would be upset if Texas' laws are applied here because Plaintiffs would not have the opportunity to pursue claims for compensatory damages against KBR and prove that it should be held jointly and severally liable.   On the other hand, the policies underlying Pennsylvania law favoring the full recovery of plaintiffs that are harmed by tortfeasors would be fully promoted if its law is used.

KBR is also not without trial defenses if Pennsylvania law is applied.   The Court of Appeals reasoned that the case would not be rendered nonjusticiable by KBR's presentation of an "empty chair" defense at trial, pointing to the potential responsibility of other actors, including the United States and presumably, WGI/URS, and arguing that KBR's activities were not a proximate cause of the harm to SSG Maseth. *See Harris*, 724 F.3d at 470-75.   Likewise, the Court of Appeals held that KBR's contributory negligence defense, arguing that SSG Maseth's own negligence was the proximate cause of his death, should be permitted. *Id.* at 475-77.   These defenses may be presented to the jury as long as it is not tasked with making a formal finding of responsibility by the United States because the same would run afoul of the political question doctrine precluding the evaluation of unreviewable military orders. *Id.*

After taking into consideration all of the above, this Court's qualitative evaluation of the instant matter results in its conclusion that Pennsylvania law shall be applied to the contested

liability and apportionment issues. The Court's decision gains further support when evaluating the other relevant factors under § 6 of the Restatement (Second) of Conflict of Laws. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 (1971). It appears that the factors under § 6(a), (b), (c), (e), (f) and (g) require little additional evaluation by the Court. To this end, as to § 6(a), the "needs of the interstate and international systems" are met if Pennsylvania law is applied because revised CPA Order 17 governing claims against contractors such as KBR provided that the laws of the United States should be used as has occurred here. (Docket No. 218-2 at § 18). With respect to § 6(b), (c), and (e), the Court has evaluated the relevant policies of the forum, the policies of other interested states and the basic policies underlying the particular field of law, prior to reaching its decision, as is more fully articulated above. *See* § V.B., *supra*. The factors under § 6(f) and (g) promoting "certainty, predictability and uniformity of result" and the "ease in the determination and application of the law to be applied" have little bearing on this dispute as all interstate torts are possibly subject to the laws of multiple jurisdictions requiring the type of evaluation that the parties and the Court have undertaken here.

The factor regarding the protection of justified expectations set forth in § 6(d) requires some further discussion. It is true that Plaintiffs would not have any real expectations of what law would apply to a claim against a government contractor arising out of their son's death in Iraq as his death was accidental. *See id.* at cmt. g. ("There are occasions, particularly in the area of negligence, when the parties act without giving thought to the legal consequences of their conduct or to the law that may be applied. In such situations, the parties have no justified expectations to protect, and this factor can play no part in the decision of a choice-of-law question."). Conversely, KBR is a sophisticated government contractor that reported to its

shareholders an expectation that it would be sued by soldiers that it may injure during the course of its overseas G&I operations, and could not have reasonably expected that all claims against it arising from its Iraq-based operations would be governed by favorable Texas laws. (Docket No. 337-1 at 90). Rather, KBR was familiar with revised CPA Order 17, potentially subjecting it to defend claims brought against it under the laws of any of the States in the Union and, as the Court previously held, KBR did not rely upon Iraq's law when entering into its contracts with the United States. (Docket No. 218-2 at § 18). Moreover, those contractual agreements make no reference to determining which law is to be applied in the likely event of such a claim by a soldier or that KBR was relying upon Texas' proportional liability scheme when it entered into same. *See* Docket No. 266 at 4; *see also* KBR-M-00001. It also appears to this Court that KBR should not be surprised at the potential application of joint and several liability because it entered into contracts with the Government out of its Virginia office, a jurisdiction that maintains a joint and several liability system, *see Sullivan v. Robertson Drug Co., Inc.*, 639 S.E.2d 250, 92 (Va. 2007),[20] and, as is fully explained above, Texas law authorizes joint and several liability against one defendant.

The Court also generally accepts that Plaintiffs would likely understand that they could not pursue the United States for a negligence claim and that KBR would not be able to join the United States to this lawsuit and pursue contribution from the government. *See Feres v. United*

---

[20]    The Supreme Court of Virginia has recounted that:

> [i]f separate and independent acts of negligence of two parties directly cause a single indivisible injury to a third person, either or both wrongdoers are responsible for the whole injury. Thus, in determining the liability of a person whose concurrent negligence results in such an injury, comparative degrees of negligence shall not be considered and both wrongdoers are equally liable irrespective whether one may have contributed in a greater degree to the injury.

*Sullivan*, 639 S.E.2d at 255 (internal citations omitted).

*States*, 340 U.S. 135, 146 (1950) (United States immune from soldier's claim against United States military for injuries incident to service). Yet, as KBR has argued to the Supreme Court of the United States, it may have an indemnification claim against the United States under its contracts. *See* n.6, *infra*. If KBR does not have a viable indemnification claim, it could have (or perhaps did) attempt to include such a clause in the relevant contracts during its negotiations with the United States. *See Appeals of -- Kellogg Brown & Root Servs., Inc.*, ASBCA No. 59357, 2015 WL 5076058 (Aug. 13, 2015) (granting motion for summary judgment in KBR's favor on indemnity agreement under LogCAP III, Task Order 003). In either event, the potential for indemnification as between KBR and the United States undermines KBR's position to the extent that it suggests that it would be overburdened by the application of Pennsylvania's joint and several liability system requiring it to possibly compensate Plaintiffs for a percentage of harm it believes was caused by the United States, an immune, non-party. Individual soldiers volunteering for military service such as SSG Maseth clearly lack an opportunity to negotiate for such concessions or protections from the United States. *See Feres*, 340 U.S. at 146. As such, it stands to reason that it should be KBR that bears the risks attendant to the application of joint and several liability in this case.

To conclude, after careful consideration of all of the parties' arguments in light of the relevant evidence of record, the Court resolves the true conflict between the laws of Pennsylvania and Texas and finds that Pennsylvania has the greater interest in the application of its laws to this case.

## VI. CONCLUSION

Based on the foregoing, KBR's Motion for Application of the Texas Proportional

Liability Scheme [319] is denied. The Pennsylvania laws of joint and several liability that were in effect as of January 2, 2008 and do not permit the assessment of fault to non-parties by the jury will be applied to the apportionment and liability issues in this case. An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Court

Date:   December 16, 2015

cc/ecf: All counsel of record